# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

_____

**TIMOTHY BOWMAN**; and,
**BOWMAN'S GUN SHOP, LLC**

        *Plaintiffs*

   *v.*

**LETITIA JAMES**, both individually and
in her official capacity;
**STEVEN JAMES**,
both individually and in his official capacity;
**OFFICE OF THE NEW YORK ATTORNEY GENERAL**; and,
**DIVISION OF NEW YORK STATE POLICE**

        *Defendants.*

_____

**COMPLAINT**

Civil Case No. 8:25-cv-1387 (AJB/DJS)


## TIMOTHY BOWMAN AND BOWMAN'S GUN SHOP, LLC
## ORIGINAL COMPLAINT AND TRIAL DEMAND


    **COME NOW** Plaintiffs Timothy Bowman and Bowman's Gun Shop, LLC ("Plaintiffs"),

by and through the undersigned counsel, to allege as follows:


## I.

## PARTIES – STANDING AND JURISDICTION

## A. PLAINTIFFS

1. Tim Bowman is an "ordinary, law-abiding adult citizen," as this term has come to mean through

decisions of the United States Supreme Court in *Heller*[1], *McDonald*[2], and *Bruen*[3].

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 575 (2008).

[2] *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

[3] *N.Y.S. Rifle & Pistol Assn, Inc. v. Bruen*, 597 U.S. 1, 31 and 15-16 (2022).

2. Mr. Bowman is a U.S. citizen and resident.

3. Mr. Bowman is a New York citizen and resident.

4. Mr. Bowman was born and raised, and continues to reside in St. Lawrence County, New York. He is over the age of 21-years.

5. Mr. Bowman grew up on a dairy farm in Richville, about 20-miles north of the 6-million acre Adirondack Park, where his family taught him about firearms, hunting, and conservation. Mr. Bowman learned how to handle firearms responsibly from a young age.

6. Mr. Bowman obtained his first hunting license in or about 1980 through the NYS Department of Environmental Conservation ("NYS DEC"). He has engaged in state-licensed hunting, annually or near annually, in his local region ever since, including for purposes of feeding his family, sportsmanship, and game conservation.

7. Mr. Bowman's father was a hunter before him, and Mr. Bowman's son is a hunter after him.

8. Mr. Bowman achieved his "New York State" concealed carry license in 1985. The license is processed, issued, and administered by St. Lawrence County (his county of residence). He has continuously recertified[4] his concealed carry license, and maintained its roster of relevant firearms both timely and accurately.

9. Since in or about 1980, Mr. Bowman has regularly undergone and successfully passed background checks for all individual state licenses referenced herein, as well as for all related firearms and ammunition purchases, as such requirements have evolved over the years.

---

[4] NY PEN §400.00(2), Types of licenses [defined]. The individual concealed carry license must be recertified every three years. NY PEN §400.00(10)(b). An investigation with background check is conducted of individuals upon the initial license application and upon recertification(s). NY PEN §400.00(4).

His individual license is in good standing, and he is eligible for annual hunting licenses, including for the 2025-2026 hunting season.

10. Mr. Bowman is a Veteran of the U.S. Army Reserves, having served his country from 1981 to 2006, or, approximately twenty-five years. During Operation Iraqi Freedom, he was deployed as a replacement medic through the Mississippi Army National Guard, 150th Engineer Battalion of the 155th Armored Brigade Combat Team. He was honorably discharged from service. Mr. Bowman also underwent background check(s) for the U.S. Army Reserves.

11. For more than twenty-five years, Mr. Bowman was a volunteer firefighter and an emergency medical technician through the Richville Fire Department and the Gouverneur Rescue Squad. Mr. Bowman started the first responder program in Richville.

12. Mr. Bowman is retired from employment as a NYS Department of Corrections Officer from 2000 to 2018. He served at several Class A, maximum-security prisons for male inmates, and, lastly, at the Gouverneur Correctional Facility, a medium security level facility for males. Mr. Bowman had to undergo background checks for this employment.

13. Over more than forty years of handling a wide range of firearms for personal, military, and professional use, Mr. Bowman has learned how to correctly and legally use, maintain, and store various types of firearms and ammunition.

14. Mr. Bowman is the sole owner of a business, named as "Bowman's Gun Shop, LLC." (Herein, "Bowman's Gun Shop."[5]) It is a single-member Limited Liability Corporation ("LLC") organized in New York. Mr. Bowman is its President.

---

[5] There is no discernable need herein to distinguish between "Bowman's Gun Shop, LLC" and the predecessor "d/b/a Bowman's Gun Shop," such that none is made. Use of "Bowman's Gun Shop" is intended to refer to the business, in either or both forms.

15. Mr. Bowman's business was initially formed in St. Lawrence County in 2014 as a sole proprietorship, doing business as "Bowman's Gun Shop."

16. The current "business premises[6] of Bowman's Gun Shop is 337 County Route 11, Gouverneur, St. Lawrence County, New York 13642.

17. The business premises is a stand-alone retail shop. It is a physical building of approximately 900 sq. ft., as separated by a driveway from the residence of the Bowman family.

18. Bowman's Gun Shop, LLC is registered with the NY Department of State, Division of Corporations. It is in active status.

19. Mr. Bowman, through Bowman's Gun Shop, engages in and intends to continue to engage in the business of interstate commerce in firearms on a full-time basis. To be "engaged in the business of" is defined by 18 U.S.C. §921(a)(21)(C) as a "regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." To do so as part of the lawful stream of "interstate commerce" in firearms is to do so at "any place in a State and any place outside of that State, or within any possession of the United States or the District of Columbia." [7]

20. Bowman's Gun Shop, LLC is a <u>federally-licensed</u> "Dealer in Firearms Other Than Explosive Devices,"[8] in accordance with 18 U.S.C. §921, *et seq*., as processed, issued, and administered

---

[6] The term "business premises," as used herein, is defined at 27 CFR §478.11, "The property on which the manufacturing or importing of firearms or ammunition or the dealing in firearms is or will be conducted."

[7] 18 U.S.C. §921(a)(2), the term "state" including the District of Columbia, the Commonwealth of Puerto Rico, and U.S. territories of American Samoa, Guam, the Northern Marianas Islands, and the U.S. Virgin Islands.

[8] The term "dealer in firearms," as used herein, is defined under federal law at 18 U.S.C. §921(a)(11)(A), meaning "any person engaged in the business of selling firearms at wholesale or retail." Also, 27 CFR §478.11. Under 18 U.S.C. §923(a), no person shall "engage in the business

by the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE" or "ATF").[9] (Herein, "Dealer in Firearms," "FFL," "FFL-01," and "FFL Type-01.")

21. Since 2013, Mr. Bowman's business has been a federally-licensed "Dealer in Firearms." His federal license was most recently renewed as of June 2025, and is valid through June 1, 2028. The license has been and is in good-standing.

22. Mr. Bowman/Bowman's Gun Shop is and has continuously been authorized since inception by the United States ("federal") government through BATFE "to engage in the business"[10] of the "acquisition and disposition"[11] of "firearms"[12] in the lawful stream of interstate commerce.

---

of…dealing in firearms…until he has filed an application with and received a license to do so from the [U.S.] Attorney General." There is no federal license or background check for the sale of ammunition.

[9] The FFL license is achieved in accordance with 18 U.S.C. §923, meaning, in general: having completed and submitted ATF Form 7 with photographs and fingerprints; being over the age of twenty-one years; not being a disqualified or prohibited persons under 18 U.S.C. §922(g); having a physical premises where business is conducted; and, having made any additional certifications required thereunder. FFLs Type-01, including Plaintiff, are required to renew the federal license every three years, including ATF Form 8. 27 CFR §478.49 and §478.45. A background check is conducted of the FFL-01, including Plaintiff, upon each license application or renewal submission. 27 CFR §478.47. See, also, for more detailed regulations 27 CFR §478.41, *et seq.*

[10] The term "to engage in the business" is defined at 27 CFR §478.13.

[11] The terms "acquisition" and "disposition" refer to FFLs and relates to the details of what, when, and how a firearm enters and leaves the inventory of the business with an FFL, including the record referred to in industry-speak as the "Book of Acquisitions & Dispositions," the "A&D Book," or "the bound book." 18 U.S.C. §923(g)(1)(A); 27 CFR §§478.122, 478.123, and 478.125.

[12] The term "firearm," as used herein, is as defined under 18 U.S.C. §921(a)(3)(A)-(B) and 27 CFR §478.11, meaning "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon." "Firearm" is intended to include "Shotgun" as defined under 18 U.S.C. §921(a)(5) and 27 CFR §478.11; "Rifle" as defined under 18 U.S.C. §921(a)(7) and 27 CFR §478.11; and, "Handgun" as defined under 18 U.S.C. §921(a)(30) and 27 CFR §478.11. The term "long guns," if used herein, is a colloquial reference to "shotguns" and "rifles," exclusively of "handguns."

23. Mr. Bowman is and has continuously been the ATF "Responsible Person"[13] for Bowman's Gun Shop on the ATF FFL license.

24. Mr. Bowman is authorized by the United States government through his ATF-issued license, in conjunction with the New York State government under the Division of NYS Police through the local County Clerk's Office, Sheriff's Department, and County Court (herein, in the shorthand of "County Clerk")[14], to engage in the business of the acquisition and disposition of firearms, including handguns,[15] in the lawful stream of interstate commerce and to perform services as a gunsmith.

25. Mr. Bowman operates Bowman's Gun Shop in accordance with federal firearms compliance laws, arising out of the Gun Control Act (1968),[16] the Firearm Owners Protection Act (1986),[17] the Brady Act (1994),[18] the Bipartisan Safer Communities Act (2022),[19] and associated ATF

---

[13] The term "Responsible Person" is defined by BATFE on Form 7, "Definitions" (p. 6) as "In addition to a Sole Proprietor, a Responsible Person is, in the case of a Corporation, Partnership, or Association, any individual possessing, directly or indirectly, the power to direct or cause the direction of management, policies, and practices of the Corporation, Partnership, or Association, insofar as they pertain to firearms."

[14] Federal law requires that if an FFL has a business premises situated in a state that requires a state dealer license, then the federal licensee must maintain a state license. 18 U.S.C. §923(d)(1)(F); see, also, ATF Form 7 (original appl.); and ATF Form 8 (renewal).

[15] "Firearms" as a matter of federal law differs from state law. At federal law, "firearms" is an inclusive term which includes, *inter alia*, rifles, shotguns, and handguns. 27 CFR §478.11. At federal law, each of the subsets of "rifles," "shotguns," and "handguns" are uniquely defined. New York uses the word "firearm" to mean what at federal law means a "handgun." Within any documents composed by Counsel to the Plaintiffs, it is federal terminology that is used throughout, unless otherwise specified.

[16] Gun Control Act of 1968, Pub. L. No. 90-618 (October 22, 1968), 82 Stat. 1213-1222, 18 U.S.C. Ch. 44 §§921, *et seq.*

[17] Firearm Owners' Protection Act ("FOPA"), Pub. L. 99-308 (Apr. 10, 1986), 18 U.S.C. §921, *et seq.*

[18] Brady Handgun Violence Prevention Act ("the Brady Act"), Pub. L. 103-159 (Nov. 30, 1993), 18 U.S.C. §§921-922, §925A.

[19] Bipartisan Safer Communities Act, Pub. L. 117-159 (June 25, 2022), 136 Stat. 1313, *inter alia*, 18 U.S.C. §§932-934.

regulations, guidance documents, and rulings. These laws uniformly blanket FFLs operating in interstate and/or foreign commerce. It is a uniform set of mandates governing those individuals, partnerships, and corporations with an FFL.

26. Mr. Bowman, through Bowman's Gun Shop has a <u>state license</u>[20] as a "Dealer in Firearms"[21,22] that is processed, issued, and administered by the St. Lawrence County Clerk's Office, St. Lawrence County Sheriff's Department, and the St. Lawrence County Court.[23,24]

27. Since 2015, Bowman's Gun Shop has been licensed by and through St. Lawrence County as a "Dealer in Firearms" and a "Gunsmith." The current license was renewed in July 2024 and is good until January 1, 2028. The license is current and in good standing.

---

[20] *N.B.*: a federally-licensed dealer in firearms of Type-01 with a business premises and operating in New York is not required to obtain a state license as a "Dealer in Firearms," unless the FFL-01 is engaged in the business of acquiring and disposing of firearms delineated at NY PEN §265.00(9), including handguns. The FFL-01 may acquire and dispose of rifles and shotguns in the lawful stream of inter-state commerce through a New York business premises on the FFL-01 license, alone, excepting firearms listed at NY PEN §265.00(9), such as handguns.

[21] The definition at state law of a "dealer in firearms" is found at NY PEN §265.00(9), being "any person, firm, partnership, corporation or company who engages in the business of purchasing, selling, keeping for sale, loaning, leasing, or in any manner disposing of, any assault weapon, large capacity ammunition feeding device, pistol, revolver, or semiautomatic rifle."

[22] In New York, the state dealer in firearms license includes the ability to sell ammunition and to engage in the customer background check system for potential sales of ammunition.

[23] NY Pen §400.00(1-a) states license application requirements. See, the uniform NYSP PPB-6, the dealer and gunsmith license application. County officials handle the NYSP application form intake, the processing, the physical license issuance, and the repeat of all steps upon renewal. NY Pen §400.00(3), (5). A state dealer license can issue to a person, firm, partnership, or corporation. *Id*.

[24] The individual Counties of New York can and do create the administrative processes for the "Dealer in Firearms" licenses and the "Gunsmith" licenses under home rule. There is no statewide physical license format issued or administered by the NY State Police. The physical, paper license issued by each county differs in appearance.

28. At or about the time Bowman's Gun Shop renews its St. Lawrence County "Dealer in Firearms/Gunsmith," an Officer of the NYS Police contacts Mr. Bowman to ask various questions and may also do a site visit.[25]

29. Mr. Bowman has and intends to maintain in good standing with all of his licenses relating to the ownership, use, and possession of firearms, both federal and state, whether personal or business, and including the ability to lawfully engage in Second Amendment core function and related activity, such as self-defense of his self, his family, and his community; hunting as a means of providing for himself, his family, and shared NY DEC conservation objectives; engaging in the business of firearms in the lawful stream of interstate commerce, including to help other law-abiding citizens in his community and broader customer base to exercise their Second Amendment rights as guaranteed to them through the Fourteenth Amendment in New York, and as is supported by NY Civil Rights Law, art. 2, §4; and such other, further, and different lawful purposes for the ownership, use, and possession of firearms, referenced herein.

30. Mr. Bowman has and intends to continue to work and to operate his business in the field of his chosen licensed profession as a federally-licensed ATF FFL-01, along with the New York state licenses as a "Dealer in Firearms" and as a "Gunsmith."

31. Mr. Bowman has and intends to continue to continuously own, possess, acquire, dispose, and use his personal firearms and ammunition[26] for lawful purposes and in the lawful stream of interstate commerce.

---

[25] These county-specific NYS Police drop-bys are not required or authorized by state law, and the same is not a uniform part of the "state" licensing process as carried out by the counties.

[26] Herein, for brevity, read "firearms" as encompassing firearms and ammunition where implied.

32. Mr. Bowman has and intends to continue to use firearms and ammunition in an on-going, daily basis, including for core Second Amendment purposes, such as self-defense, conducting operations as a state and federally-licensed dealer in firearms on behalf of customers seeking to lawfully exercise their Second and Fourteenth Amendment rights, as well.

33. Mr. Bowman has lived, worked, and contributed to his home community throughout his life, and has demonstrated through decades of hard work and service that he is committed to the safety and well-being of himself, his family, his community, his state, and this country.

## B. DEFENDANT – ATTORNEY GENERAL OF THE STATE OF NEW YORK

34. Defendant <u>Letitia James</u> is the Attorney General of the State of New York, and at all times relevant to this Complaint, was acting under color of state law. Her principal place of business is 28 Liberty Street, Albany, New York 10005. James is sued in her individual and official capacities.

35. All "Assistant Attorney General" and "Special Counsel" who work for the Office of the NY Attorney General are under the direction and ultimate state ethical code responsibility of NY Attorney General Letitia James.

36. Letitia James is an attorney licensed by the State of New York, and she has been so licensed at all times herein.

37. Letitia James does not, nor did she, hold federal office at any time referenced herein, including that she neither was nor is she the United States Attorney General; and, neither was nor is she employed by the U.S. Department of Justice, the Federal Bureau of Investigation, or the U.S. Bureau of Alcohol, Tobacco, Firearms & Explosives.

38. The New York State Attorney General ("NYS AG") is not a position of what is referred to as "common law authority" or "general authority."

39. "It is well settled that the [New York] Attorney General lacks general prosecutorial authority and has the power to prosecute only where specifically permitted by statute." *People v. Wassell*, 2019 NY Slip Op 03187[U] (4th Dep't., April 26, 2019).

40. For the NY Attorney General to become involved to prosecute a NY GBL §875 case, the NYS Police Superintendent would have to send a written request to her. NY EXE §63(3); *People v. Gilmour*, 98 N.Y.2d 126, 133 (2022). Criminal matters are otherwise under the jurisdiction of a county district attorney. NY CNT §700.

41. In spite of what may be limitations of the authority of the NY Attorney General under NY EXE §63(3) and §63(12), NY GBL §875, NY GBL §898-b, and NY PEN §§265.00 and 400.00, at all times herein, the NY Attorney General Letitia James presented herself as, and believed herself to be, acting under color of state law.

### 1. The Lack of Statutory Authority of the NY Attorney General over Plaintiffs under NY Executive Law §63(3).

42. One state statute that can function to confer authority to the NYS AG is NY Executive Law §63(3). It is the burden of the NY Attorney General to establish that authority prior to taking any action against any person or business, such as the Plaintiffs.

43. Specifically, under NY EXE §63(3), the "authority" of the NYS AG may trigger "[u]pon request of … the head of any … department, authority, division, or agency of the state."

44. Among those in state office with the discretion to extend authority to the NY Attorney General on a case-by-case basis under NY EXE §63(3) is the Superintendent of the Division of NYS Police.

45. No request was made at any time herein by the Superintendent of the Division of NYS Police under NY EXE §63(3) to the NY Attorney General concerning Mr. Timothy Bowman or Bowman's Gun Shop.

46. Defendant NY Attorney General Letitia James did not have authority under NY EXE §63(3) over Mr. Timothy Bowman or Bowman's Gun Shop at any time herein, either to "investigate" or to prosecute.

## 2. The Lack of Statutory Authority of the NY Attorney General over Plaintiffs under NY Executive Law §63(12).

47. Another state statute that can function to confer authority to the NYS AG is NY Executive Law §63(12). It is the burden of the NY Attorney General to establish that authority prior to taking any action against any person or business, such as the Plaintiffs.

48. Specifically, under NY EXE §63(12), the "authority" of the NYS Attorney General may trigger if a person engages in "repeated fraudulent or illegal acts or otherwise demonstrate[s] persistent fraud or illegality in the carrying on, conducting or transaction of business," in which event the NY Attorney General may apply to the NYS Supreme Court through a specified process.

49. Under NY EXE §63(12), the NY Attorney General would have to allege a carrying on of any "illegal act or conduct" under NY GBL §875, in the case of Plaintiffs, to try to make her case that she could apply to the NYS Supreme Court for relief.

50. To make that leap, the NY Attorney General would have to allege, under NY GBL §875, that the NYSP had found Mr. Bowman "knowingly" violated NY GBL §875 and in an on-going manner, which she knew she could not allege when she published the "Press Release" of July 18, 2025, as detailed herein.

51. Defendant NY Attorney General Letitia James did not have authority under NY EXE §63(12) over Mr. Timothy Bowman or Bowman's Gun Shop at any time herein, to make out a *prima facie* application to the NYS Supreme Court.

### 3. The Lack of Statutory Authority of the NY Attorney General over Plaintiffs under NY General Business Law, art. 39-BB.

52. In 2022, the NYS Legislature passed and on June 6, 2022 the NY Governor signed into law NY S.4970-A (2021-2022 Regular Session), which contained, *inter alia* NY General Business Law, art. 39-BB. (Herein, the "new laws" and the "2022 new laws.")

53. No amendments have been made to NY GBL, art. 39-BB, including NY GBL §875 since it was signed into law.

54. The NY Attorney General has no direct, express, statutory authority under NY PEN, art. 39-BB.

55. NY GBL, art. 39-BB, as passed by the NYS Legislature, did not grant or confer any authority to the NY Attorney General over "dealers in firearms." The scope of NY GBL, art. 39-BB is "dealers in firearms," defined at NY GBL §875-a(1) as "…a gunsmith or dealer in firearms licensed pursuant to section 400.00 of the penal law."

56. Under NY GBL, art. 39-BB, the statute at NY GBL §875-i is the penalty provision.

57. No request was made at any time herein by the Superintendent of the Division of NYS Police under NY EXE §63(3) to the NY Attorney General concerning Mr. Timothy Bowman or Bowman's Gun Shop for violation of NY GBL, art. 39-BB.

58. Defendant NY Attorney General Letitia James did not and does not have authority under NY GBL, art. 39-BB over Mr. Timothy Bowman or Bowman's Gun Shop at any time herein.

### 4. The Lack of Statutory Authority of the NY Attorney General over Plaintiffs under NY Penal Law §400.00.

59. NY Penal Law §400.00, which, *inter alia*, concerns licensing of "dealers in firearms" and "gunsmiths" does not contain reference to the New York Attorney General.

60. The NY Attorney General has no direct, express, statutory authority under NY PEN §400.00.[27]

61. Defendant NY Attorney General Letitia James did not and does not have authority under NY PEN §400.00 over Mr. Timothy Bowman or Bowman's Gun Shop at any time herein.

### 5. The Lack of Statutory Authority of the New York Attorney General over Plaintiffs under NY Penal Law, art. 265.

62. NY Penal Law, art. 265, Firearms and other dangerous weapons, concerns, *inter alia*, the legality (or not) of a host of firearms and dealer in firearm requirements for transactions involving firearms. It does not contain reference to the New York Attorney General.

63. The NY Attorney General has no direct, express, statutory authority under NY PEN, art. 265.

64. No request was made at any time herein by the Superintendent of the Division of NYS Police under NY EXE §63(3) to the NY Attorney General concerning Mr. Timothy Bowman or Bowman's Gun Shop for violation of NY GBL, art. 265.

65. Defendant NY Attorney General Letitia James did not and does not have authority under NY PEN, art. 265 over Mr. Timothy Bowman or Bowman's Gun Shop at any time herein.

---

[27] NY PEN §400.00 reflects to the operational county-level systems carrying out the license processing, administration, and oversight, which occurs in a fashion akin to the county-level individual concealed carry permitting system. The term "official" as used in NY PEN §400.00 is not defined, but subdivision §400.00(4-a) references "the licensing officer" on a revocation appeal, e.g., which is the county; and, NY PEN §400.00(11)(c) directs the surrender of the license to the "appropriate licensing official" and such firearms to an appropriate law enforcement agency as per NY PEN §265.20(f), that being, generally, the Superintendent of the NYSP or local Sheriff, or their designees.

## C. DEFENDANT – OFFICE OF THE NY ATTORNEY GENERAL

66. All preceding paragraphs regarding authorization and jurisdiction are incorporated to this section by reference.

67. Defendant Office of the New York Attorney General, and the individual "Assistant Attorney[s] General" and "Special Counsel" named in this Complaint, was acting under color of state law. It has a primary office at 28 Liberty Street, Albany, New York 10005. The office employs approximately 700 attorneys and 1,700 staff members, including the following named attorneys **Martha Grieco**, **Molly Thomas-Jensen**, **Chantal Wentworth-Mullin**, **Deanna Nelson**, and **Susan Griskonis**. (Herein, "Assistant NY Attorneys General.") Grieco, Thomas-Jensen, Wentworth-Mullin, Nelson, and Griskonis are sued in their individual and official capacities.

68. Grieco, Thomas-Jensen, Wentworth-Mullin, Nelson, and Griskonis are attorneys who were licensed by the State of New York at all times, herein.

69. At all times herein, Grieco, Thomas-Jensen, Wentworth-Mullin, Nelson, and Griskonis were acting in or presenting themselves to Plaintiff(s) as acting in their official capacity as employed by the Office of and under the direction of the New York Attorney General.

70. In spite of what may be limitations of the authority of the Assistant NY Attorney General under NY EXE §63(3), NY GBL §875, and NY PEN §§265.00 and 400.00, at all times herein, they presented themselves as, and believed themselves to be, acting under color of state law.

## D. DEFENDANT – SUPERINTENDENT OF THE NEW YORK STATE POLICE

71. Defendant <u>Steven G. James</u> is the Superintendent of the New York State Police, and at all times relevant to the Complaint was acting under color of state law. His principal place of business

is 1220 Washington Avenue, Albany, New York 12226. Superintendent James is sued in his individual and official capacities.

72. The duties and powers of the superintendent of state police and members of the state police are set forth at NY EXE §223(1), including, as follows:

> "It shall be the duty of the superintendent of the state police and of members of the state police to prevent and detect crime and apprehend criminals."
>
> Further, "They shall have power to arrest, without a warrant, any person committing or attempting to commit within their presence or view a breach of the peace or other violation of law, to serve and execute warrants of arrest or search issued by proper authority and to exercise all other powers of police officers of the state of New York." *Ibid*.

73. The New York State Police ("NYSP" and "NYS Police," herein) presents itself to the public through its website as a group who "serves, protects and defends the people of New York, while preserving the rights and dignity of all."[28]

74. The NYSP also presents itself to the public through its website as those who "[work] to ensure the safety of the state's roadways, prevent and investigate crime, prepare for and respond to emergencies and disasters and provide support to other law enforcement agencies."[29]

75. On the very same day Defendant NY Attorney General Letitia James and her Assistant NY Attorneys General hit Plaintiffs with the "Press Release" central to this Complaint, a Mr. Beau Duffy, the executive director of public information for the NYS Police, articulated the current, official posture that:

---

[28] NYS Police website, "About," at https://troopers.ny.gov/about-new-york-state-police.

[29] *Ibid*.

> "…troopers have "<u>no regulatory authority and cannot impose penalties upon firearms dealers.</u>"  Instead, state police work with those dealers *to help bring them into compliance with the regulations*, Duffy said, and they do not generally work in conjunction with the ATF.  Asked whether ATF staffing cuts would affect how the state police monitor gun dealers, Duffy offered a terse, one-word response: "No." "[30] (emphasis added)

76. The NYSP have "no regulatory authority and cannot impose penalties upon firearms dealers" because of a fateful choice made by the NYS Police Superintendent in 2022.

### 1.    The Lack of Statutory Authority of the New York State Police under NY GBL, art. 39-BB, including *inter alia* §875-g.

77. In 2022, the NYS Legislature passed and the NY Governor signed into law NY S.4970-A, which contained, *inter alia*, NY General Business Law, art. 39-BB, "Preventing the Unlawful Sale of Firearms, Rifles, and Shotguns to Individuals with a Criminal Record."[31]

78. **<u>Exhibit A</u>**, hereto, is NY S.4970-A.  (Herein, "the 2022 new laws" or "the new laws.")

79. NY S.4970-A concluded with §5, which set the deadline for the promulgation of regulations by the Superintendent of the NYSP on or before the effective date of the new law, as follows:

> "§5. This act shall take effect on the one hundred eightieth day after it shall have become a law. Effective immediately, the addition, amendment and/or repeal of any rule or regulation necessary for the implementation of this act on its effective date are authorized to be made and completed on or before such effective date."

---

[30]  Hyman, Mel, "Consequences Will Be Lethal:  New York ATF Enforcement To Be Slashed Under Trump," *New York Focus* (July 18, 2025).

[31]  *N.B.*:  a "criminal record" is not the only factor nor type of factor that disqualifies an individual under federal law at 18 U.S.C. §922(g) from purchasing a firearm from a federally-licensed dealer in firearms.  The title of this NY bill is, itself, in legal error of the responsibilities and functions performed by FFLs, including the Plaintiffs.  Nor does the title accurately reflect its contents. There is no acronym or shorthand for such provisions.  For brevity, where available herein, it is referenced as NY GBL §875 to indicate comprehensively it and its subdivisions.

80. The Superintendent of the NYS Police chose not to accept and otherwise forfeited the invitation from the NYS Legislature to have a regulatory role in conjunction with state-licensed dealers in firearms under NY S.4970-A, including NY GBL §875.

81. NY S.4970-A at NY GBL §875-a(7) defines "Superintendent" to mean "…the superintendent of state police."

82. The Division of NYS Police issue regulations into the Official Compilation of Codes, Rules and Regulations ("NYCRR"), Title 9, sub. K.

83. The NYSP did not issue regulations concerning NY Gen Bus §875 to the NYCRR, Title 9, sub. K to accord to NYS S.4970-A.

84. NY S.4970-A was signed into law on June 6, 2022, making 180-days from that date to be December 5, 2022.[32]

85. The NYS Legislature offer of delegation of statutory authority in the form of regulatory authority under NY GBL, art. 39-BB, especially NY GBL §875-g, expired without the NYSP Superintendent electing to design and promulgate any such regulations.

86. In *Gazzola v. Hochul*, Counsel to the NYS Police admitted that the first attempt to publish any "regulations" under NY GBL §875-g was not until February 7, 2024. The admission was that the publication of an "Informational Notice" did not occur until approximately fourteen months after the effective date of the statute, and was not in accordance with §5 of the Bill. N.D.N.Y.

---

[32] Pursuant to NY Gen Constr §25-a, when "an act is authorized or required to be done" that would occur on a Saturday or Sunday may be done on the next succeeding business day. NY S.4970-A provided for day 180 as the effective date, which fell on Saturday, December 3, 2022. Plaintiffs thus use December 5, 2022 as the effective date binding them under the statutes and setting the deadline for Defendant performance of regulatory responsibilities.

case no. 1:22-cv-1134, ECF-133, ¶¶D-G (p. 3).[33]  An "Informational Notice" does not constitute published regulations.

87. The NYS Police did not publish regulations, specifically concerning NY GBL §875-g, whether timely or for the relevant times herein, as established in *Gazzola v. Hochul* through April 6, 2025, N.D.N.Y. case no. 1:22-cv-1134, ECF 133-1, ¶4, Affm. Capanna, P.

88. NY S.4970-A contained multiple legislative invitations to the NYSP Superintendent to perform enumerated regulatory actions.

89. Additional responsibilities of the Superintendent of the NYS Police concerning NY GBL §875 also were not met. *See*, *Gazzola v. Hochul*, N.D.N.Y. case no. 1:22-cv-1134, ECF 33-1.

90. The absence of regulations from the Superintendent of NYS Police under NY GBL §875-g was not the only such deficit of action by the Superintendent facing state-licensed dealers in firearms, including through multiple, additional statutory provisions under the complete package of ten bills passed and signed into law in 2022. *See*, *Gazzola v. Hochul*, N.D.N.Y. case no. 1:22-cv-1134, ECF 33-1.

91. The following are examples of the forfeited regulatory authority from NY GBL §875, relevant to this case.

92. The NYSP Superintendent did timely establish through regulation the "standards" for mandated **security alarm systems** in accordance with NY GBL §875-b(2), sent. 2 and 3, as follows:

> "Standards for such security alarm systems <u>shall be established by the superintendent in regulations</u>. Such security alarm systems may be developed by a federal or state agency, a not-for-profit organization, or another entity specializing in security alarm

---

[33]  See ECF-133 p. 1 (cover) for note as to unique numbering system for this document.

standards <u>approved by the superintendent for the purposes of this act</u>." (emphasis added)

93. The NYSP Superintendent did not timely promulgate regulations setting forth minimum requirements for maintaining **records of mandatory employee training** under NY GBL §875-e(3), sent. 2, as follows:

> "<u>The superintendent shall promulgate regulations</u> setting forth minimum requirements for the maintenance of records of such training." (emphasis added)

94. The NYSP Superintendent did not timely promulgate the form and period of retention for a **book of records** to be established and maintained under NY GBL §875-f, as follows:

> "Every dealer shall establish and maintain a book, or if the dealer should choose, an electronic-based record of purchase, sale, inventory, and other records at the dealer's place of business <u>in such form and for such period as the superintendent shall require</u>…" (emphasis added)

95. The NYSP Superintendent did not timely promulgate regulations of the form and content of an **annual dealer certification** under NY GBL §875-g(1)(b), sent. 2, as follows:

> "<u>The superintendent shall by regulation</u> determine the form and content of such annual certification."   (emphasis added)

96. The NYSP Superintendent did not timely promulgate regulations relating to **periodic premises inspections** under NY GBL §875-g(2)(a), as follows:

> "<u>The superintendent shall promulgate regulations</u> requiring periodic inspections of not less than one inspection of every dealer every three years, during regular and usual business hours, by the division of state police of the premises of every dealer to determine compliance by such dealer with the requirements of this article." (emphasis added)

97. The NYSP Superintendent did not timely promulgate any **additional** "rules and regulations" as he may have deemed "necessary" to prevent the diversion of firearms from the lawful stream of commerce under NY GBL §875-h, as follows:

> "<u>The superintendent may promulgate</u> such additional rules and regulations as the superintendent shall deem necessary to prevent firearms, rifles, and shotguns from being diverted from the legal stream of commerce." (emphasis added)

98. Nearly three years have passed since the deadline for the NYSP Superintendent to perform regulatory responsibilities in accordance with NY S.4970-A.

99. This highly unusual regulatory void created a significant gap in information and guidance for state-licensed dealers in firearms, generally,[34] and Plaintiffs, specifically.

100. Defendants, instead of formal regulations, launched a website page.

101. Beginning on or about December 6, 2022, the NYSP published a website page titled "Resources for Gun Dealers" (https://gunsafety.ny.gov/resources-gun-dealers), including also to the NYSP searchable document database at https://troopers.ny.gov/system/files/documents/2022/12/dealer-faq.pdf.[35]

102. In *Gazzola v. Hochul*, Counsel to the NYS Police did not contest that a website page does not constitute regulations. N.D.N.Y. case no. 1:22-cv-1131, ECF-133, ¶H.

---

[34] As of in or about May 2022 (the last full month prior to execution of the Bill S.4970-A), there were **1,791** Federal Firearms Licensees in New York of the Type-01 and Type-02 (pawnbroker). See, ATF website at https://www.atf.gov/firearms/listing-federal-firearms-licensees. As of in or about September 2025, there were **1,441** FFL-01/02. This represents a decrease of approximately 20% in the federally-licensed retail dealers in firearms with business premises in New York since NY S.4970-A was signed into law. The NYS Police do not publish any statistics or licensee database information on state-licensed dealers in firearms or gunsmiths.

[35] The link is to an Adobe PDF version of the website content into a document titled "Frequently Asked Questions for Dealers Regarding Recent Changes to New York Firearm Laws" ("Issued December 6, 2022").

103. Included with the "Petition" served upon Plaintiffs by the Office of the Attorney General on July 22, 2025 was an "Order to Show Cause," including "Exhibits." At "Exhibit 8" was the "Resources for Gun Dealers" NYSP website page (printed 5/9/24, 6:16 AM). It was served by Defendants with the intention that Plaintiffs should rely upon such public-facing website page as legally-accurate information. It was referenced several times, previously, to Plaintiffs by Defendants.

104. The NYSP webpage titled "Resources for Gun Dealers" reflects the confusing impact of the new laws not being carried out in a timely and organized manner by NYSP.

105. The following are the examples from the NYSP webpage titled "Resources for Gun Dealers" relevant to this case.

106. The NYSP website page "Resources for Gun Dealers" ("Exhibit 8," printed May 9, 2024[36]), first question and answer, p. 2, as follows:

> **Q. Where are the new dealer requirements that become effective December 3, 2022** (*sic*)[37] **located in the law?**
>
> A. New York General Business Law, Article 39-BB, Sections 875-a through 875-i (*sic*)[38] are the new laws that dealers must comply with. In addition, the New York State Police ("NYSP") <u>will be publishing regulations</u>, to be codified in Title 9 of the New York Codes, Rules and Regulations ("NYCRR"), Subtitle K, Part 482, Sections 482-2.1 through 482-2.6 (*sic*) (emphasis added).

---

[36] This is the NYS Police website page date printed each page of the NY Attorney General "Order to Show Cause" Exhibit 8, as served upon Plaintiffs on or about July 22, 2025, and is significant relative to the allegations herein against the NY Assistant Attorney General Grieco.

[37] The effective date was December 5, 2022 (see earlier footnote).

[38] NY GBL §875-a is the definitions clause, which is not an operational mandate. NY GBL §875-i is the penalty clause, which is not an operational mandate.

107.    The NYSP website page "Resources for Gun Dealers" ("Exhibit 8," printed May 9, 2024),

questions and answers, p. 2-3, as follows:

> **"Q. When will dealers be required to certify compliance[39] with all the requirements of Article 39-BB?**
>
> A. Annual compliance certifications must be submitted to the New York State Police by January 31 of each year. The initial compliance certification *will not be due until* January 31, 2024[40]." (boldface in original, emphasis added.)

> **"Q. Where can I find a compliance certification form?**
>
> A. The New York State Police <u>will publish</u> a compliance certification form on its website and <u>will provide</u> instructions for how to electronically submit these forms." (boldface in original, emphasis added)

> **"Q. Where are the requirements for security alarm systems[41] that dealers must implement?**
>
> A. The requirements and standards for security alarm systems *are documented in*[42] New York General Business Law Section 875-b(2) and Title 9 of the NYCRR, Section 482-2.3 (sic)." (boldface in original, citation error in the original, emphasis added)

---

[39]  The reference is to NY GBL §875-g(1)(b), sent. 2.

[40]  *N.B.*:  The NYS Police have habitually, since December 6, 2022, spontaneously published random dates that do not accord to the statute.  No notification is sent to any state-licensed dealer about the page or any change to it.  No version date appears with modified text.  Both techniques of user notification and "rev. (date)" are used by the ATF, and both techniques are industry standard for computer programmers and web masters.  As of this filing, the "Resources for Gun Dealers" page differs from the "Exhibit 8" to the Order to Show Cause, as served by the NY Office of the Attorney General.  This page should not be considered an accurate source of legal information on any given date.  It is utilized herein for the specific purpose stated, which is as served by the NY Attorney General's Office on July 22, 2025 on Plaintiffs to be relied upon by thema s legally-accurate information.

[41]  The reference is to NY GBL §875-b(2), sent. 2 and 3.

[42]  *N.B.*:  This is a circular reference to the statute for which regulations were to have been issued by the Superintendent ahead of the effective date of December 5, 2022.

108.  The NYSP website page "Resources for Gun Dealers" ("Exhibit 8," printed May 9, 2024),

questions and answers, p. 4, as follows:

> "**Q. When will the New York State Police begin conducting the required compliance inspections[43]?**
>
> A. <u>There is no official start date identified at this time</u>. Dealers will be given reasonable notice before any compliance inspection." (boldface in original, emphasis added.)

109.  That the Superintendent of the NYSP chose not to timely perform regulatory

responsibilities by December 5, 2022 amounted to a waiver, *inter alia*, of the opportunity to

become legislatively-authorized to conduct "inspections" at state-licensed "Dealers in

Firearms" in accordance with NY GBL §875-g(2)(a).  Again, the NYSP website page served

by Defendants upon Plaintiffs confirms: "There is <u>no official start date</u> [to required compliance

inspections] identified at this time." (emphasis added)

110.  The Division of State Police may continue to have traditional police authorities under

NY EXE §223 (referenced above), but any potential authority under NY GBL, art. 39-BB,

including, but not limited to, under NY GBL §875-g(2)(a) to conduct "inspections" of state-

licensed dealers in firearms never went into effect.

111.  Defendant Superintendent Steven James did not have legal authority to conduct an

"inspection," as that term is intended under and relates to NY GBL §875-g(2)(a) (or otherwise,

as enumerated, above), concerning Mr. Timothy Bowman or Bowman's Gun Shop at any time

herein.

---

[43]  The reference is to NY GBL §875-g(2)(a).

112.    In spite of what may be limitations of authority of the Superintendent of NYS Police under NY GBL §875, the Superintendent and those under his direction and control at all times herein presented, and believed themselves to be, acting under the color of state law, at all times herein.

## E.  DEFENDANT – NEW YORK STATE POLICE

113.    Serving under the authority and direction of the Superintendent, the NYS Police consists of "employees," defined at NY EXE §211.

114.    Among those employees of the NYSP relevant to this Complaint are or were one man who made a telephone call to Mr. Bowman (name unknown) and three men who presented themselves at Bowman's Gun Shop (one name given was Alan Freeman; two names are unknown) in or about October 2023, whose actions are described herein.

115.    Among those employees of NYSP are Officers relevant to this Complaint are or were two Officers, as described herein, including former Officer Patrick Loveland and Officer Raymond C. Mead, III, along with such other employees whose names appear (or are redacted) from records of the NYS Police, as served upon Plaintiffs by the NY Office of the Attorney General on July 22, 2025 attached to their "Order to Show Cause" at "Exhibits 5 and 6." [44]

116.    In spite of what may prove to be legal limitations of authority of the NYS Police under NY GBL §875, the men and women of the NYS Police presented, and believed themselves to be, acting under the color of state law, at all times herein.

---

[44]  *N.B.*:  It is unknown who redacted the NYS Police partial records at Exhibits 5 and 6.  No reference is made to redactions on the certifications by NYSP Counsel Michael Deyo.  Any subsequent redaction would destroy the certification.  It is standard that redactions include statutory reference. There is no on-going investigation or person stated to be in witness protection.

## F.  JURISDICTION AND VENUE

117.    Pursuant to 28 U.S.C. §1331, the Court has subject matter jurisdiction over the claims asserted in this case.  The case involves claims sounding in the First, Second, and Fourteenth Amendments to the U.S. Constitution.  The action seeks to prevent state officials from interfering with federal rights as guaranteed to those who are concurrently state citizens.  Further, subject matter is conferred on this Court by 28 U.S.C. §1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution.  This Court has supplemental jurisdiction over all state law claims asserted in this action under 28 U.S.C. §1367.

118.    Pursuant to 28 U.S.C. §1391(b), venue is properly vested in this Court because at least one Defendant resides in this District and the events giving rise to Plaintiffs' causes of action arose or exist in this District.

119.    There is a present and actual controversy between the Parties.

120.    The relief requested of Plaintiffs against the Defendants is authorized pursuant to 28 U.S.C. §1343(a)(4) (recover damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. §1651(a) (injunctive relief), 28 U.S.C. §§2201 and 2202 (declaratory and other appropriate relief), 42 U.S.C. §1983 (deprivation of rights, privileges, and immunities secured by the U.S. Constitution), and 42 U.S.C. §1988 (award of attorneys' fees and costs).

## II.

### FACTUAL ALLEGATIONS COMMON TO THE CLAIMS MADE

### A. THE "PRESS RELEASE" PUBLISHED BY THE
### NY ATTORNEY GENERAL ON JULY 18, 2025
### CONTAINED FALSE FACTS AND FICTITIOUS LAW.

#### 1. The NY Attorney General Ambushed Mr. Bowman by "Press Release."

121.   On Friday, July 18, 2025, the New York Attorney General Letitia James published an official state government "Press Release," on official letterhead with official logo, including a quotation attributed to her. The "Press Release" targeted "Timothy Bowman" and "Bowman's Gun Shop."

122.   The "Press Release" of July 18, 2025 also credits attorneys actively working for and under the direction of NY AG Letitia James in relation to Plaintiffs, including Martha Grieco; Monica Hanna; Deanna Nelson; and, Molly Thomas-Jensen.

123.   Mr. Bowman first learned of the press release when, on July 18, 2025, at or about 12:30 p.m., Mr. Bowman answered a telephone call from a person identifying herself as being from the Watertown News and, subsequently, a phone call from Channel 7 television news.

124.   No one from the NY Attorney General's Office gave Mr. Bowman an advance copy of the "Press Release."

125.   No one from the NY Attorney General's Office told Mr. Bowman they would be contacting the media.

126.   Mr. Bowman found the press release on Friday, July 18, 2025 by doing an Internet search.

127.    The Office of the New York Attorney General would not, until several days later, or, Tuesday, July 22, 2025, hand Mr. Bowman a copy of the papers they had filed to state court on July 18, 2025.[45]

128.    The "Press Release" was not among the several hundred pages of documents served upon Mr. Bowman by the Office of the NY Attorney General on July 22, 2025.

129.    The "Press Release" was not part of the "Order to Show Cause" or its multiple "Exhibits" as filed by the Office of the NY Attorney General to the St. Lawrence County Supreme Court ("state court") electronic filing system, where it would have been visible to the assigned judge.

130.    The "Press Release" was not part of the multiple documents filed to date by the Office of the NY Attorney General to the N.D.N.Y. federal court electronic filing system, where it would have been visible to the Hon. Anthony Brindisi.

131.    Defendants NY Attorney General Letitia James and Assistant NY Attorneys General Nelson, Thomas-Jense, Hanna, and Grieco went public with their "Press Release," but intentionally withheld it from Mr. Bowman and the state and federal courts.

### 2.    The Attorney General Press Release was Designed to Achieve Maximum Coverage, Comprehension, and Retention with Average Readers.

132.    On or before Friday, July 18, 2025, the Defendants NY Attorney General drafted, edited, finalized, authorized, published, and/or caused to be published a "Press Release" from or on

---

[45]  As filed to state court, *People of the State of New York by Letitia James, Attorney General of the State of New York v. Bowman's Gun Shop, LLC, and Timothy Bowman*, NYS Sup. Ct., St. Lawrence Co., Index No. EFCV-25-168235. The case was removed to federal court, N.D.N.Y. case no. 8:25-cv-01131. (Referred to herein as "Bowman II – state court" and "Bowman II – federal" where such distinction is useful.)

behalf of the Attorney General of the State of New York, her Assistant NY Attorneys General, and/or the Office, targeting Timothy Bowman and Bowman's Gun Shop.

133.    **Exhibit B**, attached hereto and incorporated as if set forth herein, is the lengthy, multi-page, official "**Letitia James** New York State Attorney General" (emphasis in original) press release[46] of July 18, 2025, targeting Timothy Bowman and Bowman's Gun Shop.   It is incorporated as if set forth, herein, due to its length of five (5), single-spaced pages. It constitutes a necessary part of this pleading.   All excerpts herein are exact to the document. (Herein, "Press Release of July 18, 2025" or "the Press Release.") (Accord NY CPLR R.3016(a).)

134.    The July 18, 2025 "Press Release" was **published** and continues to be accessible on the official New York State government website pages of the New York Attorney General at https://ag.ny.gov/press-release/2025/attorney-general-james-sues-st-lawrence-county-gun-shop-violating-gun-safety.

135.    The "Petition" referenced in the "Press Release" was filed electronically to the NYS Supreme Court of St. Lawrence County Clerk's Office on Friday, July 18, 2025 at 9:28 a.m. The filed "Petition" was separately uploaded onto the official state government website of the New York Attorney General at its own public-facing page of ag.ny.gov/sites/default/files/court-filings/state-of-new-york-v-bowman-s-gun-shop-llc-timothy-bowman-complaint-2025.pdf.

136.    "Timothy Bowman" and "Bowman's Gun Shop" are the unmistakable subject of the press release.   The document contains the word "Bowman" twenty-three times (23 times).

---

[46] *N.B.*:  the only place the document says "press release" is within the https address.   The document, itself, visually presents as if it is a newspaper article prepared by a journalist.   The use of the term "Press Release" herein to properly distinguish this as Defendant-initiated trial publicity.

137.    The press release content repetition of "Bowman" is by design by Defendants Attorneys General to signal to the public and the media, and to increase subject matter retention through imprinting.  The content repetition is also intended to increase search engine hits to get the press release in front of as many people as quickly and as often as possible through " bowman" as one of the Internet keywords that have and will continue to be captured by search engine spiders, or, web crawlers.

138.    A Google search engine result for "bowmans gun shop" now top ranks and returns the New York Attorney General Letitia James Press Release of July 18, 2025 and associated media coverage.

139.    A person can no longer simply pop into a popular search engine, like Google, Safari, DuckDuckGo, or FireFox to grab the Bowman's Gun Shop address or telephone number without the Press Release of July 18, 2025 by the New York Attorney General Letitia James popping up in the top five, if not as the leading, search engine result.

140.    The Press Release of July 18, 2025 has a permanence of form within the World Wide Web.

141.    The July 18, 2025 "Press Release" and "Petition" as uploaded to, hosted by, and continuously appearing on the official state government website pages of the NY Attorney General as **public-facing** documents, freely available to the public and the media.

142.    The July 18, 2025 "Press Release" with link to the "Petition" was published by the NY Attorneys General **to individual reporters** and to the **mass media** with the intention that its contents would and should be disseminated verbatim and/or used for content generation by such third-parties to their websites, social media, messaging, and email distribution platforms, applications, and accounts.  (Herein, "the media" for simplicity.)

143.    The July 18, 2025 "Press Release" with link to the "Petition" was transmitted by the NY Attorney General's Office to individual reporters and the media using a New York State government database.

144.    On July 18, 2025 the "Press Release" with link to the "Petition" was distributed by the NY Attorney General's Office to individual reporters and the mass media through state-sponsored and state-sanctioned systems and methods, including by e-mail, list serve, text, and press broadcasting sites.

145.    The NY Attorney General transmitted the Press Release of July 18, 2025 to media based in and serving audiences in, and including, New York State, New York City, the Tri-Borough Area, Philadelphia, and Barbados, for purposes of reaching an audience that was and remains local, statewide, national, and international.

**3.    The NY Attorney General Press Release Was Widely Reported.**

146.    Beginning July 18, 2025 and continuing thereafter, the NY Attorney General Press Release was widely reported, disseminated, and/or distributed by the media.

147.    On and after July 18, 2025, the NY Attorney General Press Release was widely re-published by the media, including via print media, television media, radio media, Internet-based media, and social media platforms.

148.    Among the reporters and media outlets that obtained the NY Attorney General "Press Release" of July 18, 2025 and published its words verbatim and/or in derivative form, included more than a dozen media outlets, republishers, and WWW repositories, which are listed herein (for brevity) by media outlet name, reporter name (if any), headline, date, and link:

i. Yahoo! News (national), "Attorney General lawsuit claims Gouverneur gun shop not properly securing inventory" (July 18, 2025, 6:22 p.m.) at https://www.yahoo.com/news/attorney-general-lawsuit-claims-gouverneur-222200649.html.

ii. WWNY TV News 7 (Watertown, NY) 47, Diane Rutherford (July 18, 2025, 1:50 p.m.), "State sues St. Lawrence Co. gun shop over 'lax security,' on television repeatedly on Friday, July 18, 2025 through Sunday, July 20, 2025, on-line upload of television coverage, and on-line print coverage, with social media extensions, at https://www.wwnytv.com/2025/07/18/state-sues-st-lawrence-co-gun-shop-over-lax-security/.

iii. WWNY TV News 7 (Watertown) (July 21, 2025), "Your Turn: AG suing gun shop, public broadcasting cuts, superyacht in Clayton" at https://www.wwnytv.com/2025/07/21/your-turn-ag-suing-gun-shop-public-broadcasting-cuts-superyacht-clayton/.

iv. NNY360.com (Watertown Daily Times and Northern New York Newspapers), "Attorney General lawsuit claims Gouverneur gun shop not properly securing inventory" (July 19, 2025) at https://www.nny360.com/news/stlawrencecounty/attorney-general-lawsuit-claims-gouverneur-gun-shop-not-properly-securing-inventory/article_d8539733-af74-5cb2-9ee7-151974970d93.html.

v. WWTI-TV ABC 50, North Country CW, and InformNY.com (ABC affiliate), Dan Mount, "State attorney general's office sues St. Lawrence County gun shop" (July 18, 2025 at 2:22 p.m.) at https://www.informny.com/abc50-now/state-attorney-generals-office-sues-st-lawrence-county-gun-shop/.

vi. North Country NOW and North Country This Week (Potsdam), Josh Davis, "Gouverneur gun shop sued for lack of security" (July 22, 2025) at

---

[47] WWNY 7News Watertown is owned by Gray Television, who operate CBS, BOX, and MeTV television. "About," at https://www.wwnytv.com/2019/05/23/about-wwny-newswnyf-fox-metv/.

https://northcountrynow.com/stories/gouverneur-gun-shop-sued-for-lack-of-security,312908.

vii. Syracuse.com (The Post Standard), Darian Stevenson, "AG sues gun shop after stolen firearms were trafficked to NYC, Philly, Barbados" (July 18, 2025, 2:45 p.m.) at https://www.syracuse.com/crime/2025/07/ag-sues-gun-shop-after-stolen-firearms-were-trafficked-to-nyc-philly-barbados.html.

viii. Capital District Times (Albany), "New York AG sues St. Lawrence County gun shop over alleged safety violations" (July 18, 2025) at https://capitaldistricttimes.com/stories/674057424-new-york-ag-sues-st-lawrence-county-gun-shop-over-alleged-safety-violations.

ix. Finger Lakes Daily News, Lucas Day, "NY Attorney General Sues St. Lawrence County Gun Shop" (July 22, 2025) at https://www.fingerlakesdailynews.com/regional-state-congressional/ny-attorney-general-sues-st-lawrence-county-gun-shop.

x. Hudson Valley Press "AG Letitia James Sues Gun Shop for Violating Gun Safety Laws" (July 23, 2025) at https://hudsonvalleypress.com/2025/07/23/ag-letitia-james-sues-gun-shop-for-violating-gun-safety-laws/.

xi. Hoodline (NYC), Holden Draper, "New York AG Sues St. Lawrence County Gun Shop for Alleged Safety Violations" (July 19, 2025) at https://hoodline.com/2025/07/new-york-ag-sues-st-lawrence-county-gun-shop-for-alleged-safety-violations/.

xii. Legal Reader, Ryan J. Farrick, "Lawsuit: Burglarized Upstate NY Gun Dealer Had No Security, Falsified Records" with by-line "Bowman's Gun Shop in Gouverneur has been burglarized at least twice. In the first incident, thieves entered through an unlocked door; in the second, they took advantage of an open window. In total, nearly 60 firearms, along with ammunition, were taken before being resold." (July 18, 2025) at https://www.legalreader.com/letitia-james-new-york-lawsuit-firearms-dealership/.

xiii.   Ground News, "AG sues gun shop after stolen firearms were trafficked to NYC, Philly, Barbados" (July 18, 2025) at https://ground.news/article/ag-sues-gun-shop-after-stolen-firearms-were-trafficked-to-nyc-philly-barbados.

xiv.    Gale.com48, "Attorney General James Sues St. Lawrence County Gun Shop for Violating Gun Safety Laws" (July 18, 2025) at https://go.gale.com/ps/i.do?id=GALE%7CA848228692&sid=sitemap&v=2.1&it=r&p=EAIM&sw=w&userGroupName=nysl_oweb&isGeoAuthType=true&aty=geo.

xv.     Bridgetown Daily (Barbados), "Attorney General James Sues St. Lawrence County Gun Shop for Violating Gun Safety Laws" (undated) at https://www.bridgetowndaily.com/article/831918293-attorney-general-james-sues-st-lawrence-county-gun-shop-for-violating-gun-safety-laws.

xvi.    Barbados Political Currents (Barbados), "Attorney General James Sues St. Lawrence County Gun Shop for Violating Gun Safety Laws" (undated) at https://www.barbadospoliticalcurrents.com/article/831918293-attorney-general-james-sues-st-lawrence-county-gun-shop-for-violating-gun-safety-laws.

149.    These media outlets that published the NY Attorney General "Press Release" of July 18, 2025, in whole, part, or as derived from, continued to do so as of this filing.

### 4.     The NY Attorney General "Press Release" Reached Its Intended Audience.

150.    Friday, July 18, 2025 and all weekend long, media coverage looped, repeatedly, on television and radio broadcasts, and appeared in print newspapers, viewed by Mr. Bowman,

---

[48] "About Gale," "GALE is the leading provider of research and learning resources for libraries." For more than 65 years, it has "partner[ed] with librarians and educators around the world to connect learners to essential content…" at https://www.gale.com/about.

his wife, his son, and their extended family, as well as their friends. This type of coverage and the fall-out described herein is on-going, now more than sixty days.

151.    Right away, customers started coming in person to Bowman's Gun Shop to say they saw Tim on the news and to ask him *what happened*?

152.    Other customers started calling, continuing still at a rate of several times per week, to find out if the shop is still open, *because I saw what happened*.

153.    The "Press Release" of July 18, 2025 reached a significant number of persons, including Mr. Bowman's immediate and extended family; the community in which Mr. Bowman was raised and has lived his entire adult life; Mr. Bowman's co-workers and family member co-workers; colleagues in the firearms industry, including firearms instructors; and, his customer base, including, but not limited to customers who are active and retired members of the New York State Police.

154.    The "Press Release" of July 18, 2025 reached an audience that included those who have served as prior references for Mr. Bowman's licensing processes, including renewals and recertifications, and who have been and who will continue to be necessary to the future, intended, and required renewals and recertifications of his licenses.

155.    The "Press Release" of July 18, 2025 reached an audience that included federal, state, and local licensing authorities, which have in the past, approved, renewed, and recertified Mr. Bowman's federal, state, and local licenses, both for himself as an individual, and for his business, and who have been and who will continue to be necessary to future, intended, and required licensing renewals and recertifications.

156.    The "Press Release" of July 18, 2025 reached and continues to reach an audience that included and continues to include colleagues, who are also licensed dealers in firearms, gunsmiths, licensed manufacturers of firearms, wholesalers, distributors, and associated industry professionals such as firearms instructors, and who have been and will continue to be necessary to the future, intended supply chain and operations of his business.

157.    The media that published the "Press Release," in whole, in part, or as derived from, include contemporaneous and on-going World Wide Web posts and links to the original press release and/or the "Petition," social media posts with comparable links, and posts with social media shares that contain linked posts, including media with followers into the *millions*, including, but not limited to, this one example, for brevity, of "Yahoo! News": followers on Facebook at 7,400,000; followers on X at 1,000,000; followers on Instagram at 589,000.

### 5.    On July 18, 2025, NY Attorney General Letitia James Declared Mr. Bowman Guilty by Press Release.

158.    The state government position of an attorney general carries with it a significant public influence, including upon state citizens.

159.    On July 18, 2025 through the Press Release and resultant coverage, Defendants New York Attorneys General and her Assistant NY Attorneys General intended to and attempted to contort Mr. Bowman from the man he built through a lifetime of hard, law-abiding, and community-driven work into a person he is not – into a criminal, engaged in criminal activity, supporting criminal activity, facilitating criminal activity, and encouraging criminal activity through his person and his business.

160. On July 18, 2025 through the Press Release and resultant coverage, Defendants New York Attorney General Letitia James with her Assistant NY Attorneys General changed the course of the rest of Mr. Bowman's life.

161. A "press release" is not a requirement to commence a civil proceeding in New York under the NY Civil Procedure Law & Rules or in federal court under the Federal Rules of Civil Procedure.

162. A "press release" is not a requirement to commence a criminal prosecution in New York under the NY Criminal Procedure Law or in federal court under the Federal Rules of Criminal Procedure.

163. On or before July 18, 2025, the Defendant NY Attorney General Letitia James and her Assistant NY Attorneys General made the choice to publish, disseminate, and promote the "Press Release" of July 18, 2025.

164. The **headline** of the Press Release of July 18, 2025 (emphasis in original) is:

"**Attorney General James Sues St. Lawrence County Gun Shop for Violating Gun Safety Laws**:

Owner of Boman's Gun Shop Failed to Properly Secure His Store, Despite Two Burglaries Where 58 Guns Were Stolen and Trafficked, Putting New Yorkers at Risk"

165. The first sentence of the "Press Release" of July 18, 2025 states:

"New York Attorney General Letitia James today filed a lawsuit against Bowman's Gun Shop, a gun store in St. Lawrence County, and its owner, Timothy Bowman, for violating New York's gun safety laws, storing guns and ammunition in an unsafe manner, and failing to properly secure the gun shop, all of which endangered New Yorkers."

166.    Through the "Press Release" of July 18, 2025, Defendant New York Attorney General Letitia James committed libel *per se* against Mr. Bowman in his profession, licensed profession, and/or trade, as a state and federally-licensed dealer in firearms and a gunsmith through Bowman's Gun Shop, including through use of such exact words as:

> " "Irresponsible and inadequate security at gun shops is dangerous for all New Yorkers," said **Attorney General James**. "New Yorkers deserve to feel safe in their communities, and gun shop owners like Timothy Bowman, who repeatedly violate our gun safety laws and make it easy for thieves to steal and traffic guns, put New Yorkers at risk. Gun shop owners have a responsibility to maintain the utmost security in and around their stores to prevent theft and gun trafficking. Mr. Bowman violated that responsibility and today we are taking action to hold him accountable and protect New Yorkers." " (emphasis in original)

167.    The "Press Release" of July 18, 2025 was designed and executed by Defendants NY Attorneys General to concurrently raise the political profile and garner popular support towards Letitia James. They were willing to do so at the expense of Timothy Bowman ("gun shop owners like Timothy Bowman"). Defendants converted Mr. Bowman and Bowman's Gun Shop into symbols of who and what *not* to be – if one wants to be associated with "a national leader in gun safety," namely, Letitia James.

168.    The techniques deployed by Defendants NY Attorneys General in the "Press Release" of July 18, 2025 were intentional.

169.    The "Press Release" of July 18, 2025 is designed as layers of overlapping words, designed to achieve specific goals using Tim Bowman and Bowman's Gun Shop, as follows:

- First, the language of criminal conviction by the State's top prosecutor and a list of assistant prosecutors;

- Second, the language of blame and shame to expel the target from the desirable group for the benefit of the Letitia James-associated group;

- Third, the language of crime to land the target into the undesirable group of criminals associated with illegal guns; and,

- Fourth, the language of invitation to the undesirable group to embrace the target with benefits to them for doing so such as directions on where and how to go rob a gun store with impunity.

170. <u>First, the language of criminal conviction by the States' prosecutors</u>. The July 18, 2025 "Press Release" of the New York Attorney General and her Assistant NY Attorneys General **defamed Mr. Bowman in his profession, licensed profession, and/or trade**, as a state and federally-licensed dealer in firearms and a gunsmith, including *to convey guilt of crimes within the asserted knowledge of the state's top prosecutor and her team*, targeting Timothy Bowman and Bowman's Gun Shop to the average reader, by repetitively using such exact words, including as follows:

- "Bowman's Gun Shop…its owner, Timothy Bowman, for violating gun safety laws;"

- "Mr. Bowman has persistently violated New York's gun safety laws;"

- "New York law requires;"

- "all of which Mr. Bowman failed to do;"

- "these violations of New York's gun safety laws;"

- "gun shop owners like Timothy Bowman, who repeatedly violate our gun safety laws" (Letitia James quote); and,

- "Mr. Bowman violated that responsibility" (Letitia James quote).

- All of which is juxtaposed against the penultimate conclusion of the "Press Release" that "Attorney General James has been a national leader in gun safety."[49]

171.   The July 18, 2025 "Press Release" of the New York Attorney General and her Assistant NY Attorneys General **defamed Mr. Bowman in his profession, licensed profession, and/or trade**, as a state and federally-licensed dealer in firearms and a gunsmith, *using value propositions laced without any reference to actual laws*, targeting Timothy Bowman and Bowman's Gun Shop to the average reader, using such exact words, including as follows:

- "unsafe"

- "endanger"

- "burglars"

- "58 guns and dozens of boxes of ammunition"

- "stolen guns were trafficked"

- "additional theft and trafficking"

- "security plan," "properly store firearms," "install and maintain a security alarm system from a licensed alarm system operator"

- "irresponsible and inadequate security" (Letitia James quote);

- "dangerous for all New Yorkers" (Letitia James quote);

---

[49]  Please note the absence of the "New York" before "Attorney General" in the original.  This inflates and exaggerates the credentials, as well as the authority and jurisdiction, of the New York State Attorney General.

- "New Yorkers deserve to feel safe in their communities" (Letitia James quote);

- "make it easy for thieves to steal and traffic guns" (Letitia James quote);

- "put New Yorkers at risk" (Letitia James quote); and,

- "Gun shop owners have a responsibility to maintain the utmost security in and around their stores to prevent theft and gun trafficking. Mr. Bowman violated that responsibility and today we are taking action to hold him accountable and protect New Yorkers." (Letitia James quote)

- All of which is juxtaposed against the penultimate conclusion of the "Press Release" that "Attorney General James has been a national leader in gun safety."[50]

172.    Part of how the language of the July 18, 2025 "Press Release" of the NY Attorney General and her Assistant NY Attorneys General achieve the conviction of crime association with Bowman's Gun Shop and Mr. Bowman is by using the raw power and emotional comfort value of references to multiple official law enforcement offices, using such exact words, including as follows:

- "after an investigation by the New York State Police (NYSP);"

- "NYSP were repeatedly contacted by other police departments that had recovered guns in the course of their criminal investigations;"

- "were recovered by authorities in New York City, Philadelphia, and Barbados;"

---

[50] Please note the absence of the "New York" before "Attorney General" in the original. This inflates and exaggerates the credentials, as well as the authority and jurisdiction, of the New York State Attorney General.

- "Moreover, the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF)…"; and,

- "NYSP inspected Bowman's Gun Shop and concluded…"

- All of which is juxtaposed against the penultimate conclusion of the "Press Release" that "Attorney General James has been a national leader in gun safety."

173. <u>Second, the language of blame and shame to expel the target from the desirable group with benefits for them for doing so.</u> The "Press Release" of July 18, 2025 puts Bowman's Gun Shop and Mr. Bowman on the outside of the circle of the NY Attorney General and her Assistant NY Attorneys General, the NYSP, the NYPD, the Philly PD, an international Caribbean police department, and the federal ATF. The July 18, 2025 "Press Release" of the New York Attorney General and her Assistant NY Attorneys General **defamed Mr. Bowman in his profession, licensed profession, and/or trade**, as a state and federally-licensed dealer in firearms and a gunsmith, including *through use of repetitive words to shame and blame* Timothy Bowman and Bowman's Gun Shop to the average reader, using such exact words, including such as: ▪ "violating…safety laws," ▪ "unsafe manner," ▪ "failing to properly secure," ▪ "endangered New Yorkers," ▪ "lax security," ▪ "two burglaries," ▪ "burglars," ▪ "unlocked door," ▪ "open window," ▪ "58 guns," ▪ "stolen," ▪ "stolen guns," ▪ "guns were trafficked," ▪ "persistently violated," ▪ "still has not taken," ▪ "to prevent additional theft and trafficking," ▪ "security plan," ▪ "properly store," ▪ "security alarm system," ▪ "all of which Mr. Bowman failed to do," ▪ "violations…safety laws," ▪ "stop Bowman," ▪ "disgorgement," ▪ "penalties," ▪ "irresponsible and inadequate security," ▪ "dangerous for all New Yorkers," ▪ "gun shop owners like Timothy Bowman," ▪ "repeatedly violate…safety laws," ▪ "easy for thieves to steal and traffic guns," ▪ "New Yorkers at risk," ▪ "Gun shop owners have a responsibility to maintain the utmost

security in and around their stores to prevent theft and gun trafficking. Mr. Bowman violated that responsibility," ▪ "license and permit were suspended after an investigation by the New York State Police," ▪ "Mr. Bowman admitted," ▪ "he knew possessed them illegally and that he made false entries," ▪ "license and permit were suspended," ▪ "irresponsibly," ▪ "burglars broke into," ▪ "stole," ▪ "burglars," ▪ "exterior door that was unlocked," ▪ "forced open an interior door," ▪ "did not take adequate steps," ▪ "group of burglars," ▪ "broke into," ▪ "burglars stole," ▪ "burglars," ▪ "Mr. Bowman admitted," ▪ "neglected to arm," ▪ "second burglary," ▪ "second burglary," ▪ "criminal investigations," ▪ "stolen," ▪ "guns stolen," ▪ "burglary," ▪ "inspected," ▪ "did not comply with legal safety requirements," ▪ "ban Bowman," ▪ "disgorgement," ▪ and "penalties."

- All of which is piled atop the penultimate conclusion of the "Press Release" that "Attorney General James has been a national leader in gun safety."[51]

174.  Third, the language of crime to land the target into the undesirable group. The July 18, 2025 "Press Release" of the New York Attorney General and her Assistant NY Attorneys General **defamed Mr. Bowman in his profession, licensed profession, and/or trade**, as a state and federally-licensed dealer in firearms and a gunsmith, by pushing Timothy Bowman and Bowman's Gun Shop into the undesirable realm of criminals, burglars, and traffickers of guns, using such exact words, including as follows:

- Use of the name of the Plaintiffs, "Bowman," twenty-three times (23x);

- Use of the word "gun" and "guns" a total of sixty-two times (62x);

---

[51] Please note the absence of the "<u>New York</u>" before "Attorney General" in the original. This inflates and exaggerates the credentials, as well as the authority and jurisdiction, of the New York State Attorney General.

- Use of the word "burglar," "burglars," "burglary," and "burglaries" a total of thirteen times (13x);

- Use of the word "criminal;"

- Use of the word "thieves;"

- Use of the word "stole" and the word "stolen;"

- Use of the word "traffic" and the word "trafficking;"

- Use of the word "broke (into);"

- Use of the word "violate," "violated," "violating" a total of fifteen times (15x).

- Use of the words "endanger" and "endangered."

- All of which is juxtaposed against the penultimate conclusion of the "Press Release" that "Attorney General James has been a national leader in gun safety."

175. <u>Fourth, the language of invitation to the undesirable group to embrace the target with benefits to them for doing so</u>. The July 18, 2025 "Press Release" of the New York Attorney General and her Assistant NY Attorneys General **defamed Mr. Bowman in his profession, licensed profession, and/or trade**, as a state and federally-licensed dealer in firearms and a gunsmith, by inviting criminals to take advantage of the opportunity to further burglarize Bowman's Gun Shop and get away with many guns, using such exact words, including as follows:

- "storing guns and ammunition in an unsafe manner;"

- "failing to properly secure the gun shop;"

- "lax security;"

- "two burglaries;"

- "burglars were able to enter through an unlocked door;"

- "through an open window;"

- "still has not taken adequate steps to improve security at the store to prevent additional theft and trafficking;"

- "all of which Mr. Bowman failed to do" [have a security plan, properly store firearms, install and maintain a security alarm system from a licensed alarm system operator];

- "irresponsible and inadequate security at gun shops" (Letitia James quote);

- "make it easy for thieves to steal and traffic guns" (Letitia James quote);

- "Gun shop owners have a responsibility to maintain the utmost security in and around their stores to prevent theft and gun trafficking.  Mr. Bowman violated that responsibility…" (Letitia James quote);

- "The burglars entered through an exterior door that was unlocked…;"

- "Mr. Bowman did not take adequate steps to improve security at the store;"

- "another group of burglars broke into Bowman's Gun Shop;"

- "This time, the burglars stole 28 pistols, 12 revolvers, nine rifles – including four AR-style rifles – and two shotguns."

- "The burglars were able to enter…left a window partially open;" and,

- "he neglected to arm the system "three quarters of the time."

- All of which is juxtaposed against the penultimate conclusion of the "Press Release" that "Attorney General James has been a national leader in gun safety."

176. The July 18, 2025 "Press Release" of the New York Attorney and her Assistant NY Attorneys General **defamed Mr. Bowman in his profession, licensed profession, and/or trade**, as a state and federally-licensed dealer in firearms and a gunsmith, throug the use of false facts about four events, by using such exact words as those detailed herein.

177. The language of the "Press Release" of July 18, 2025 is plain and **capable of comprehension** by an average reader.

178. The language of the "Press Release" of July 18, 2025 does not contain the word "**allege**" in reference to "the lawsuit" or the "violations" being concurrently *started* by the Defendants against Mr. Bowman, nor any similar or comparable words such as are generally associated with a person being charged with a crime as a first step in a process, who is entitled to the presumption of innocence, and who is facing a case presided over by a judge where the prosecutor will have the burden of proof beyond a reasonable doubt, and the defendant will have the benefit of all criminal rights.

179. In other, recent press releases concerning civil litigation from NY Attorney General Letitia James, the word "allege" is used repeatedly for everything from a newly-filed complaint through to a settlement stipulation. See, e.g., August 6, 2025 concerning landlords[52] wherein the word "allege" appears repeatedly announcing cases filed on behalf of "tens of thousands"

---

[52] Website, NY Attorney General Letitia James, "Attorney General James and HCR Commissioner Visnauskas Sue Queens Landlord For Illegally Overcharging Rent-Stabilized Tenants" (Aug. 8, 2025) at https://ag.ny.gov/press-release/2025/attorney-general-james-and-hcr-commissioner-visnauskas-sue-queens-landlord.

of victims. See, e.g., April 14, 2025 concerning Payday loans.[53] The word "allege" also appears repeatedly in single documents concerning settlements in the hundreds of millions of dollars. See, e.g., April 7, 2025 concerning pharmaceutical company.[54]

180. In the press release of NY Attorney General Letitia James against the National Rifle Association in August 2020, at the start of the civil litigation *James v. NRA*, she used the word "allege" five times and concluded with the word "allegations" in that 8-page text.[55]

181. By comparison, the U.S. Department of Justice press releases concerning the 2019 burglary, apprehension, plead of guilt, and sentencing of the three criminals minimizes the use of "Bowman's Gun Shop," does not broadcast business premises security features, does not sensationalize the firearms stolen, and maintains a focus upon reporting of established facts to deter crimes against federally-licensed dealers in firearms through swift and professional means in compliance with the law and the rules. See, e.g., U.S. Attorney's Office, Northern District of New York, "Former Fort Drum Soldiers Plead Guilty to Burglarizing North Country Firearms Dealers," Press Rel. (Feb. 12, 2020).[56]

---

[53] Website, NY Attorney General Letitia James, "Attorney General James Sues Payday Lending Companies for Exploiting Workers with Illegal Loans Attorney General James Sues Payday Lending Companies for Exploiting Workers with Illegal Loans" (Apr. 14, 2025) at https://ag.ny.gov/press-release/2025/attorney-general-james-sues-payday-lending-companies-exploiting-workers-illegal.

[54] Website, NY Attorney General Letitia James, "Attorney General James Secures up to $335 Million from Pharmaceutical Company Mylan for Its Role in Fueling Opioid Crisis" (Apr. 7, 2025) at https://ag.ny.gov/press-release/2025/attorney-general-james-secures-335-million-pharmaceutical-company-mylan-its-role.

[55] Website, NY Attorney General, "Attorney General James Files Lawsuit to Dissolve NRA" (Aug. 6, 2020) at https://ag.ny.gov/press-release/2020/attorney-general-james-files-lawsuit-dissolve-nra. Corresponding press conference at https://www.youtube.com/watch?v=KOl1ltT-WSQ.

[56] U.S. Attorney's Office, Northern District of New York, "Former Fort Drum Soldiers Plead Guilty to Burglarizing North Country Firearms Dealers," Press Rel. (Feb. 12, 2020), at https://www.justice.gov/usao-ndny/pr/former-fort-drum-soldiers-plead-guilty-burglarizing-north-country-firearms-dealers.

### 6. The Press Release Misrepresents the Legal Authority of the Defendants NY Attorneys General Over the Plaintiffs.

182. The language of the "Press Release" of July 18, 2025 does not contain language to alert the average reader or the media that a state attorney general **has neither legislatively-conferred authority, nor jurisdiction**, to charge or prosecute <u>an alleged violation of federal law or the Uniform Code of Military Justice</u>, which prosecutions are within the authority of the U.S. Attorney General and the U.S. Department of Justice ("US DOJ") or the U.S. Armed Forces Judge Advocate General's Corps. ("JAG Corps"), such that the NY Attorney General and her Office cannot and will not be charging or prosecuting Mr. Bowman or Bowman's Gun Shop with an alleged violation of federal law.

183. The language of the "Press Release" of July 18, 2025 does not contain language to alert the average reader or the media that a state attorney general has neither legislatively-conferred authority, nor jurisdiction, to initiate <u>a federal administrative proceeding</u> concerning a federal license of a dealer in firearms, which administrative proceedings are within the authority of the U.S. Attorney General, the U.S. Department of Justice ("US DOJ"), and/or the ATF, such that the NY Attorney General and her Office cannot and will not be filing or pursuing a suspension or revocation of the federal dealer's license of Mr. Bowman and Bowman's Gun Shop.

184. The language of the "Press Release" of July 18, 2025 does not contain language to alert the average reader or the media that, prior to December 5, 2022, there was no **legislatively-conferred authority or jurisdiction** for the NYSP to "inspect" any state-licensed dealer in firearms and that the inaction of the Superintendent of NYSP after that date caused a lapse of any potential regulatory authority, such that there was and will not either an "inspection" or an investigation under NY GBL §875-g by the NYSP, nor would there be any referral under NY

47

EXE §63(3) to the NY Attorney General and her Office to prosecute Mr. Bowman and Bowman's Gun Shop under NY GBL §875-i.

185.    The language of the "Press Release" of July 18, 2025 does not contain language to alert the average reader or the media that the NY Attorney General **has neither legislatively-conferred authority, nor jurisdiction** to oversee state-licensed dealers in firearms under the new 2022 NY GBL §875, specifically §875-b through §875-g, which authority, if any, belongs to the NYS Police, such that the NY Attorney General and her Office could not and will not be doing so concerning Mr. Bowman and Bowman's Gun Shop.

186.    The language of the "Press Release" of July 18, 2025 does not contain language to alert the average reader or the media that a state attorney general has neither **legislatively-conferred authority, nor jurisdiction** to prosecute state-licensed dealers in firearms under the new 2022 NY GBL §875-i, through NY EXE §63(3) unless invited to do so by the NYS Police Superintendent, which invitation having not issued, the New York Attorney General and her Office could not and would not be doing so concerning Mr. Bowman and Bowman's Gun Shop.

187.    The language of the "Press Release" of July 18, 2025 does not contain language to alert the average reader or the media that the NY Attorney General **has neither legislatively-conferred authority, nor jurisdiction** as a licensing official under NY PEN §400.00, such that the NY Attorney General and her Office could not and will not be seeking to suspend or revoke the state license as a dealer in firearms concerning Mr. Bowman and Bowman's Gun Shop.

188.    The language of the "Press Release" of July 18, 2025 does not contain language to alert the average reader or the media that the NY Attorney General **has neither legislatively-conferred authority, nor jurisdiction** under NY PEN §265.00, concerning any alleged

firearms transaction of a state-licensed dealer in firearms without an invitation under NY EXE §63(3) from the NYS Police Superintendent to investigate and/or prosecute, such that the NY Attorney General and her Office could not and will not be seeking to suspend or revoke the state license as a dealer in firearms concerning Mr. Bowman and Bowman's Gun Shop.

189.    The language of the "Press Release" of July 18, 2025 does not contain language to alert the average reader or the media that a state attorney general cannot sue federally-licensed dealers under NY GBL §898-b in general nuisance because of the federal Protection of Lawful Commerce in Arms Act and, most recently, *Smith & Wesson Brands v. Mexicano*[57], such that the NY Attorney General and her Office could and would not be doing so.

190.    The "Press Release" of July 18, 2025 was published with the intention that it enhance the political stature of Letitia James as a state attorney general who regularly stands at the podium to take down her enemies from her position as "the guardian of the law."

> "It is my sworn duty and responsibility to lead that fight, working with the Governor of this great state, Kathy Hochul. This is not the time to be fearful, New York, but faithful and steadfast, knowing that I, as the attorney general, along with my entire team, we are guardians of the law, and we are prepared, my friends, to fight back."[58],[59]
>
> And: "I will not be silenced. I will not be bullied. I will not bend, I will not break, and I will not bow to anyone."[60]
>
> And: "I'm covered by the blood. I'm not afraid of Donald Trump. You can come after me, but no enemy – nothing formed against me

---

[57]    *Smith & Wesson Brands v. Estados Unidos Mexicano*, 605 U.S. 280 (June 5, 2025).

[58]    Wehner, Greg, "Trump hating NY Attorney General Letitia James vows war with president-elect in divisive news conference," Fox News (November 6, 2024), with video.

[59]    Website, Office of the New York State Attorney General Letitia James, "About the Office," including "The Attorney General serves as the guardian of the legal rights of the people of New York…" at https://ag.ny.gov/about/about-office.

[60]    Garcia, Deanna, "AG James: Trump's 'allegations are baseless,'" NY1.com (Apr. 17, 2025).

will perish (*sic*), nothing formed against me, nothing formed against me, nothing formed against me!"[61]

191.   The NY Attorney General and her Assistant NY Attorneys General presented themselves to the public, the media, and the Plaintiffs as acting under color of state law, at all times herein.

### 7.   The NY Attorney General "Press Release" Did Not Comport to Standards of "Trial Publicity" Under the NY Code of Professional Conduct.

192.   The "Press Release" of July 18, 2025 constitutes "Trial Publicity," as the term is defined and governed by NY Rules of Professional Conduct.

193.   The "Press Release" of July 18, 2025 does not distinguish between civil and criminal proceedings.

194.   The average reader of the "Press Release" of July 18, 2025 will understand the NY Attorney General to be prosecuting for "violations" of the criminal law, following NYSP having "investigated" Mr. Bowman and Bowman's Gun Shop.

195.   The "Press Release" of July 18, 2025 constitutes "trial publicity" as being "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." NY Rules of Professional Conduct, Rule 3.6(a).

196.   The "Press Release" of July 18, 2025 relates to "the character, credibility, reputation or criminal record of a party, [or] a suspect in a criminal investigation," as defined in NY Rules of Professional Conduct, Rule 3.6(b)(1).

---

[61]   C-SPAN, National Action Network, Convention Discussion on DEI in Higher Education (April 4, 2025), outtake at 2:00. The error is that the biblical quote is "nothing formed against me shall *prosper*." Isaiah 54:17.

197.    The "Press Release" of July 18, 2025 relates to "any opinion as to the guilt or innocence of a defendant or suspect in a criminal matter that could result in incarceration," as defined in NY Rules of Professional Conduct, Rule 3.6(b)(4).

198.    The "Press Release" of July 18, 2025 relates to "information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would, if disclosed, create a substantial risk of prejudicing an impartial trial," as defined in NY Rules of Professional Conduct, Rule 3.6(b)(5).

199.    Because of the exposure to criminal charges and criminal penalty and because there is language associating Plaintiffs with concepts of criminal guilt and with criminals, the "Press Release" of July 18, 2025 relates to and is guided by "the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty" from the NY Rules of Professional Conduct, Rule 3.6(b)(6).

200.    The commentary of Rule 3.6, Comment [1] well-states that "If there were no such limits, the result would be the practical nullification of the protective effect of the rules of forensic decorum and the exclusionary rules of evidence."

201.    The commentary of Rule 3.6, Comment [4], articulates that "There are certain subjects that are more likely than not to have a material prejudicial effect on a proceeding, particularly when they refer to a civil matter triable to a jury, a criminal matter or any other proceeding that could result in incarceration," which, simplistically, would include a New York state attorney general and her group of prosecutors naming themselves on a press release with the exact language used against Mr. Bowman and Bowman's Gun Shop in the "Press Release" of July 18, 2025.

202. The sensitivity of "trial publicity" takes on an increased level of risk of improper conduct when through publication or press conference the words originate from a prosecutor. NY Code of Professional Conduct, Rule 3.8.

203. The commentary of the NY Code of Professional Conduct, Rule 3.8, Comment [1] emphasizes that "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."

204. The commentary of the NY Code of Professional Conduct, Rule 3.8, Comment [5] speaks to the exact risk to Mr. Bowman and Bowman's Gun Shop created by Defendants' "trial publicity" (as excerpted):

> "Rule 3.6 prohibits extrajudicial statements that have a substantial likelihood of prejudicing an adjudicatory proceeding. In the context of a criminal prosecution, a prosecutor's extrajudicial statement can create the additional problem of increasing public condemnation of the accused. Although the announcement of an indictment, for example, will necessarily have severe consequences for the accused, a prosecutor can, and should, avoid comments that have no legitimate law enforcement purpose and have a substantial likelihood of increasing public opprobrium against the accused. A prosecutor in a criminal case should make reasonable efforts to prevent persons under the prosecutor's supervisory authority, which may include … employees and other persons assisting or associated with the prosecutor, from making extrajudicial statements that the prosecutor would be prohibited from making under Rule 3.6." *See, also,* Comment [6] and [6A].

205. The NY Code of Professional Conduct sets standards for "Truthfulness in Statements to Others" at Rule 4.1, including that "Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements."

206. The "Press Release" of July 18, 2025 was intended by the NY Attorney General and her Assistant NY Attorneys General to be understood by the average reader as the truth relative to Mr. Bowman and Bowman's Gun Shop.

### 8. The "Press Release" Promotes False Facts, as Contradicted by Records Served by the NY Attorneys General Upon the Plaintiffs and Filed to State and Federal Courts.

207. The "Press Release" of July 18, 2025 contains "**false facts**," accusations directly contradicted by documents supplied by Defendant Assistant NY Attorneys General with their "Order to Show Cause" (Bowman II – state court), the record of the case of Bowman I[62], and otherwise readily available through such sources as records in the public domain and on PACER.

208. The "Press Release" of July 18, 2025 emphasizes four moments in time as the Defendant prosecutors' primary 'evidence' to the jury of the court of public opinion as occurring between 2019 and 2023. (Herein, "events" for simplicity.)

209. The "Press Release" of July 18, 2025 is akin to a pleading or a summation, but without the ability to object and obtain immediate judicial oversight within a courtroom.

210. The "Press Release" of July 18, 2025 is an intentional effort by Defendants to evade the burden of proof that is their legal responsibility, namely, to prove guilt beyond a reasonable doubt through admissible evidence in a court of competent jurisdiction. Defendants contrive that Plaintiffs should have to establish their non-criminality in the courts and in the public, through a process that could take years and result in considerable expense.

---

[62] *Bowman's Gun Shop, LLC v. Letitia James*, St. Lawrence Co., Sup.Ct., NYSCEF EFCV-24-167057, commenced Nov. 12, 2024.

211. The Defendants' actions are precisely the scenario U.S. Supreme Court Justice Thomas anticipated could ensue in the wake of the unanimous *Mexicano* decision. As he foretold:

> "Allowing plaintiffs to proffer mere allegations of a predicate violation would force many defendants in PLCAA litigation to litigate their criminal guilt in a civil proceeding, without the full panoply of protections that we otherwise afford to criminal defendants. And, these defendants might even include ones who were *cleared* in an earlier proceeding, such as through a noncharging decision or a not-guilty or not-liable verdict. Such collateral adjudication would be at best highly unusual, and would likely raise serious constitutional questions that would counsel in favor of a narrower interpretation." *Mexicano*, 605 U.S., at 299, Thomas J., concurring.

212. The four events referenced in the Press Release are: (1.) 2019 "Orders" by Judge Richards, (as retired from) St. Lawrence County Court; (2.) the 2019 burglary at Bowman's Gun Shop; (3.) the 2020 burglary at Bowman's Gun Shop; and (4.) the 2023 NYSP Officer interface by telephone and at Bowman's Gun Shop. Each is taken in turn in this section and throughout the balance of this Complaint.

   a) **Press Release Event #1: The 2019 "Orders" of Judge Richards; *Ex Parte* Communication from an NYSP Officer; Lack of Subject Matter or Personal Jurisdiction; Other Legal Irregularities.**

213. Regarding the first event, the Press Release asserts false facts, exactly as follows:

> "In April 2019, Mr. Bowman's license to sell pistols and his permit to possess pistols were suspended by the St. Lawrence County Court for six months and one year, respectively. His license and permit were suspended after an investigation by the New York State Police (NYSP), during which Mr. Bowman admitted that he had knowingly received two handguns from someone who he knew possessed them illegally and that he made false entries about these two handguns into his legally required logbooks." (p.2-3)

214.   There was **no "investigation** by the New York State Police" of Mr. Bowman in 2019, nor did Mr. Bowman "admit" to "knowingly receiv[ing] two handguns from someone who he knew possessed them illegally," nor did Mr. Bowman "admit" "he made false entries about these two handguns into his legally required logbooks."

215.   It was not, nor is it, Mr. Bowman's intention to engage in a federally-authorized FFL-to-FFL transfer in a manner that is anything less than compliant with federal law. 18 U.S.C. §922(a); 27 CFR §§478.93, 478.94, 478.95, 478.122, 478.123, and 478.125.

216.   Mr. Bowman did not, nor would he, knowingly engage in an illegal interstate transfer of a firearm.

217.   It is, and was at the time in question, legal under federal law for a federally-licensed dealer in firearms to make an interstate FFL-to-FFL.

218.   There is, nor was there at the time in question, no state law concerning the inter-state transfer of a firearm by a state-licensed dealer. Such a transfer, *arguendo* that it occurred, is done exclusively on the federal license.

219.   No document in admissible form, or otherwise, supports the language of the "Press Release" of July 18, 2025 that the NYS Police engaged in an "investigation" in or about 2019 of Mr. Bowman or Bowman's Gun Shop.

220.   There is a reference in the NY County Court order, served upon Defendants by Plaintiffs with the "Order to Show Cause" at "Exhibit 4" that states  "NOW, on good cause shown by a New York State Police Incident Report received by this Court on February 25, 2019, indicating {X}." Any such "Incident Report" was not attached to the papers as served by Defendant NY Attorneys General upon Plaintiffs.

221.    The two NY County Court orders, as served upon Defendants by Plaintiffs with the "Order to Show Cause" at "Exhibit 4" **on their face** violate *ex parte* motion practice, whether under NY CPLR §2213 or NY CPLR §7804, including by commencing a proceeding without a pleading by a county attorney or district attorney of competent authority to request relief within the jurisdiction of the court against a licensee, or, for a licensee to appeal an administrative ruling by the licensing officer (in St. Lawrence County, against the county court judge).

222.    The language of the *ex parte*-based introduction paragraph ("NOW"), does not give notice of any state requirements or responsibilities that "Timothy C. Bowman" (see caption) is alleged to have violated, either in terms of his individual concealed carry permit or his state license as a dealer in firearms and/or as a gunsmith.

223.    Any underlying papers, including any NYSP "Incident Report" would have been required to be served upon Plaintiffs, and there is no indication from the orders that such an action was undertaken. See, e.g., CPLR, art. 22 and art. 78.

224.    The as-titled "Order of Suspension and Notice of Right to a Hearing" appears to have been issued *ex parte* and should have been clearly marked and titled as such.

225.    Neither a county court nor the NYS Police have jurisdiction over a federal ATF license or any federal records created and maintained by Plaintiffs pursuant to the federal license and federal law and regulations. Equally, in 2019, there was no state statute requiring state-licensed dealers in firearms to create or maintain any records for the State of New York or to authorize any state-required records reviewed or evaluated by the NYS Police. The Plaintiffs' federal records could not have provided basis for either an "investigation" by the NYS Police, nor an order by a NY County Court.

226. The two NY County Court Orders, as served upon Plaintiffs by Defendants with the "Order to Show Cause" at "Exhibit 4," **on their face**, raise a plethora of legal issues, including (a.) federal versus county jurisdiction; (b.) no recitation of federal law requiring the federally-licensed dealer in firearms to maintain the A&D Book in accordance with its form and contents requirements; (c.) no recitation of federal law penalties for failure to do so in a timely and accurate manner; (d.) no recitation of subject matter or personal jurisdiction over federal laws, regulations, and records of a federally-licensed dealer in firearms; (e.) no witness or evidence from the ATF; (f.) no evidence of a specific A&D Book entry; (g.) no calling of the third party who allegedly walked the two handguns into Bowman's Gun Shop; (h.) no information about the lawful owner of the handguns; and, (i.) no reflection of what the Court would have deemed to be the lawful approach that should have been taken in accordance with any state law that should have been (but was not) taken.

227. The "Press Release" of July 18, 2025 raises questions about an event that may have occurred, *arguendo*, six years ago. Any known state statute of limitations would have expired, making academic the analysis of a potential criminal charge against a person (deceased in the interim) who allegedly brought two handguns into Bowman's Gun Shop in 2019 for an interstate FFL-to-FFL transfer.

228. In fact, it was because of a peculiar conversation in 2019 with (former) NYS Police Officer Patrick Loveland, that Mr. Bowman, contemporaneously, of his own volition, requested and engaged in an after-action review of the transaction with his (former) regional ATF Agent. He understood from the ATF Agent that his A&D Book entries were correct and the steps he undertook in advance of the transfer were correct as a matter of federal law and in accordance

with his federal license. No changes were made by the ATF to Mr. Bowman's original A&D Book.[63]

229. As to the conversation with former NYS Police Officer Loveland and a date in or about 2019, the Officer appeared at Bowman's Gun Shop and asked questions about a man well known in the community to be a friend of the Officer.

230. At no time did NYS Police Officer Loveland present Mr. Bowman with a search warrant or any other legal document that would have formalized a conversation that otherwise amounted to gossip about a divorce.

231. Another person brought up by Officer Loveland on that same occasion was known to Mr. Bowman to have been a former employee of a different NY-based FFL and to have a NY concealed carry permit.

232. NYS Police Officer Loveland did not indicate that any of his questions related to a federally-disqualified person(s), a person lacking a valid concealed carry permit, or any suspected illegality associated with the physical firearms.

233. NYS Police Officer Loveland did not provide any reason for an officer of the state police to be having a public conversation about the private affairs of the officer's friend.

234. NYS Police Officer Loveland was at Bowman's Gun Shop on multiple, subsequent occasions. The subject was not revisited.

---

[63] There is a formal system for doing so when applicable. See, for an introduction on point, Rydberg, J., "Zero Tolerance Protection: How to Make Corrections (Correctly)," Orchid Advisors website blog (Sept. 8, 2022) at https://orchidadvisors.com/zero-tolerance-protection-how-to-make-corrections-correctly/.

235.   Mr. Bowman received no relevant, subsequent communication from a court of competent jurisdiction, such as a NYS Supreme (divorce) or Family Court (custody/visitation, child support, order of protection).

236.   In relation to what may have been the County Court Order of March 6, 2019, as attached to the "Order to Show Cause" served on Mr. Bowman at "Exhibit 4," in or about 2019, former NYSP Officer Loveland appeared with a second Officer, to collect handguns from inventory of Bowman's Gun Shop and to collect Mr. Bowman's personal handguns.  The second Officer looked at a piece of paper (not shown to Mr. Bowman) and asked Loveland why "this" hadn't been done two weeks prior, to which Loveland blew off the other Officer and said it was "not high on his priority list."  Officer Loveland downplayed to Mr. Bowman the upcoming date at court as being routine, and similar to informal concealed carry permit license interviews conducted by this particular Judge in his office.

237.   As Mr. Bowman was leaving the courthouse after the second County Court appearance, Officer Loveland appeared and approached Mr. Bowman to express in the manner of an apology or remorse that he hadn't known the court was going to take away Mr. Bowman's license for so long.

238.   Following several similar encounters with Officer Loveland, between in and about 2019 through in or about 2021, Mr. Bowman reached out to Loveland's NYSP supervisor (Canton). Mr. Bowman related his concerns about the Officer's abusive and erratic behaviors.   He provided a recording of a telephone call with Loveland during which the Officer was shouting and yelling at Mr. Bowman, interspersed with profanities.  The supervisor requested the filing of a formal complaint, which was done by Mr. Bowman and his son.  Upon information and belief, NYSP Officer Loveland retired not long thereafter.

239. The ordered paragraphs of the March 6, 2019 "[*Ex Parte*] Order of Suspension and Notice of Right to a Hearing" were never executed upon in full, as evidenced by the <u>blank</u> section on page 2 that would have been filled out by an executing officer.

240. At no time did the NYSP "take all steps necessary to lock down the licensee's place of business," nor did the NYSP "insure (*sic*) the licensee shall have no access to said premises or to any weapons, firearms or handguns, including any and all long arms…"

241. Bowman's Gun Shop remained open for business at all times, before, during, and after the court proceedings. It simply did not have handguns for sale for a period of approximately six months.

242. Mr. Bowman does not recall being formally served or otherwise receiving or seeing the two "Orders" of Judge Richards now received by him on July 22, 2025 attached to the "Order to Show Cause" at "Exhibit 4." Neither Order is familiar to him. He has no recollection of ever having seen or heard that his business was under a court order to be shut down under the terms of the "[*Ex Parte*] Order of Suspension and Notice of Right to a Hearing" of March 6, 2019. Learning about the language in the old County Court Orders and being able to put it into the context of events involving Officer Loveland came as a shock to Mr. Bowman.

243. Mr. Bowman twice left the county courthouse without any papers in his hands.

244. Again, Bowman's Gun Shop was never shut down by the NYS Police.

245. All federal jurisdiction and due process issues raised herein are unfamiliar to Mr. Bowman and, to the best of his knowledge, were not made part of the earlier court appearances.

246. Mr. Bowman had and continues to have solid and regularly inter-active relationships with multiple persons employed by St. Lawrence County, particularly as part of the execution of his

state and federal responsibilities, including, but not limited to, assisting persons with purchases of handguns that are inventoried on their individual permits, and, himself, undergoing the same as an individual concealed carry permittee. No one brought to his attention the language of Judge Richards' 2019 Orders or asked why his business *wasn't* closed.

247. In a departure from proper court proceedings that commence through an *ex parte* order, the County Court appears to have gone forward with a second court appearance without completion of the "Return to the County Court by Police Officer," without an affidavit of service, and, without spelling out in the record a judicial approval of the modification of the terms of the *ex parte* order and any modification in the requested relief.

248. Any "New York State Police Incident Report received by this Court on February 25, 2019" was neither attached to the March 6, 2019 Order of Judge Richards as supplied by Defendants, nor was included as part of the NYSP records attached to the "Order to Show Cause" at "Exhibits" 5 and 6.

249. Judge Richards did not have jurisdiction over the individual concealed carry permit of Mr. Bowman or his personal handguns. There is no indication on the face of either Order of an alleged violation of the terms of Mr. Bowman's personal use or possession of his handguns.

250. Even the "Press Release" of July 18, 2025 by Defendants makes no remark concerning Mr. Bowman improperly owning, using, or possessing any handgun of his person or from his permit-listed handgun inventory.

251. Assuming *arguendo* that NYSP Officer Loveland made some form of written submission to Judge Richards (not attached, as served upon Plaintiffs on July 22, 2025) such contact may have constituted *ex parte* communication. NY Administrative Rules of the Unified Court System & Uniform Rules of the Trial Courts, Part 100.3(B), under "Adjudicative

Responsibilities," includes subdivision (6): "A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers concerning a pending or impending proceeding, except (a)-(e)." (emphasis added)

252. Judge Richards also collapsed his role as a judge into that of a prosecutor, as reflected not only in the lack of any county attorney or county district attorney appearing to seek any requested relief, but also the language of the Order of April 26, 2019, such as "The hearing did not go forward. As a result *of negotiations* with Mr. Haggard *and the Court*…" Judge Richards appears to have failed to uphold the integrity and independence of the judiciary by acting both as a judge and as an attorney from the executive branch. NY Administrative Rules of the Unified Court System & Uniform Rules of the Trial Courts, Part 100.1, 100.2(A), and 100.3(A).

253. There is no transcript of either court appearances in County Court amongst what Defendants served upon Plaintiffs.

254. The two Orders of March 6, 2019 and April 26, 2019, presented as signed by Judge Richards, are not in a form able to be given judicial notice, nor are they presented in admissible form. Fed. R. Civ. P. 201(b), 404, and 1005.

255. Even if a court were to admit such orders into evidence as part of a general negligence claim, the orders are of no evidentiary value.

256. Except for the chatter by Officer Loveland described above, the myriad of problems with the two County Court Orders were or should have been readily apparent or could have been readily ascertained by any attorney practicing law in New York with experience in concealed carry permit applications and hearings. Even without the specialized experience required

concerning federally-licensed dealers in firearms, questions of federal versus state jurisdiction and a court obtaining subject matter jurisdiction are obvious from the face of the County Court Orders.

257. There was no reason to include the alleged 2019 event or the 2019 "Orders" of Judge Richards in the "Press Release" of July 18, 2025 other than to defame, harass, or maliciously injure Mr. Bowman and Bowman's Gun Shop.

      b)     **Press Release Event #2: The 2019 Burglary of Bowman's Gun Shop as a Textbook Example of How and Why Federal Agencies and Law Are and Should Remain on Lead for Licensed Dealers of Firearms.**

258. Regarding the second event, the Press Release asserts false facts, exactly as follows:

> "In September 2019, burglars broke into Bowman's Gun Shop and stole two shotguns, three rifles, two pistols, a BB gun, and over 50 boxes of ammunition, and cash. The burglars entered through an exterior door that was unlocked and then forced open an interior door. Following this first burglary, Mr. Bowman did not take adequate steps to improve security at the store." (p.3)

259. In 2019, Bowman's Gun Shop was burglarized by three men who were in the U.S. Army, stationed at Ft. Drum, who were identified, charged, pleaded guilty, convicted, and sentenced. All firearms were recovered. No persons suffered harm. The outcome for a second, area shop also burglarized a few days later, was similar.

260. The men broke into Bowman's Gun Shop through a locked, rear exterior door by forcibly disassembling the door casing off the frame. The burglars were captured through interior cameras wired to video storage, which was used to alert the public, and to identify the defendants, as well as to achieve convictions. Mr. Bowman took numerous steps in conjunction with the ATF, the St. Lawrence County Sheriff's Department, the NYSP, federal

prosecutors, and the media, contributing to a swift and successful outcome. The defendants also admitted to and were convicted of burglarizing a second licensed gun shop nearby.

261. There was no (zero) involvement of the NY Attorney General Letitia James or her Assistant NY Attorneys General in this event.

262. All criminal case proceedings in 2019, *et seq.*, took place in federal court at the direction of prosecutors from the U.S. Department of Justice, in the Northern District Federal Court, as follows:

- *USA v. Devin Diggs*, N.D.N.Y. case 8:20-cr-0031, Complaint filed October 2, 2019 (CM/ECF doc. 2); Judgment entered October 8, 2020 (doc. 42);

- *USA v. Tyrease Kimmons*, N.D.N.Y. case 5:19-cr-00416, Complaint filed October 2, 2019 (doc. 2); Judgment entered February 3, 2021 (doc. 34); and,

- *USA v. Rian Patterson*, N.D.N.Y. case 8:20-cr-00021, Complaint filed October 2, 2019 (doc. 2); Judgment entered September 29, 2020 (Minute Entry).

263. All firearms stolen from Bowman's Gun Shop in 2019 were recovered. The stolen firearms were returned to the inventory of Bowman's Gun Shop by the NYSP ("Order to Show Cause" at Exhibit 5, p. 22), except one which was destroyed by the ATF due to a criminal attempt to and damage of one serial number.

264. It was not, nor is it, Mr. Bowman's intention that his shop would be burglarized in 2019 or at any other time. Mr. Bowman has, since starting his business, continuously invested money, time, and oversight into security features and security enhancements of his business premises that went and continue to go beyond federal and state requirements.

265.    According to the NYSP partial records from the 2019 burglary, attached to the State's

"Order to Show Cause" as "Exhibit 5," at "date of action: 09/14/2019:"

> "I interviewed the complainant, TIMOTHY C. BOWMAN, who stated on September 13, 2019, he closed the gun shop at about 6:00 p.m.  TIMOTHY BOWMAN locked the front and back door of the shop before leaving.  The back door has a bolt lock and a lock on the handle." (p. 8)

> Continuing further down the same entry: "TIMOTHY BOWMAN [the next day] watched the news until about 8:50 a.m., went out to the gun shop and unlocked the door to prepare for the day." (p. 8)

> And continuing down the same entry: "He walked around to the cash register and saw the wooden door frame of the back door on the floor.  TIMOTHY BOWMAN walked over to the back door and observed the door was ajar." (p. 8)

266.    Mr. Bowman was not a stranger to, nor was or is he adverse to, alarms and security cameras, particularly because of his work as a Corrections Officer for the State.

267.    Mr. Bowman conscientiously purchased, installed, and operated a computer-based camera system and video storage system at his gun shop as soon as he shifted from inside of his house to the free-standing building (his home having independent security systems) – years prior to the 2019 burglary.

268.    At the time of the 2019 burglary, the security at Bowman's Gun Shop included multiple aspects of structural and operational security, including, at least eight cameras external and internal to the shop, video storage of feed from all cameras; and, a wired, full-building alarm system with central alarm relay through a NYS-licensed security company.  Mr. Bowman and Bowman's Gun Shop paid for all such security features, oversaw such security, and worked in an on-going manner with the security company.

269.    <u>None</u> of the security features of Bowman's Gun Shop, including the cameras, video feed and storage, and third-party security contract were required by federal or state law in 2019 or at any time prior.

270.    According to the NYSP partial records from the 2019 burglary, attached to the "Order to Show Cause" as "Exhibit 5", date of action 09/16/2019:

> "During a re-interview of TIMOTHY BOWMAN, I learned of an unsecured WiFi network at the gun shop. TIMOTHY BOWMAN agreed to provide access to the Troop B Computer Crimes Unit for download. Investigator [redacted] was notified and responded. The netgear (*sic*) router was downloadable to preserve historical digital events at the gun shop at the time of the burglary. A Gen'l 34D, Digital Photo Record was completed, a copy of which is attached to this report as Enclosure #13." [Not provided with the "Order to Show Cause."] (p. 12)

271.    Immediately following the 2019 burglary, on his own initiative, Mr. Bowman upgraded and expanded his existing network of cameras and video surveillance and storage at his shop. He also had to repair and refortify the casing around the rear door to the shop, which the burglars had forcibly disassembled and destroyed, using some sort of hammer or crowbar.

272.    As was eye-witnessed by an Officer of the NYS Police and found in the NYSP partial records attached to the "Order to Show Cause" at "Exhibit 5," from 09/16/2019 – two days after the burglary – as follows:

> "I patrolled to 377 County Route 11, town of Gouverneur for scene visit. I located TIMOTHY C. BOWMAN, proprietor of Bowman's Gun Shop, inside. I re-interviewed TIMOTHY BOWMAN and he had no new information or leads regarding the burglary. TIMOTHY BOWMAN was in the process of installing a new camera system, which will record all activity outside of the building. I inspected the

rear (south) door to the gun shop.  The door casing had not yet been permanently repaired during my scene visit.[64]” (p. 12)

273.　On October 1, 2019, the Watertown Daily Times covered Mr. Bowman's tenacity to "beef up security" following the burglary in their article by T.W. Eckert titled "In shadow of shop burglaries, owners beef up security, advise inventory lists to help relocated stolen goods."

274.　In 2019, there were *no* federal or state requirements for licensed dealers in firearms to install or use security cameras, surveillance footage, video storage, or a building alarm system with central relay – that would come at the state level three years later, on December 5, 2022 (via NY GBL §875).

275.　In 2019, there were no state or federal laws or regulations concerning doors or windows or other points of ingress or egress such as loading docks or overhead delivery doors as distinct from man doors – nor are there any such to this date.

276.　In 2019, Mr. Bowman's shop exceeded state and federal statutory requirements governing the physical structure and operations of a state and federally-licensed gun shop, including cameras, video storage, alarm system, door locks and dead bolts, materials used in the physical construction of the walls, and lighting.

277.　Following the 2019 burglary, none of the improvements made by Mr. Bowman were required by state or federal law.

278.　Mr. Bowman has been and is safety-conscious with respect to his shop and its inventory.

---

[64] *N.B.*:  the opening was sealed, pending the repair.

279. As soon as Mr. Bowman discovered the 2019 burglary, he immediately contacted '911' and he got right to work with the NYS Police, the St. Lawrence County Sheriff's Department, and, within approximately 90 minutes, the ATF.

280. Immediately after discovery of the 2019 burglary, Mr. Bowman completed the federally-required ATF Loss/Theft Report (ATF Form 3310.11), which he attested to and filed with the ATF and which was processed by the ATF. He had previously received routine training from the ATF on loss/theft procedures and reporting requirements. He understood what was required of him by federal law and regulations. And, he fulfilled those responsibilities properly and in a timely manner.

281. Within a day or so of the discovery of the 2019 burglary, Mr. Bowman engaged in the full firearms inventory reconciliation, conducted on-site with the ATF. The reconciliation included the physical identification of all firearms – one-at-a-time – hands on – to account for every open entry in the A&D Book. Both Mr. Bowman and the ATF signed off on that inventory reconciliation and in relationship to the 2019 ATF Loss/Theft Report.

282. The reason the Defendants' Press Release contains a list of stolen firearms is because Mr. Bowman, in conjunction with the ATF, maintained the firearms inventory of Bowman's Gun Shop in accordance with federal law, including (a.) an accurate A&D Book; (b.) training from the ATF concerning inventory control and record-keeping; (c.) applying that knowledge and his increasing experience in partnership with the ATF during the post-burglary inventory reconciliation and ATF Loss/Theft Report; and, subsequently, (d.) being ready to receive the stolen firearms into inventory from and in accordance with further training and guidance from the ATF as to that unique federal record-keeping requirements in practice.

283. Equally, federal investigators and the federal court had critical evidence as a result of Mr. Bowman's record-keeping and attestations, as matched to the recovered firearms. That work by Mr. Bowman with the ATF, federal investigators, and federal prosecutors became evidence in admissible form and contributed to the admission of guilt by three men to multiple federal crimes committed against Plaintiffs and a second gun shop.[65]

284. The property stolen from Bowman's Gun Shop in 2019, as appears in the NYSP partial records attached to the "Order to Show Cause" at "Exhibit 5" on pages 4 through 8 is copied by the NYS Police from records prepared immediately after discovery of the crime scene by Mr. Bowman and the ATF, such as the ATF Loss/Theft Report.[66,67]

285. In 2019, Mr. Bowman cooperated fully with all law enforcement officers, including (a.) giving sworn statements; (b.) stolen property valuations; (c.) property damage valuations concerning the shop and then concerning the recovered firearms; (d.) allowing full access to the business premises; (e.) allowing full access to all video storage; (f.) remaining engaged with law enforcement in an on-going basis; and, (g.) cooperating with the media as part of the request for assistance from the public launched by the NYS Police.

286. The only reason the NYS Police were able to obtain a media appeal to the public for help investigating the burglary was through use of the cameras and surveillance footage captured by Bowman's Gun Shop. The video, as stored, was of sufficient quality to extract still shots

---

[65] The defendants "broke down the front door" of the second, nearby shop. News 7 WNNY-TV, "Another gun shop burglarized" (Sept. 30, 2019).

[66] *N.B.*: the A&D Book is a federal law construction. No comparable records were required under state law in 2019 or to present as the Superintendent issued no such form in accordance with NY GBL §875-f (see above under Defendant – Superintendent of the NYS Police).

[67] Even the NY Point of Contact background check system instituted September 13, 2023 would be insufficient for NYS Police to achieve such inventory reconstruction as the system is a dispositions-only system.

from it to publish in the local newspapers and to air on television. See, e.g., "NYSP Seeking Public's Assistance in Burglary at Bowman's Gun Shop," The Gouverneur Tribune Press (September 26, 2019).

287. All federal prosecution records are public-facing within the PACER system and were freely available to Defendants prior to creation of the "Press Release" of July 18, 2025.

288. All defendant names and prosecutions were brought directly to the attention of Defendant Assistant NY Attorneys General Martha Grieco and Susan Griskonis through correspondence from Counsel to the Plaintiffs transmitted October 15, 2024 and then filed in *Bowman I* on November 12, 2024 to the state court public record. NYSCEF, EFCF-24-167057 at no. 16, including all U.S. DOJ Press Releases (October 3, 2019, February 12, 2020, September 29, 2020, and October 6, 2020) and all defendant prison locator results.

289. On September 29, 2019, within days of the burglary at Bowman's Gun Shop, a second burglary took place at a licensed gun shop approximately five miles away. According to the NYSP partial records attached to the "Order to Show Cause" at "Exhibit 5," p. 21, the St. Lawrence County Sheriff's Department responded also to that call and subsequently communicated with the U.S. Army Criminal Investigation Command ("CID," herein) at Ft. Drum (any further notes in the NSYP partial records being fully redacted).

290. It has been so long since the actual crimes occurred against Mr. Bowman and Bowman's Gun Shop and the second gun shop that the three men convicted of the 2019 federal crimes were released from prison upon *completion* of their sentences. Upon information and belief, the men are believed to have also completed their paroles.

291. The 2019 burglary is irrelevant to any claim now trying to be fashioned by Defendants under NY GBL §898-b, sounding in negligence. The event preceded the effective dates of NY GBL §898-b (as amended, 2021) and NY GBL §875 (eff. Dec. 5, 2022).

292. The facts contained herein were readily apparent or could have been readily ascertained by Defendant NY Attorneys General, including through Google search and PACER search. Defendant NY Attorneys General could have reviewed the federal prosecution, conviction, and sentencing in the federal cases, the U.S. DOJ Press Releases, the media coverage, and could have contacted federal prosecutors with any questions.

293. The value of an after-action analysis of the 2019 burglary at Bowman's Gun Shop is that federal ATF agents and federally-licensed dealers in firearms demonstrated preparedness and competency in their rapid response to a loss or theft of a firearm from inventory using controls and systems already in place, which contributed to the conviction of the criminals and the recovery of the stolen firearms through a process admissible into evidence.

294. Plaintiffs are part of a federal, nationwide, uniform system has evolved over more than fifty years with the full and bi-partisan support of Congress and several U.S. Presidents.

295. No state or local law enforcement agency has the expertise, resources, and budget, as does the ATF. ATF procedures and systems that have developed since 1968 on as large a scale as all fifty states and U.S. territories, through the size and budget of the agency, and with the collaborative work of all the ATF federally-licensed FFL Type-01/02 dealers and other FFLs.

296. The original bill version of NY S.4970-A was a one-subject bill that acknowledged and sought to take advance of the unique and superior value of an ATF trace to benefit public safety in New York. The federal trace system is only possible because of the daily dedication of federally-licensed dealers in firearms, such as Plaintiffs. The bill circled through the legislative

hopper for years, had the sole purpose of NY EXE §230(4) that every report made to the state criminal gun clearinghouse:

> "will result in the prompt submission of a request to the national tracing center of the bureau of alcohol, tobacco, firearms and explosives to trace the movement of the subject gun and such federal agency will be requested to provide the results of such a trace to the superintendent of the division of state police and to the law enforcement agency that submitted the clearinghouse report."

297.    Burglaries at FFLs, nationwide, are sufficiently rare that state and local law enforcement doesn't and won't ever develop of the competency and experience to exclusively serve the purpose of investigators of crimes committed against state and federally-licensed dealers in firearms or to perform the complex work required in its immediate aftermath. Nor is the NYS Police capable even of carrying out routine inventory reconciliations during the regular course of business.

298.    Nationwide, from 2019 to 2023, of the total firearms reported stolen to the ATF, only 2.8% occurred at an FFL. Over 95% of firearms theft occurs against private citizens. The remaining 2% were thefts occurred during transit of interstate shipments. U.S. DOJ, National Firearms Commerce and Trafficking Assessment (NFCTA), Vol. IV, Pt. II, "Firearm Thefts from Private Citizens," p. 7-8.[68],[69]

299.    Between 2019 - 2023, FFL thefts occurred at an incident rate of 5.6 per 1,000 FFLs. *Id.*, p. 12. Translating this ratio to the NY FFL-01/02 industry of, in May 2022, a total of 1,791

---

[68] ATF website, <u>National Firearms Commerce and Trafficking Assessment (NFCTA): Protecting American from Trafficked Firearms – Volume Four</u> (2025), at https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-firearms-trafficking-volume-four.

[69] This ATF-lead research group conducted a comprehensive study of criminal gun trafficking, under the April 2021 directive of U.S. President Biden and U.S. Attorney General Garland. The fourth and final volume issued Jan. 8, 2025.

such licensed dealers, one would expect approximately eight or nine burglaries/year, statewide. Indeed, in 2019, the ATF annual "Federal Firearms Licensee Theft/Loss Report" shows a total of three (3) burglaries reported.[70]  In 2020, that figure is seven (7) burglaries reported.[71]

300.    There was no reason to include the 2019 burglary in the "Press Release" of July 18, 2025 other than to defame, harass, or maliciously injure Mr. Bowman and Bowman's Gun Shop.

c)    **Press Release Event #3**:  **The 2020 Burglary of Bowman's Gun Shop.**

301.    Regarding the third event, which is the 2020 burglary at Bowman's Gun Shop, the Press Release asserts false facts, exactly as follows – this is part one of the full quotation:

> "A year later, in September 2020, another group of burglars broke into Bowman's Gun Shop.  This time, the burglars stole 28 pistols, 12 revolvers, nine rifles – including four AR-style rifles – and two shotguns.  The burglars were able to enter the store because Mr. Bowman had left a window partially open when the store was otherwise closed.  Although Bowman's Gun Shop had an alarm system in place at the time of the second burglary, Mr. Bowman admitted that he neglected to arm the system "three quarters of the time," including on the night of the second burglary." (p.3)

302.    On October 28, 2021, at the invitation of the federal prosecutor, Mr. Bowman testified at the court martial of criminal defendant Elan-Ray Anglin (herein "Anglin") before a military judge at Ft. Drum, where a plea agreement was placed upon the record to multiple federal crimes and a prison sentence was ordered.  The defendant was represented by multiple attorneys from JAG Corps.  The government prosecutors were present, as well.

---

[70]  ATF website, "Federal Firearms Licensee (FFL) Theft Loss Report – 2019," slide 4.
[71]  ATF website, "Federal Firearms Licensee (FFL) Theft Loss Report – 2020," slide 4.

303. According to the defendant's live testimony in open court, four soldiers burglarized Bowman's Gun Shop, including the defendant, Mr. Elan-Ray Anglin [Anglin, TR:103, 112-113]. All four men were at that time enlisted in the U.S. Army, stationed at Ft. Drum [Anglin, TR:102]. Anglin plus a second soldier from the U.S. Army worked together to force a window open that was closed. One soldier, trying to break in on his own was insufficient to pry open and forcibly raise the lower window sash to a height through which the two men could enter. A third soldier waited outside the building and the fourth soldier waited in the rental car at the road [TR:111, 112-113].

304. Anglin is the one man who was part of the 2020 burglary known by Mr. Bowman to have been identified and charged, to have pleaded guilty, and to have been convicted and sentenced.

305. The statute of limitations for identifying, charging, and prosecuting the three additional soldiers (criminals #2 - #4) is believed to have expired as of on or about September 20, 2025.

306. There were two additional men who were former members of the U.S. Army, as identified by Anglin as receiving some of the stolen firearms. [Anglin, TR:122-132]

307. The statute of limitations for so identifying, charging, and prosecuting the two additional men (criminals #5 and #6[72]) is believed to have expired as of on or about September 20, 2025.

308. While the statute of limitations was expiring against the criminals who partook in the 2020 burglary, the NY Attorney General and her Assistant NY Attorneys General were, instead, pursuing the victims of the crime – the Plaintiffs – via "Press Release."

---

[72] During the plea colloquy and court-martial, one of those men off base (criminal #6) was named; the other (criminal #5) was not. [Anglin, TR:130]

309.    On October 28, 2021, during live testimony in a U.S. Court of Military Justice, both the

defendant and Mr. Bowman, separately, testified in open court that the window was tightly

closed when Anglin and criminal #2 began breaking and entering into the building.

310.    In one window of the shop (both prior to and after the burglary) was an air conditioner unit,

put on two blocks with lags going into the sill to hold the window closed, leaving a 1/2"

opening for a hose running outside.  That window and air conditioning unit was not disturbed.

311.    The building of Bowman's Gun Shop was a ground-up build of new construction, designed

and undertaken by Mr. Bowman for the specific purpose of the gun shop.  The two windows

(one in each side wall) were new, Pella windows.

312.    On October 28, 2021, during live testimony in a U.S. Court of Military Justice, Anglin

described that he went to Bowman's Gun Shop at 2 a.m., when it was closed, and that he and

criminal #2 broke into and entered the building through a window on the side of the building

that was closed and required the force of two soldiers to open, as follows:

      Anglin:    It was difficult, at first, for him to get his hands in and under the
                    window, in the windowsill, so I helped.  Yeah.

      Judge:     So you also pried open the window with the other person?

      Anglin:    Yes, Your Honor.

      Judge:     So, when I asked if you opened the window, you said "No."
                    You did help this other –

      Anglin:     I did, in fact, open the window.

      Judge:     You and another person, together, opened the window?

      Anglin:    Yes, Your Honor. [TR:116]

313.    Anglin's live testimony continued a few minutes later, when the Judge asked him, again:

      Judge:     So just to be very clear:  That window wasn't open, was
                    it, when you go there?

      Anglin:    No, it wasn't, Your Honor.

Judge: There were no signs that said, "Come on in"?

Anglin: No, there wasn't, Your Honor. [TR:120]

314.  Mr. Bowman also testified at the hearing, under oath, responding to questions presented by the prosecutor, including describing twice how he had "closed" and "locked" his business the night of the burglary, as follows:

> Advocate: Now, on the Friday before, what did you do before you closed up for the weekend?
>
> Bowman: I made sure everything – I put up – put my money in my safe. I made sure all the windows were secure, the doors were secure. [TR:275]

And, again, later in the testimony:

> Advocate: Before you had left for the weekend, had you secured the windows and doors?
>
> Bowman: Yes. I made sure the windows were all locked; the back door was secure, locked; and the front door was secure and locked when I left." [TR:281]

315.  One of the immediate visual cues to Mr. Bowman upon entry was that "the window was a little ajar." [TR:281]

316.  The window through which Anglin and criminal #2 broke in was a Pella tilt double-hung window that was new upon installation. The window was installed into the wall at approximately three feet (3') off the ground. Raising the lower sash creates an opening of fourteen inches (14"). To gain entry through the closed, locked window required a person to find leverage at the mid-point of the window, then begin to lift from the crack beneath the lower sash, get hands in the opening crack, and, during the attempted lift, apply considerable force to break the latches and pin hooks. That tilt-capable mechanism, if damaged, then disbalances the pivots and increases resistance against raising the lower sash.

317.    Then, two men had to be hoisted the three feet upwards to clear the sill and drop that distance to the floor inside the shop.

318.    Basically, to gain entry into Bowman's Gun Shop through that means could only be done by soldiers, fit and skilled from basic training with the U.S. Army. It was a plan that applied obstacle course training that is otherwise intended to prepare soldiers for overseas deployments and the clearing of rooms under cover of darkness.

319.    To the best of the knowledge of Mr. Bowman, Mr. Anglin was not a disqualified person on the day he committed his crimes. Mr. Anglin could have chosen, instead, to walk through the front door of the shop, be greeted by a Veteran of the U.S. Army Reserves, and lawfully attempt to purchase a firearm, including completion and submission of the ATF Form 4473. The same, as far as Mr. Bowman is aware, would have been true for Messrs. Diggs, Kimmons, and Patterson in 2019.

320.    Mr. Bowman's testimony was open to cross-examination, which was waived by defense counsel. It was also available to judicial inquiry. The defendant was present in the courtroom while Mr. Bowman testified.[73]    [TR:283]    Mr. Bowman had the opportunity to observe Mr. Anglin during his victim impact testimony.

321.    As with the 2019 burglary, as soon as Mr. Bowman discovered the 2020 burglary, he immediately contacted '911.' He then went straight to work with the arriving NYS Police, the St. Lawrence County Sheriff's Department, and, shortly thereafter, the ATF. [Also, TR:281.]

---

[73] *N.B.*: Mr. Bowman was only permitted to be in the courtroom during his own testimony.

322.   Immediately thereafter of discovery of the 2020 burglary, Mr. Bowman, with the assistance

of the ATF, completed the federally-required 2020 ATF Loss/Theft Report, to which he attested

and filed with the ATF and which was processed by the ATF.

323.   As referenced in the NYSP partial records attached to the "Order to Show Cause" at

"Exhibit 6," the NYSP were eye-witnesses to the 2020 ATF inventory reconciliation operations

conducted on site and in conjunction with Mr. Bowman at Bowman's Gun Shop, as follows:

> "On 09/21/2020, ATF agents [redacted] and [redacted] responded to
> Bowman's Gun Shop. ATF agents conducted a complete inventory
> of Bowman's Gun Shop." (p. 15)
>
> Continuing down the note: "A copy of the ATF inventory of stolen
> guns from Bowman's Gun Shop is attached to this report as
> Enclosure #5." [document not attached] (p. 15)

324.   The NYS Police does not participate in an ATF reconciliation audit with an FFL-01,

whether routine or post-theft/loss reporting. It did not do so in the case of either the 2019 or

2020 post-burglary reconciliations at Bowman's Gun Shop.

325.   As with the 2019 post-burglary inventory reconciliation, Mr. Bowman and the ATF

manually went through every open A&D entry and laid hands and eyes physically on every

firearm, in order to accurately prepare and complete the ATF Loss/Theft Form.

326.   As with the 2019 post-burglary inventory reconciliation, Mr. Bowman's federally-required

records were timely and accurately maintained and were ready to go upon arrival of the ATF

approximately 90-minutes after Mr. Bowman called '911.'

327.   As with the 2019 burglary, Mr. Bowman, with tutelage from the ATF as available on-going

to any and all FFLs, maintained the firearms inventory of Bowman's Gun Shop in accordance

with federal law, including maintaining an accurate A&D Book, having received training from

the ATF concerning all aspects of inventory control and record-keeping, applying that knowledge and his growing experience in partnership with the ATF during the post-burglary inventory reconciliation and ATF Loss/Theft Form, and, subsequently, being ready to receive any recovered (stolen) firearms back into inventory from and in accordance with guidance from the ATF as to federal record-keeping requirements.

328.    Approximately one year later, in 2021, during a routine ATF inventory reconciliation, while working directly with Mr. Bowman at Bowman's Gun Shop, his (former) ATF Field Agent discovered that she had not transposed from her handwritten notes onto the ATF Loss/Theft Report one of the firearms not physically accounted for <u>during</u> the 2020 post-burglary inventory reconciliation. Bowman's Gun Shop's A&D Book was accurate as of the date of the post-2020 burglary inventory reconciliation and, again, in 2021. It was the 2020 ATF Loss/Theft Report that was prepared with and approved by the ATF that was missing one firearm timely identified by Mr. Bowman and the ATF Agent as having been stolen.

329.    The ATF Field Agent told Mr. Bowman that she would contact the NYSP to inform them of the inadvertent error on the 2020 ATF Loss/Theft Report. It appears from the NYSP partial records provided with the "Order to Show Cause" at "Exhibit 6" that the ATF Agent did so on or about November 19, 2021, as is reflected by the "date of action" note of that date (p.21-22) and the "property" list entry (undated) for the Ruger revolver (p. 14).

330.    As further enhanced since the 2019 burglary of Bowman's Gun Shop, at the time of the 2020 burglary there were even more cameras that fed to video that recorded the burglary. Again, all cameras, video feed, and video storage at Bowman's Gun Shop were pro-actively purchased and installed by Mr. Bowman – none of which were required by federal or state law at the time of or prior to either burglary.

331.    As with the 2019 burglary of Bowman's Gun Shop, Mr. Bowman made freely available all 2020 burglary footage from the cameras and stored video feed to law enforcement officers, including the NYS Police.

332.    The NYSP partial records provided as attached to the "Order to Show Cause" at "Exhibit 6" reference Mr. Bowman giving consent to law enforcement access to video footage by from Bowman's Gun Shop:

> On 09/21/2020, "BOWMAN signed consent to search forms for his Swann Video Recorder, Ring Video and Internet Service." [no copies attached] (p. 14)

> Continuing into the another note, same date: "On 09/21/20, Troop B, CCU, S/I [redacted] and Investigator [redacted] responded and conducted download of video surveillance and Bowman's Gun Shop internet router. The video and the router information was committed to a CD and secured as evidence."

> Continuing, "Several video clips were secured as evidence and place (*sic*) on DVD." (p. 15)

333.    The NYSP partial records provided as attached to the "Order to Show Cause" at "Exhibit 6" reference video footage items:

> Property Item #5 – CV Containing Ring Camera Footage from August 2020 – Secured at SP Canton BCI. (p. 13)[74]

> Property Item #201 – video from Bowman's Gun Shop – Secured at SP Canton BCI. (p. 13)

> Property Item #202 – DVD-R containing the Ring Video from Bowman's Gun Shop. Secured at SP Canton BCI. (p. 13)

---

[74] No video footage was included with the papers served upon Mr. Bowman on July 22, 2025, which is just one category of items missing from the NY AG-supplied records of the NYSP.

Property Item #203 – (1) DVD-R Containing the Raw Video From
Bowman's Gun Shop – Secured at SP Canton BCI. (p. 13)

334.    In spite of a long recitation by NYSP of what was not working among the cameras at

Bowman's Gun Shop the night of the second burglary, multiple of the approximately sixteen

cameras were working and did record the burglary as it occurred, with necessary clarity (frames

per second), to enable law enforcement officers to write up a description of the physical

attributes of the perpetrators, clothing, and shoes.  The video footage as recorded and stored

allowed out-take stills with sufficient pixels for media outlet reproduction, including in

physical newspapers, to request public assistance in the identification of the criminals.  See,

e.g., Griffin, E., News 7 WNNY-TV, "More than a dozen firearms stolen in Gouverneur gun

shop break-in, troopers say" (September 22, 2020).

335.    As documented in the NYSP partial records provided as attached to the "Order to Show

Cause" at "Exhibit 6" are references to the physical description, the clothing, and the shoes of

the burglars.  That visual information was used throughout the investigation. *See*, e.g., p. 15,

p. 17 (matched to Facebook photograph of defendant), p. 17-18 (interview of defendant

referencing Facebook photograph and clothing depicted in Bowman footage), and p. 18 (search

warrant obtained and executed for clothing, shoes, and duffle bag from Bowman footage).

336.    As a result of the 2020 burglary, Mr. Bowman suffered financial losses of over $14,000 in

refunds and compensation he had to pay out to customers [TR:282] for firearms purchased and

awaiting customer pick-up[75] and for firearms on consignment.  Total financial losses of

---

[75] Such as handguns awaiting county processing to complete the lawful disposition from inventory,
including the data necessary for the A&D Book entry.

approximately $60,000 were attributable to the 2020 burglary. All financial losses were paid by Mr. Bowman and Bowman's Gun Shop.

337. Following the 2020 burglary, Mr. Bowman caused to be designed and installed customized steel bars to the two windows of the building, added another lock to the back door, and added exterior lights over the four entry points into the building to enhance camera visibility at night. [See, also, TR:277 and 283.]

338. Mr. Bowman has, since he started Bowman's Gun Shop, consistently made efforts and invested money and time, to secure his business and its inventory. To this date, there is neither federal nor state law requiring a host of security features Mr. Bowman has spent time and money putting into place at Bowman's Gun Shop across more than ten years in business.

339. Regarding the third event, which is the 2020 burglary at Bowman's Gun Shop, the Press Release asserts false facts, exactly as follows – this is part two of the full quotation:

> "In investigating the second burglary, NYSP were repeatedly contacted by other police departments that had recovered guns in the course of their criminal investigations that had been stolen from Bowman's Gun Shop. Guns stolen in the 2020 burglary were recovered by authorities in New York City, Philadelphia, and Barbados. Moreover, the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) recovered an additional gun that was stolen but was not reported as stolen by Bowman's as required by federally licensed gun dealers." (p. 3-4)

340. As with the 2020 burglary of Bowman's Gun Shop, without Mr. Bowman's record-keeping and attestations, law enforcement would not have been, nor would or will they be, in a position to make *any* attempt to match any recovered firearms without the work performed by Mr. Bowman and the ATF.

341. There is not, nor has there been, any allegation of an error to the A&D Book data of Bowman's Gun Shop as to the make, model, or serial number of a firearm, concerning either the 2019 or the 2020 burglaries.

342. A review of the partial NYSP records served upon Plaintiffs by the NY AGO on July 22, 2025 provides a sharp and disturbing contrast of the "investigation" by the NYSP into the 2020 burglary at Bowman's Gun Shop, compared to the solid and rapid work performed by federal, state, and local agencies in response to the burglary in 2019.

343. A mere two months after the 2020 burglary, the NYS Police effectively stopped their "investigation," without following up on leads from three separate law enforcement agencies, the U.S. Army CID, and at least one important witness who came forward.

344. Errors of the NYS Police combined with additional errors made by the Gouverneur Police Department and the U.S. Army CID to result in the failure to identify criminals #2, #3, #4, and #6 and to recover and restore the stolen firearms to the inventory of Bowman's Gun Shop.

345. The following are some of the obvious deficiencies and errors in the investigation of the 2020 burglary demonstrated by records served by the Defendants NY Attorneys General upon the Plaintiffs, which they, themselves, should have studied prior to making a decision to and composing the "Press Release" of July 18, 2025.

346. First, on the night September 20, 2020, shortly after the burglary occurred, the Gouverneur Police Department stopped the getaway vehicle with the four soldiers in it, speeding away from the scene of the crime with all of the stolen firearms. The local police officer failed to gain valid identification from the driver or to ticket the driver. He did not do so, even though "for an unknown reason there was no data returned for (redacted) driver's license" shown to the

officer "from his cell phone" as "a photograph of his Florida Driver's License."[76]  The local police officer then failed to contact the U.S. Army at Ft. Drum to verify "a US Department of Defense, US Army Identification card" shown to him, as to whether *it* was a valid form of identification.  The officer failed to document the two forms of "identification" shown, even though the officer did establish that the car was a rental.  The officer failed to document identification information about the vehicle and the rental car company.  And, the officer failed to contact the U.S. Army at Ft. Drum to request at least gate camera footage, to assist in the proper identification of the four soldiers.  *See*, the NYSP partial records attached to the "Order to Show Cause" at Exhibit 6, entry 09/25/2020 (p. 16).

347.   After the local police officer let the men drive away, the four soldiers drove around Gouverneur, aimlessly, for more than an hour, as captured on multiple cameras obtained by the NYSP. *See*, as referenced in the NYSP partial records served upon Plaintiffs with the "Order to Show Cause" at "Exhibit 6," date of action 09/28/2020.  That period of one or more hours was a gift to law enforcement.  It would have allowed inquiry and notification to gate police at Ft. Drum of the suspicious activity and to request support with, at the least, the identification of the soldiers in the vehicle upon their return to the gate at Ft. Drum in the middle of the night. It also would have allowed communication to the NYS Police to ask for back-up or further vehicle or driver information (or confirmed lack of valid driver's license information).

348.   During his sworn testimony in a U.S. Court of Military Justice, Anglin testified the four soldiers left the scene of the crime with all of the firearms in the car he had rented; and, that

---

[76]  Anglin was the driver of the rental car.

they returned to the U.S. Army base and entered through the gate. Anglin testified he dropped "both" soldiers off at their barracks and returned to his own barracks. [TR:102-103[77]]

349. According to defendant Anglin, during his sworn testimony in a U.S. Court of Military Justice, he left the rental car, filled with the stolen firearms, parked *on base* <u>for a week</u>. [TR:127] When asked by the Judge "What did you do with the duffel bag full of firearms?" Anglin replied, "I left it in the vehicle, Your Honor." [TR:104]

350. An additional law enforcement error occurred, making reference to "Exhibit 6" when the NYSP and U.S. Army CID failed follow-up on a telephone call from and to interview the "wife" [name redacted] of the "husband" [soldier name redacted]. U.S. Army CID did relay the wife's preliminary telephone information to the NYS Police. The lead was characterized in NYSP records as "a domestic dispute between Fort Drum Soldier (redacted) and his wife (redacted)." (p. 19) The NYSP did not interview "the wife." Instead, NYSP and CID interviewed *the husband*, and told him about the call from "the wife." The husband then accused the wife of being involved with stolen guns, the wife cheating on him with other soldiers, and the wife being involved in drugs. (p. 19-20). Note was made of a U-Haul seen near the off-base apartment. No one from the NYSP interviewed the wife. NYSP and CID let the lead run cold.

351. No further activity was taken by the NYSP concerning the 2020 burglary at Bowman's Gun Shop after the interview of the husband, noted as date of action 11/24/2020.

---

[77] Note is made that the testimony suggests that the fourth soldier was dropped off prior to arriving at the base, which would be consistent with more than one witness testimony concerning an off-base apartment. This point is not necessary to be resolved for purposes of this pleading.

352.    The JAG prosecution may also have included errors.  Allowance is made that one or more persons involved may have become a confidential informant or had the record sealed for the same or similar purposes.  At the time of Anglin's plea colloquy and court-martial, a female witness[78] was denied the opportunity to testify.  The prosecutor called her.  Defense counsel objected, as follows:

> Defense Counsel: "However, these firearms in the stip, they're not the same firearms from the burglary, and there's no facts that are going to be out there that these are firearms that he obtained from any of the charged offenses.  It's an incident that happened with her, and it's in the stip; but that it's actually tied to the specific firearms, there's no back to that.  And so her – or, the effect that had on her, it's not relevant. [TR:307]

> Prosecutor:  "Your Honor, while Specialist [redaction of name by the undersigned Counsel of Record to this pleading] would have no way of knowing what was and was not taken from Mr. Bowman's Gun Shop, these were handguns that were left discreetly in her home around the same time period between October and December of 2020…" [TR:308]

> Judge:  Government, does the court have any way of tying the three handguns in the black backpack in Specialist [redaction of name by the undersigned Counsel of Record to this pleading] off-post residence to the 52 that were stolen? [TR:308]

353.    Mr. Bowman was on base, in the witness waiting room, and not one lawyer or the judge either thought to call him in, to examine the handguns, to use the serial numbers off the handguns to compare to the 2020 ATF Loss/Theft Report in the courtroom and identified by Anglin was an accurate accounting of the firearms[79].

---

[78] *N.B.*:  the name of the witness is in the transcript, but it is not included herein because she did not testify.

[79] As queried by the court, Anglin testified that he reviewed "the list that Timothy C. Bowman gave the investigators" as the basis of his belief that he took "52 firearms." [TR:95]  That "list" was not

354. The prosecutor did not overcome the objection, did not place an offer of proof on the record, and did not call her into the courtroom for the testimony the Court said would be allowed. The prosecutors chose, instead, to waive her testimony, altogether. [TR:307-310]

355. The disposition of the "three handguns" as referenced by counsel and the court is unknown. Mr. Bowman has never been contacted by anyone to identify any firearms recovered, held in evidence, or otherwise, relating to the 2020 burglary.

356. And, there remains the 2020 burglary Pandora's Box, which the "Press Release" of Defendants will now pry open. During the entirety of the multi-hundred-page plea colloquy and court-martial, no one asked Anglin to name the other three burglars or to identify the first of the two additional men who became part of the crime by receiving and possessing stolen property. [TR:93-274] No statement was made whether others were facing charges or had made deals or whether Anglin had become an informant.

357. Defendants' "Press Release" of July 18, 2025 recklessly and needlessly exposes Mr. Bowman, his family, and his business to persons who *years ago* were associated and affiliated in the commission of a crime(s), who are now legally revived as necessary to meet demands created by the prosecutors and investigators who did not capture, charge, or incarcerate them in a timely manner. It is a perversion of Justice for Defendant prosecutors and law enforcement to wait until the eve of the statute of limitations to publicly humiliate and shame the victims of crime to re-expose them to the criminals when there is no societal value to come of identifying criminals who won't be charged.

---

marked for or brought into evidence. *See*, "Certified Record of Trial, preface second page (unnumbered), "Trial Exhibits" listed.

358.    The NYS Police effectively stopped working on the investigation of the burglary at Bowman's Gun Shop on or about November 24, 2020. A mere two months after the crime occurred on September 21, 2020. No further actions were taken by the NYSP, apart from noting in-bound communication from third parties on 12/25/2020 (p. 20), 05/11/2021 (p. 20), 05/11/2020 (p. 20), 06/04/2021 (p. 20-21), and 12/22/2021 (p. 22).

359.    The NYS Police formally closed their investigation on July 26, 2021, less than one year after the burglary at Bowman's Gun Shop on September 21, 2020. The NYSP did not identify or apprehend a single one of six (6) individuals involved in this crime. The NYSP did not physically recover a single firearm, nor return even one firearm to the rightful owner. The NYSP did not and still does not provide any victim support services to Mr. Bowman or his family. The NYSP did not dust for fingerprints or take any DNA swabs (as they did in 2019). The NYSP did not request gate footage from Ft. Drum. The NYSP did not interview "the wife." The NYSP did not act on leads received from NYPD or Philadelphia PD about recovered stolen firearms or push those leads across to the ATF to assist their open and on-going federal investigation, or to otherwise contact the U.S. Army to transmit that communication on an inter-agency basis to assist that open and on-going federal investigation into the burglary and the prosecution of the one man in custody and facing trial.

360.    The partial records of the NYS Police attached to the "Order to Show Cause" include three notes (12/25/2020, 05/11/2021, and 05/11/2021) of potential firearms recoveries *after* the NYS Police had effectively closed their investigation. The "Exhibit" records are so heavily redacted that Mr. Bowman is unable to attempt to ascertain whether the firearm(s) is one that was stolen from Bowman's Gun Shop, or not. The NYS Police did not (at any time) contact Mr. Bowman concerning these potential matches, nor request his involvement, nor offer him the opportunity

to directly interface with the other law enforcement offices, nor offer him the opportunity interface with the ATF to request their assistance with such communication. Mr. Bowman learned of the leads ignored by the NYS Police when he was served with the "Exhibits," as yet another of the shocks he is suffering as a result of Defendants' actions.

361. Upon receipt and analysis of the NYSP partial records attached to the "Order to Show Cause" at "Exhibit 6," pages 20-22 were forwarded to the ATF Legal Department with a request for their assistance in outreach to the external law enforcement offices concerning the referenced firearms and the potential recovery of stolen firearms back to the rightful owner, Bowman's Gun Shop.

362. It appears that NYS Police failed to recover firearms from the NYPD and Philadelphia Police Department after receiving notification of potential recovery of stolen property, and that NYS Police failed to so notify either federal entity still engaged in on-going work on the case, and that the NYS Police may have contributed to the failure of federal authorities to identify and charge additional defendants connected to the 2020 burglary at Bowman's Gun Shop.

363. The NYS Police may be liable to Plaintiffs for monetary compensation if the firearms recovered have been damaged or destroyed in the interim of these several years.

364. Mr. Bowman does not know the disposition of any firearms that may have been recovered by one or more law enforcement agencies, which are referenced in the partial NYS Police records, as served upon him by Defendants with the "Order to Show Cause" at "Exhibit 6."

365. The NYS Police records attached to the "Order to Show Cause" include an entry made months *after* the NYS Police officially closed their investigation, and that entry references "Barbados." There is nothing visible in the text of that entry that references "Bowman's Gun

Shop," nor is there any information identifying the firearm make, model, or serial number in comparison to the 2020 ATF Loss/Theft Report of Bowman's Gun Shop.

366. As with the failure to act on leads from state-side law enforcement agencies, the NYSP failed to act on the lead, if it was in fact a lead, from "Barbados."

367. Mr. Bowman does not know how many firearms stolen from the ownership and inventory of Bowman's Gun Shop were recovered, where they were recovered, for how long they were sitting in evidence, whether they were destroyed after a certain period of time as 'unclaimed' or some similar misnomer, or whether the ATF was contacted by any such law enforcement.

368. And, as discussed below, one Officer of the NYS Police told Mr. Bowman's son that the Officer was part of a "sting" to buy-back firearms stolen from Bowman's Gun Shop, but there is not such entry in the partial NYSP records attached to the "Order to Show Cause" by Defendant NY Attorneys General.

369. There were more than a dozen identifiable errors after the 2020 burglary at Bowman's Gun Shop, as well as significant questions *five years later* surrounding the truth of the location of the stolen firearms, which will necessarily involve questions of multiple law enforcement agencies, beginning with Defendant NYS Police.

370. There was no reason to remark upon the 2020 burglary in the "Press Release" of July 18, 2025 other than to defame, harass, or maliciously injure Mr. Bowman and Bowman's Gun Shop, such "false facts" in the press release going beyond libel *per se*.

      **d)**       **Press Release Event #4: The 2023 NYSP Officers at Bowman's Gun Shop to "Drop-Off" "Educational Materials."**

371. Regarding the fourth event, which refers to the 2023 NYS Police Officers on the business premises of Bowman's Gun Shop, the "Press Release" asserts false facts, exactly as follows:

"In October 2023, NYSP inspected Bowman's Gun Shop and concluded that it did not comply with legal safety requirements for gun stores." (p.4)

372.    Above, this Complaint set out the jurisdictional limits of the Defendants Superintendent of

NYS Police and the Officers thereof, particularly with respect to NY GBL §875-g(2)(b),

concerning "inspections," and those allegations are not repeated in this section, for sake of

brevity.

373.    The interaction by the Defendant NYS Police Officers with Tyler Bowman at Bowman's

Gun Shop did not constitute an "inspection" as this term is intended at NY GBL §875-g(2)(b).

374.    In October 2023, the NYS Police had no actual jurisdiction or authority to conduct an

"inspection" under NY GBL §875-g(2)(b), although they represented themselves to Plaintiffs

as acting under color of state law.

375.    All allegations, above, concerning the jurisdiction or authority of the NYS Police are

repeated and realleged.

376.    Again, in October 2023, the NYS Police official, public position on their "Gun Dealer

Resources" page and the corresponding PDF downloadable version plainly stated that there

was "no official start date" for "inspections," as follows:

> **"When will the New York State Police begin conducting the required compliance inspections?**  There is no official start date identified at this time." (emphasis in original, p.4)

377.    Again, Defendant NY Attorneys General demonstrated their intention to have Mr. Bowman

and this Court rely upon the "Gun Dealer Resources" page when the attorneys included it with

the papers served upon Mr. Bowman on July 22, 2025 as an attachment to the "Order to Show

Cause" at "Exhibit 8."

378. The details of the encounter of the NYS Police with Tyler Bowman in October 2023 are set out in the following section at "G."

379. The rebuttal of the "Checklist" attached to the "Order to Show Cause" at "Exhibit 7" and its relationship to the false facts of the "Press Release" of July 18, 2025 are also detailed in the following sections "G" and "H."

380. The "Checklist" from the "Order to Show Cause" at "Exhibit 7" is not the one that was left at Bowman's Gun Shop with Tyler in or about October 2023.

381. The "Checklist" from the "Order to Show Cause" at "Exhibit 7" is not a self-authenticating document under Fed. R. Evd. 902(5).

382. The "Checklist" is not an official form of the NYS Police. It does not include an attestation by the person completing the form, nor any statement of the form being completed from personal knowledge and information. It does not even allege whether NYSP Officer Mead was one of the three NYSP Officers who went by Bowman's Gun Shop in October 2023.

383. The "Checklist" does not include any allegations by any NYSP Officers who were on-site to describe the basis upon which the answers "Yes" and "No" boxes were checked.

384. The "Checklist" was not attached to any affidavit by any of three NYSP Officers who were on-site at Bowman's Gun Shop in or about October 2023.

385. The "Checklist" fails to make the critical allegation that the any person "knowingly" failed to comply with any negatively-checked item.

386. The "Checklist" is not in admissible form, nor for the stated purpose.

387.    The "Checklist" has no "educational" content.  It regurgitates the statute.  It provides no instructions to achieve compliance.  It does not reference any materials or on-line resources. It does not explain the criteria used to select "yes" or "no."

388.    No person was harmed, nor alleged to have been harmed, as a result of the "inspection" or any alleged deficiencies under NY GBL §875.

389.    The "Checklist" is irrelevant to any negligence claim under NY GBL §898-b.

390.    There was no reason to remark upon the alleged "Checklist" of October 2023 or an alleged "inspection" of October 2023 in the "Press Release" of July 18, 2025 other than to defame, harass, or maliciously injure Mr. Bowman and Bowman's Gun Shop, such "false facts" in the press release going beyond libel *per se*.

### 9.    The Press Release Misrepresents the Legal Standards that Would Apply under NY GBL §875

391.    The language of the "Press Release" of July 18, 2025 contains "**legal fiction**," meaning the Defendants Attorney General and Assistant NY Attorneys General knew such assertions were false, knew them not to be an accurate representation of a law, knew them not to be available remedies at law, knew them to be outside of the law, or were otherwise on notice of the same by Plaintiff through filings in *Bowman I*.

392.    NY GBL §875 requires *scienter*, or a conscious "knowing," to establish a defendant is guilty non-compliance with the operational mandates listed at §§875-b through 875-f, as penalized in §875-i, as follows:  "Any person, firm, or corporation who <u>knowingly</u> violates any provision of this article shall be guilty of a class A misdemeanor punishable as provided for in the penal law." (emphasis added)

393.     The "Checklist" attached to the "Order to Show Cause" at "Exhibit 7" does not make a *prima facie* allegation of *scienter*.  Mr. Bowman was not present at Bowman's Gun Shop when the three NYSP Officers made their "drop-by."  That defect in the form is fatal.

394.     Mr. Bowman never intended not to comply with NY GBL §875.

395.     Mr. Bowman sought and intended to be in compliance with the new laws.

396.     Mr. Bowman started asking questions of the NYS Police and the NY Attorney General's Office about specific subsections of NY GBL §875 because he wanted to meet the State's expectations for state-licensed dealers in firearms under the new laws.

397.     As detailed below, Mr. Bowman wanted to meet with the Defendant NYSP for the drop-off of "educational materials" and to go over his questions.  The NYSP aggressively denied him that opportunity.

398.     The Defendant NYSP chose to go to Bowman's Gun Shop at a day and time they knew Mr. Bowman would not be able to be present.

399.     As detailed below, Mr. Bowman is the owner-operator of Bowman's Gun Shop and there are aspects of the shop security that are not known to any other person.

400.     Mr. Bowman initially found a copy of the new laws on the Internet.[80]   Reading the new laws on his own, Mr. Bowman identified vague words in the statute, the possibility of multiple interpretations, potential conflicts with federal law and local building/fire codes, as well as the collision of public safety concepts drilled in at the federal level and through generally accepted industry standards such as 'the building is the vault.'

---

[80]  *N.B.*:  comparison can and will be made throughout this case to the routine ATF and FBI systems of dealer notification, emergency alerts, print resources, website, and dynamic tools designed for FFL use.

401.   Mr. Bowman was interested in and wanted to get answers to his questions so that he could make decisions, with confidence, and conduct the necessary physical modifications and make the necessary financial investments, to be in compliance with the new laws.  He was also looking for an NYSP training session, comparable to the live sessions offered by the ATF.

402.   Mr. Bowman in 2019 and 2020, particularly as a direct result of the burglaries, appreciated and understood the value of maintaining one's firearms inventory consistently in the same location within the physical public-access and inventory storage areas of the business premises, to enhance immediate visual recognition of disturbance, visual identification of missing firearms, and rapid interaction with the ATF and the A&D Book to enumerate lost or stolen firearms to get data, such as serial numbers, into law enforcement accessible systems as soon as possible.

403.   Mr. Bowman in 2019 and 2020, particularly as a direct result of the burglaries, appreciated and understood the value of having cameras in key interior and exterior locations, and he exceeded the new 2022 standard years ahead of it going into effect.

404.   Mr. Bowman in 2019 and 2020, particularly as a direct result of the burglaries, appreciated and understood the value of having video storage associated with the cameras, and he was years ahead of it going into effect.  He had a valid question concerning the number of frames per second, including the effect of fps on video quality, and he had a reasonable question concerning continuous versus motion-activated recording as impacting the number and size of storage devices.

405.   Mr. Bowman in 2019 and 2020, particularly as a direct result of the burglaries, appreciated and understood the value of having a third-party, NYS-licensed security alarm company with

central relay, and he already had such a company on paid contract years ahead of the new 2022 standard going into effect.

406.  None of the Defendants could or would answer those questions.

407.  The "Checklist" at "Exhibit 7" to the "Order to Show Cause" contains multiple errors as matters of fact.

408.  The "Checklist" form at "Exhibit 7" to the "Order to Show Cause" contains multiple errors as a matter of law.

409.  Mr. Bowman was a NYS Corrections Officer.  Every year, he would be issued an updated handbook that he would sign off for, review, and understand and meet the expectations of him in the performance of his state government job.  The plain words of the NY GBL §875 do not say that a "security plan" must be in writing.  That answer is an example of an incorrect checkmark by Defendant NYSP upon the "Checklist" attached to the "Order to Show Cause" at "Exhibit 7."

410.  All firearms are in a secured and locked area on the business premises of Bowman's Gun Shop.  That answer is an example of an incorrect checkmark by Defendant NYSP upon the "Checklist" attached to the "Order to Show Cause" at "Exhibit 7."

411.  Ammunition is stored separately from firearms and requires customer assistance to make a product selection and purchase.  That answer is an example of an incorrect checkmark by Defendant NYSP upon the "Checklist" attached to the "Order to Show Cause" at "Exhibit 7."

412.  Mr. Bowman is a federally-licensed dealer in firearms.  From the moment he was issued that license, he has engaged in direct, personal, pro-active communication with his ATF Field Agents, specifically, and the ATF and the FBI NICS Unit, generally.  All of Mr. Bowman's

questions to the ATF have been promptly and substantively answered. If there has been an occasion that an ATF employee does not immediately know the answer, they promptly respond with an answer that they have procured on his behalf.

413.    The "Press Release" by the state's top prosecutors fails to articulate an actual legal standard under which Mr. Bowman could be found legally guilty of a violation of NY GBL §875 or could lose his license under NY PEN §400.00.

414.    NY GBL §898-b, a general nuisance standard, sounding in tort, would be foreclosed by the PLCAA affirmative defense, as articulated and so-ruled in the *Mexicano* case, which was delivered by SCOTUS in the weeks immediately prior to Defendants' "Press Release" and commencement of Bowman II – state court.

415.    The "Press Release" of July 18, 2025 presents no cogent theory of law or substantiated argument for change. It makes no reference to an actual law or standard set by a precedent.

416.    The "Press Release" of July 18, 2025 does not communicate to an average reader a verifiable legal theory or statutory reference of precisely how it is that the NY Attorney General claims Mr. Bowman is guilty.

417.    There was no reason to remark upon the 2023 NYSP Officer drop-off in the "Press Release" of July 18, 2025 other than to defame, harass, or maliciously injure Mr. Bowman and Bowman's Gun Shop, such "false facts" in the press release going beyond libel *per se*.

### 10.    The Press Release Misrepresents the Credentials of the NY Attorney General Letitia James

418.    The language of the "Press Release" of July 18, 2025 **exaggerates** and misrepresents the professional, legal, and statutory credentials and authority of the Defendant Attorney General

Letitia James in order to bolster her perceived authority and power over the Plaintiffs, and other FFLs, statewide, who are one individual in a one-person shop.

419.   The "Press Release" of July 18, 2025 was published to the detriment of Plaintiffs to promote Defendant NY Attorney General Letitia James, including (p. 4) as directly quoted:

"Attorney General James has been a national leader in gun safety."

420.   The language of the "Press Release" of July 18, 2025 does not alert the average reader or the media that Letitia James was already in office as the New York Attorney General when it was time to charge and prosecute the defendants from the 2019 burglary at Bowman's Gun Shop but that prosecution was performed by the federal U.S. DOJ attorneys.

421.   The language of the "Press Release" of July 18, 2025 does not alert the average reader or the media that Letitia James was already in office as the New York Attorney General when it was time to identify, charge, and obtain a grand jury indictment of in order to prosecute the defendant(s) from the 2020 burglary at Bowman's Gun Shop but that prosecution was performed by the federal U.S. JAG attorneys.  Nor did she inform the public or the media of her role, if any, in the NYSP investigation (in as much as an investigation was conducted).

422.   The "Press Release" of July 18, 2025, p. 4, states "Earlier this month, Attorney General James successfully defended New York's firearms accountability law, which allows the state and localities to hold firearm manufacturers and sellers accountable for injuries from gun violence that result from misconduct in the sale and marketing of firearms," even though neither Letitia James, nor her Office, is or are the attorneys of record for the defense in *National Shooting Sports Foundation v. James*, N.D.N.Y. case no. 1:21-cv-01348, on appeal to the Second Circuit Court of Appeals docket no.22-1374, wherein counsel of record is the private law firm of Michael G. McCartin Law PLLC.

423.    The "Press Release" of July 18, 2025, p. 4, states "In May, Attorney General James fined **Walmart** for shipping illegal realistic toy guns to New York" through an "Assurance" document of May 13, 2025 that silences Walmart, except as to unresolved issues concerning the application of law. ("The Respondent shall not take any action or make any statement denying, directly or indirectly, the propriety of this Assurance or expressing the view that this Assurance is without factual basis." (p. 8) and "The parties retain the right to argue and for a court to decide the scope of any applicable laws in any future proceeding." (p. 9)).

424.    The "Press Release" of July 18, 2025, p. 4-5, states "In July 2024, Attorney General James urged the Supreme Court to uphold a federal rule that regulates ghost guns like other firearms," even though the amicus (non-party) brief in ***Bondi v. VanDerStok***, U.S. Supreme Court case 23-852, was submitted through amicus counsel from the Offices of the Attorneys General for Washington, D.C., New Jersey, and Pennsylvania. New York and additional states are names added in the "on behalf of" list, not as a submitting attorney. Further, no amicus is permitted to make oral arguments by U.S. Supreme Court Rules, nor was an exception sought or granted in this case.

425.    The "Press Release" of July 18, 2025, p. 5, states "In March 2024, Attorney General James secured $7.8 million against gun retailer **Indie Guns** for illegally selling ghost gun components in New York," even though she is not counsel of record for the civil case *People v. Arm or Ally*, S.D.N.Y. case no. 22-cv-06124, doc. 250, nor was there fact-finding through a trial process with adversarial counsel and judicial scrutiny of testimony and tangible evidence and appellate review, as the judgment entered upon default.

426.    The "Press Release of July 18, 2025 states "Since taking office, Attorney General James has removed more than 9,000 guns out of New York communities through gun buy backs,"

even though there is no verification process for such a claim, including that there is no public-facing or firearms industry-available process to review such claims; no state or federal legislatively-approved process through statutory enactment to demand accountability of all such "buy back" firearms through recordkeeping akin to the records of acquisition and disposition mandated at federal law for federally-licensed dealers in firearms; nor any state or federal government office or agency that oversees the intake and analysis of "buy back" firearms through the defendant NY Attorney General's Office[81]; including that the state prosecutor's office grants anonymity to the surrendering individual, even if such person obtained the firearm through the commission of a crime; offering financial remuneration and/or Apple iPads.

### G. THE ACTIONABLE CONDUCT BY THE DEFENDANT NYS POLICE AGAINST PLAINTIFF BEGAN WITH THEIR ON-SITE VISIT TO BOWMAN'S GUN SHOP IN OCTOBER 2023

#### 1. The NYSP Phone Call in or about October 2023.

427. In or about October 2023, to his best recollection, Mr. Bowman got a call from a man identifying himself as a NYS Police Officer, who said he wanted to drop off some educational materials at the shop about the new laws.

428. Mr. Bowman was scheduled to be out-of-state with his wife for specialized surgery and post-surgical care.

---

[81] See pending legislation at NY S.638 (2025) to require entities operating such programs to check the serial number of all firearms obtained against the NYSP Information Network records and to obtain the express permission of the lawful owner of any firearm found to be stolen before the destruction of such firearm. Through the 2022 Bipartisan Safer Communities Act, federally-licensed dealers in firearms, nationwide, were given Congressional approval to access the FBI NCIC Stolen Gun File through a free tool made available by the ATF/FBI.

429.    Mr. Bowman requested the officer come on a day Mr. Bowman could be available to talk because he had a few questions.

430.    Mr. Bowman was not under any legal obligation to disclose his wife's HIPAA-protected, personal health information to the male voice on the other end of a cold call from a stranger.

431.    There was no statutory deadline, emergency, or exigent circumstance in or about October 2023 identified by the caller as necessitating a NYS Police Officer get to Mr. Bowman's property or Bowman's Gun Shop in the absence of Mr. Bowman.

432.    Mr. Bowman is, and has continuously been, the sole business owner of "Bowman's Gun Shop," the federal ATF licensee, the federal ATF "Responsible Person," the NY state licensee, and the real property owner.  He is the person with the best knowledge of the business, the business premises, the security systems, the record-keeping, the inventory, and the customers. He is the person who has the relationship with the ATF.

433.    Mr. Bowman's son, Tyler Bowman, is not, nor has he been, an owner (in whole or in part) of Bowman's Gun Shop, does not have a federal license as a dealer in firearms, is not a state-licensed as a dealer in firearms or as a gunsmith, is not an employee, does not work at the premises on a full-time basis, and was a high school and then college student when the shop was launched and during its early years.

### 2.    The NYSP Premises Visit in October 2023.

434.    In or about October 2023, three (3) male NYS Police Officers in uniforms showed up at the business premises of Bowman's Gun Shop, in the absence of Mr. Bowman, and in the presence of Tyler.

435. In October 2023, the NYSP Officer(s) who went onto and into the property of Mr. Bowman and the business premises of Bowman's Gun Shop did not have statutory or regulatory authority to conduct an "inspection" under NY GBL §875-g.

436. In October 2023, the NYSP Officer(s) who went to the property of Mr. Bowman and the business premises of Bowman's Gun Shop did not conduct an "inspection" within the meaning of or under NY GBL §875-g.

437. There is no other state statutory provision concerning state-licensed dealers in firearms that concerns an "inspection," as akin to the term used in NY GBL §875-g.

438. There is no state statutory provision concerning state-licensed dealers in firearms that concerns an "inspection" to secure the initial dealer in firearms license or upon renewal, as the term is used in NY GBL §400.00.

439. The NYSP Officer(s) who arrived at Bowman's Gun Shop arrived during regular business hours and in the presence of customers going into and out of the shop on an unseasonably hot day during or immediately prior to the open day of the 2023 hunting season.

440. The NYS Police Officers entered the business premises through the front door, proceeded directly to and stood on the customer side of the counter in front of Tyler, asked Tyler questions, and then everyone went outside to talk. They did not walk around inside. No Officer was observed to walk around the exterior of the shop. The Officers did not request to do so.

441. Some physical attributes of Bowman's Gun Shop were in plain sight and self-explanatory at the time the NYSP Officer(s) were on-site, including custom-forged and fitted steel bars on all windows, a security alarm system, and many of the nearly three dozen cameras. Other

security features are not in the line of sight of the front door upon entry or the counter during conversation. Still more are behind a man door closure to Mr. Bowman's office

442.    The NYSP Officer(s) who went to Bowman's Gun Shop caused Tyler to feel degraded as a victim of crime and victim-shamed by being told they were having to take measures and the new laws were "because of" the robberies at Bowman's Gun Shop.

443.    Tyler tried repeatedly to direct the NYSP Officer(s) to speak to his father and that his father was not in the area because his mother was having surgery, but the officer(s) kept coming back at Tyler with catch phrases such as: "we have to do it," "we're stopping by (or "we're here") to give you information," and "we have to get it done."

444.    The NYSP Officer(s) who went to Bowman's Gun Shop and interacted with Tyler gave him a blank "checklist" with empty columns of boxes for "yes" and "no" and, also, a copy of pages from the state penal code.

445.    The NYSP Officer(s) who went to Bowman's Gun Shop and interacted with Tyler appeared to keep a blank copy of the "checklist" for themselves.

446.    The NYSP Officer(s) who went to Bowman's Gun Shop told legal misinformation to Mr. Bowman's son, including, that the requirements weren't going into effect "until 2027."[82,83]

447.    One of the NYSP Officer(s), who appeared to Tyler to be on lead, did most of the talking, and said several times to Tyler that "we're not here to shut you down."

---

[82]   The statement is correctly typed herein as "20_27_" (Twenty Twenty-Seven).

[83]   *N.B.*: this is a legal misrepresentation. The effective date of NY GBL §875 was December 5, 2022. NY S.4970-A, §5, hereto at Exhibit A.

448.    The NYSP Officer who appeared to Tyler to be on lead kept reiterating that he was just there as a formality and that they weren't trying to shut down Bowman's Gun Shop or anything, that they didn't really know what to expect from these rules, and that the new rules were just something to try to help prevent burglaries.

449.    One of the pieces of information Tyler distinctively remembered about the on-site visit was the NYSP Officer who appeared to be on lead saying that these things were put forth by the Governor's Office and Letitia James, and that these policies weren't going to shut them down, that the Officers were going to give them "a grade," but that he didn't know the answer whether it would be "all-or-nothing" or that you "pass with an 80%" or that you "weren't in compliance in one or two areas and had to work on that."

450.    The NYSP Officer who appeared to be on lead gave Tyler the impression that he was talking very vaguely and that the Officer didn't seem to know what was happening with the new laws, including, but not limited to, because neither he, nor the other two Officers, answered any of Tyler's questions about the meaning and expected implementation of the new laws by a licensed dealer in firearms, such as Bowman's Gun Shop.

451.    The NYSP Officer who appeared to Tyler to be on lead gave him further legal misinformation when the NYSP Officer said to Tyler that there wasn't a way to institute a fine[84] or give a punishment[85] for non-compliance with the new laws.

---

[84] It is correct that there is no monetary fine or other administrative process or relief within NY GBL §875.

[85] *N.B.*:  this is legally incorrect.  Under NY GBL §875-i, "Any person, firm, or corporation who knowingly violates any provision of this article shall be guilty of a class A misdemeanor punishable as provided for in the penal law."

452.    The three NYSP Officers gave Tyler the distinct impression that one or more Officer(s) was trying to point a finger at and blame Mr. Bowman for the new laws.

453.    One of the NYSP Officers present and interacting with Tyler added that "these policies are so that what happened to you before doesn't happen again," and that "I was part of the sting in New York City to buy back some of your stolen guns,"[86] or other, similar words to that effect.

454.    One of the NYSP Officers told Tyler he was in the counter-terrorism unit out of Gouverneur, and the officer tried to push the idea to Tyler that if the firearms were locked in a vault every single night that the guys who broke in wouldn't have had access to the shop or to the firearms.[87]    The Officer gave Tyler a business card that identified him as Scott Freeman, and the card read "New York State Police Investigator, Counter Terrorism Intelligence Unit."

455.    Mr. Bowman's son reiterated to the NYSP Officers that his mother was having surgery and that the Officers should come back when his father was at the shop, but the NYSP Officers kept coming back at Tyler with the unified language of words like "we have to do it" and "we're just stopping by to give you information" and "we need to get it done."

456.    Mr. Bowman's son told the Officers it wasn't their plan or hope to get broken into and that those guys [the convicted criminals] were already back out on the street.  To which Tyler asked them, "How did you do us justice?"  The Officers didn't respond.  They were silent.

---

[86]    There is no separate records of a "sting" operation or event, nor entry within the NYSP partial records provided as attached to Mr. Bowman through the "Order to Show Cause" at Exhibits 5 and 6.

[87]    *N.B.*:  The after-hours storage clause at NY GBL §875-b(1)(a) contains the word "or."  It says "in a locked fireproof safe or vault" – "or" – "in a secured and locked area on the dealer's business premises."

457.    Tyler asked the NYSP Officers what to do for storage; to which the Officer(s) said they didn't know, "but a room within a room counts for safe storage."[88]

458.    Tyler asked the NYSP Officers if they wanted Mr. Bowman to break the fire code, and an Officer(s) said, "No," without elaboration.

459.    The NYS Police Officers finally said they would contact Mr. Bowman, and they left.

### 3.    The Lack of NYS Police After-Action or Follow-Up to the Drop-By in October 2023, or Thereafter.

460.    Neither Mr. Bowman, nor Tyler, are aware of any of the three NYSP Officers who were on site at Bowman's Gun Shop in or about October 2023 to have physically returned to the business premises.

461.    Neither Mr. Bowman, nor Tyler, are aware of the three NYSP Officers who were on site at Bowman's Gun Shop in or about October 2023 to have since communicated through any means to or with Mr. Bowman or Tyler.

462.    The NYS Police had multiple interactions with Plaintiffs after the October 2023 site visit, including receipt of firearms seized through "Emergency Removal Protection Orders" ("ERPOs"), receipt of estate firearms; reviewing footage of disqualified persons concerning

---

[88]  *N.B.*: this, too is a legal misrepresentation.  The after-hours storage clause at NY GBL §875-b(1)(a) says "(a) all firearms, rifles and shotguns shall be secured, other than during business hours, in a locked fireproof safe or vault on the dealer's business premises or in a secured and locked area on the dealer's business premises."  "Business premises" is a term of federal regulation for FFLs, at 27 CFR §478.11 and is "The property on which the manufacturing or importing of firearms or ammunition or the dealing in firearms is or will be conducted.  A private dwelling, no part of which is open to the public, shall not be recognized as coming within the meaning of the term."  This statutory language reflects the long-standing industry federal standard that 'the building is the vault.'  The building, itself, is the "secured and locked area on the dealer's business premises."

who Mr. Bowman contacted the NYS Police to pass along such information; and, coordinating of an arrest of a disqualified person who attempted to make an illegal firearms purchase.

463.     At no time since the three NYSP Officers were on site at Bowman's Gun Shop in or about October 2023 did Mr. Bowman receive from the Division of NYS Police a completed "checklist;" notice of any deficiencies in meeting their expectations for operational compliance mandates under the new laws; any request for modification of existing operations; any notice of violation of any of the new laws; any license suspension as a result of any violation of the new laws; any license revocation as a result of any violation of the new laws; any hearing being called as a result of any violation of the new laws; any criminal charges being brought as a result of any violation of the new laws; or, any prosecution being brought as a result of any violation of the new laws.

464.     "Exhibit 7" to the "Order to Show Cause" as served upon Plaintiffs by the Defendant NY Attorneys General contained four (4) pages purporting to be a "NY Dealer Certification[89]/ Compliance Checklist," bearing a computer fill-in of the checkmark symbol ("√") to various boxes, and what is stated to be "digitally signed by Investigator Raymond C. Mead III" on October 20, 2023.

465.     The "Order to Show Cause" at "Exhibit 7" is not a self-authenticating document[90]; it does not bear a logo or other Division of NYS Police official insignia or identifying mark; nor is it handwritten by a human person; nor does it bear an attestation and handwritten date signed and dated by a human person; nor is it accompanied by an affidavit in admissible form by the

---

[89]   Under the new laws a "dealer certification" is a legal term of art under NY GBL §875-g(1)(b). This four-page document at "Exhibit 7" to the "Order to Show Cause" provided to Mr. Bowman is not, nor does it include, a dealer certification, either in blank or completed.

[90]   "Self-authenticating document" is as defined by Fed. R. Civ. P. 902. See, also, Fed. R. Civ. P. 44.

person(s) who allegedly completed the computer keystrokes; and, nor is it alleged anywhere upon it that it was created, relates to, or concerns Bowman's Gun Shop, interaction with Tyler, or interaction with any other person present during the on-site visit, or interaction with Mr. Bowman.

466.  At no time during the year-long pendency of *Bowman I* did the Assistant NY Attorneys General file to state court the "checklist" now at *Bowman II* – state, Exhibit 7.

467.  At no time during the year-long pendency of *Bowman I* did the Assistant NY Attorneys General file to state court an affidavit from an Officer Mead identifying him as one of the Officers from the on-site visit of October 2023 at Bowman's Gun Shop; nor have him verify his signature under penalties of perjury; nor state his personal knowledge of the contents of the "checklist;" nor state for what purpose he believed the "checklist" was being created or used; nor state the criteria upon which he made his determinations of negative compliance determinations; nor articulate what he might have construed as the words or meaning of communication by Tyler; nor provide any other records created or produced by him related to the on-site visit or the "checklist;" nor explain any credentials he had to make his assessment; nor identify any training he had received before completing the "checklist;" and, nor any other standard foundational witness sworn statements to support a non-self-authenticating document bearing individualized content into admissible form.

468.  NYS Police Officer Mead has prior knowledge of Bowman's Gun Shop from the 2019 and/or 2020 burglaries at which time he performed, among other functions, the video technology tasks on stored camera video footage Mr. Bowman captured in and at the shop of the criminals committing the burglaries. Officer Mead sat at Mr. Bowman's desk and worked for several hours on for one or more days, including making copies of relevant video footage

to use for purposes of investigation, evidence, and circulating to the media with request for help from the public to identify the criminals.

469. The "Checklist" at "Exhibit 7" as attached to the "Order to Show Cause" is not self-authenticating, is not admissible, would be subject to *voir dire*, and includes neither attestation nor an affidavit from an enabling witness.

470. The "Checklist" at "Exhibit 7" as attached to the "Order to Show Cause" is the only record offered as related to the October 2023 "inspection" by the NYSP.

471. The "Checklist" at "Exhibit 7" does not allege or establish that Mr. Bowman or Bowman's Gun Shop were in "knowing" violation of any provision of NY GBL §875. It makes no note that Mr. Bowman was not there at the time of the on-site visit, nor that he had not been "interviewed," in any sense of that word. Crucially, the "Checklist" does not allege Mr. Bowman "knowingly" violated any portion of NY GBL §875. The format does not even ask the Officer to assess the intention, if any, of Mr. Bowman relative to the requirement, let alone whether the subject formed the requisite criminal intention to violate the law.

472. The informality and lack of reflection of a crucial statutory element for a criminal charge gives the "checklist" the air of the informality of a survey.

473. The "checklist" was presented in multiple versions through multiple Officers to multiple state-licensed dealers in firearms, statewide, in addition to Plaintiffs.

474. One or more Officers of the NYS Police told one or more state-licensed dealer(sS in firearms that they were conducting "a survey for the Attorney General."

475. The NYSP Officers recited the same or similar lines as they told state-licensed dealers that that didn't know what they were doing, hadn't received any training before being forced out to

fill in checklists, someone outside the NYSP from the NY Department of Criminal Justice Services had insisted via e-mail that the Officers started getting out to dealers, and the Officers needed help *from* the dealers to understand what the checklist and the law meant.

476. More than one NYSP Officer told more than one state-licensed dealer in firearms that they disagreed with what was being done in having to go out to the very individuals, like Plaintiffs, who they depend upon to assist them with crime, criminals, and tips and leads.

477. The scam of the Defendant Superintendent of NYSP and his Officers was blown open when the NYSP released the first of two annual reports with aggregate numbers of dealer inspections and fail rates, as follows:

- 2023 – 55 "inspections by New York State Police," of which 40 dealers were "in full compliance with Article 39-BB" and 15 were "<u>not</u> in full compliance with Article 39-BB" (emphasis in the original).

- 2024 – 143 "inspections by New York State Police," of which 119 dealers were "in full compliance with Article 39-BB" and 24 were "<u>not</u> in full compliance with Article 39-BB" (emphasis in original).

478. Neither the 2023, nor the 2024 NYSP annual report, was officially released to or communicated to the state-licensed industry or to Plaintiffs. The NYSP reports, as published, first came to light when a state-licensed dealer received the 2023 report during an e-mail exchange with the NYSP Officer who had made a site visit. *Gazzola v. Hochul*, N.D.N.Y. case no. 1:22-cv-1134, doc. 122-6 (Liuni), ¶¶66-67.

479. The 2024 NYSP annual report was discovered on line during the preparation of this pleading. It was not communicated from the NYSP to any state-licensed dealer, nor from Counsel to the Defendants in any associated, pending case.

480. Neither Plaintiffs nor any other state-licensed dealer in firearms who was subjected to an a NYSP Officer on-site visit received any results-oriented communication from the NYS Police. *See*, e.g., *Gazzola v. Hochul*, N.D.N.Y. case no. 1:22-cv-1134, docs. 122-4 (Serafini), 122-6 (Liuni), 122-7 (Ingerick), and 122-8 (Sehlmeyer).

481. The "Checklist" at "Exhibit 7" to the "Order to Show Cause" is neither admissible nor relevant to NY GBL §875-i, nor is it admissible or relevant for under NY GBL §898-b as foreclosed by PLCAA and *Mexicano*.

### H. THE ACTIONABLE CONDUCT BY THE DEFENDANT OFFICE OF THE ATTORNEY GENERAL INCLUDED EXTRA-JUDICIAL SUBPOENAS AND AN "ASSURANCE" DOCUMENT TO FORCE MR. BOWMAN INTO SILENCE.

482. The actions of the NY Attorney General and Assistant Attorney Generals against Mr. Bowman and Bowman's Gun Shop began in March of 2024, when Ms. Grieco signed and caused to be transmitted to Mr. Bowman two extra-judicial subpoenas and a proposed "Assurance" stipulation of settlement document.

483. The extra-judicial subpoenas signed by Ms. Grieco pertain to NY GBL §875.

484. The extra-judicial subpoenas signed by Ms. Grieco and transmitted at her direction and by her to Plaintiffs did not contain a caption, did not put Plaintiffs on notice that Mr. Bowman or Bowman's Gun Shop or both were the subject of her investigation.

485. When Mr. Bowman received the first extra-judicial subpoena from Ms. Grieco (dated March 21, 2024), he wasn't sure what to do about it. He couldn't understand most of it. He

tried to reach out to another FFL in the area, but didn't get a response. So, Mr. Bowman contacted the individual who signed the subpoena and put his questions to her – that person being Ms. Grieco.

486.     Ms. Grieco behaved in a manner both casual and personable to Mr. Bowman, including a transmittal letter with the first subpoena that said, "If you have any questions about the enclosed subpoena, please do not hesitate to reach out to me. My cell phone number is [number, redacted herein]."

487.     Between on or about March 21, 2024 and August 6, 2024, Mr. Grieco exchanged two or three telephone calls and several e-mails with Mr. Bowman. They also texted.

488.     At no time during her personal contact with Mr. Bowman did Ms. Grieco notify Mr. Bowman of any rights he may have, nor warn him of any criminal charge(s) he could face such as NY GBL §875-i.

489.     There was nothing on the face of the first subpoena that caused Mr. Bowman to think that he was the subject of an investigation or that he could be facing criminal charges or other penalties.

490.     In a telephone call between Ms. Grieco and Mr. Bowman in between the dates of the first and second subpoenas, Mr. Bowman asked whether to bring an attorney to his upcoming meeting with her in Albany. Ms. Grieco responded, "That's up to you. I can't advise you on that. But, I can tell you no one else has brought an attorney with them; you would be the first," or other, similar words to this effect.

491.     Ms. Grieco engaged with Mr. Bowman in a casual and personable manner in order to elicit responses from him, regardless the potential adverse consequences to him.

492.    Ms. Grieco engaged with Mr. Bowman in a manner that caused him to rely upon her and communicate to her in a manner than an ordinary person does with their retained, private counsel, as differentiated from a prosecuting attorney conducting an investigation that could result in criminal charges.

493.    Mr. Bowman thought that he was being helpful to Ms. Grieco because she appeared interested in learning about his profession and was appreciative of him answering her questions.  Ms. Grieco's questions were broad and included things like how was the shop building constructed and could Mr. Bowman send her some photographs of it, which he did.

494.    Mr. Bowman had worked for the federal and state governments for approximately forty years.  He has worked in partnership with the ATF as an FFL for more than ten years.  Mr. Bowman placed his trust in Ms. Grieco and did not consult with an attorney about either subpoena or his responses to them.

495.    Through a course of intentional conduct, Ms. Grieco drew Mr. Bowman into a relationship under a shroud of "secrecy."

496.    Mr. Bowman took seriously the secrecy directive of the second subpoena, as follows:

> "**TAKE FURTHER NOTICE** that You are requested not to disclose the existence of this subpoena, its contents, or any subsequent communications with the Office of the Attorney General while this investigation is pending.  Disclosure of this subpoena may impede a confidential investigation being conducted by the Attorney General.  In the event You believe that You are required to disclose the existence of this Subpoena or any information related thereto, You should notify the Assistant Attorney General listed below immediately and well in advance of Your disclosure of same." (emphasis in original)

497.    It did not occur to Mr. Bowman was that he might be the subject of the NY OAG investigation.  He had no prior notification of any deficiency of his compliance under the new

laws. He had enjoyed an excellent relationship with the ATF since first achieving his license. He worked at prisons and was aware that there are times a witness is summoned to provide information that may be useful concerning a subject person. Based upon what Mr. Bowman did understand from the two extra-judicial subpoenas and based upon the relaxed and casual nature of Ms. Grieco's conversational tone and content with him, he thought he was in a comparable position of being an informational witness.

498.    Ms. Grieco talked Mr. Bowman into traveling approximately 400 miles roundtrip from Governeur to Albany to meet in person. Ms. Grieco only sent Mr. Bowman the second extra-judicial subpoena after she received e-mail responses and records from him.

499.    Ms. Grieco's e-mail to Mr. Bowman minimized the seriousness of what she was walking him into, using casual language like "Hi" and "…at the mercy of train schedules," and "Best, Martha."

500.    Ms. Grieco did not disclose to Mr. Bowman in advance of his trip that she intended to ask him potentially incriminating questions in a formal setting, with multiple co-counsel, under oath with a stenographer.

501.    Mr. Bowman was lead by Ms. Grieco to believe, in advance of walking into the room in Albany, that he was helping her learn about what it is that licensed dealers in firearms do, because it was painfully evident that Ms. Grieco had never gone to a gun shop and didn't know what state-licensed dealers in firearms actually did on a day-to-day basis.

502.    Ms. Grieco was well aware that Mr. Bowman was unrepresented by an attorney during every point of contact she had directly with him.

503.    In Albany, Mr. Bowman and Ms. Grieco bumped into each other on the street. He had been walking around Albany for more than an hour trying to find the building. She was late. Ms. Grieco walked Mr. Bowman into the room as casually as if she were his attorney.

504.    On or about June 10, 2024, as Mr. Bowman entered the room with Ms. Grieco, he was surprised to see the additional attorneys and the stenographer.

505.    On or about June 10, 2024 in Albany, three attorneys from the NY Office of the Attorney General, including Ms. Grieco, Ms. Thomas-Jensen, and Ms. Wentworth-Mullin, subjected Mr. Bowman to a multi-hour interrogation.

506.    All three attorneys from the Office of the NY Attorney knew Mr. Bowman was an unrepresented person.

507.    As the interrogation wore on, Mr. Bowman started to get a knot in his stomach and he started to wonder if he was the one being investigated. Mr. Bowman's background and training, particularly in the military, as well as in the state corrections department, caused him to automatically view Ms. Grieco and the other lawyers in the room as having the authority to question him. He didn't know how to or whether he could end leave the room, return home, or otherwise stop whatever was going on so that he could consult with an attorney.

508.    At the conclusion of the interrogation on June 10, 2024, Mr. Bowman said to Ms. Grieco words to the effect that it sounded like all she wanted to do was close him down and take guns from law-abiding citizens in New York. In response, Ms. Grieco said he should keep their session in Albany a secret and should not discuss it with anyone. She told him her office would be in touch. And she reiterated to Mr. Bowman that he should not mention what was discussed until he heard from her.

509. Mr. Bowman walked away from the interrogation room in Albany feeling sick. He felt as though he had been treated as coming from some remote, rural area, without any understanding of the law. Mr. Bowman felt as though he had fallen for a trap. The three attorneys from the Office of the NY Attorney General caused Mr. Bowman to feel a sense of dread and embarrassment that resulted in him refraining from seeking counsel from an attorney or even from a fellow licensed dealers in firearms. He kept looking at the news and on-line thinking *I can't be the only one they're doing this to*. There was nothing but silence on all fronts for more than a month.

510. Defendants NY Attorneys General did not offer Mr. Bowman a copy of the transcript. They did not inform him he could order a copy. They did not provide him with the contact information of the stenographer. They did not ask whether he wanted to make corrections.

511. On July 23, 2024, Mr. Bowman received an email with an attached document from Ms. Grieco (titled "Assurance"). Mr. Bowman opened the attachment and was stunned to read that Ms. Grieco was accusing him of violating laws he didn't even know existed and that she was demanding he agree to a multi-year plan for the NY Attorney General's Office to become involved in his business.

512. The July 23, 2024 e-mail attachment from Ms. Grieco was the first document from Defendant NY Attorneys General to Mr. Bowman with a caption on it that read: "In the Matter of **Investigation by LETITIA JAMES, Attorney General of the State of New York,** of BOWMAN'S GUN SHOP, LLC, and TIMOTHY BOWMAN." (emphasis in original)

513. The July 23, 2024 e-mail attachment from Ms. Grieco was the first written or oral communication from Defendants NY Attorneys General that notified Mr. Bowman that *he* was the subject of the investigation.

514.    Ms. Grieco wanted Mr. Bowman to sign the attached document, the "Assurance."  She repeatedly asked him in short order to sign it and if he was going to sign it.

515.    Mr. Bowman did not sign the "Assurance" document attached to the July 23, 2024 e-mail he received from Ms. Grieco.

516.    The "Assurance" attached to the e-mail contained another warning of secrecy:

> "21.  Respondents agree not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any finding in the Assurance or creating the impression that the Assurance is without legal or factual basis."[91]

517.    The July 23, 2024 e-mail attachment from Ms. Grieco referred repeatedly in error to Mr. Bowman and his "counsel,"[92] even though Ms. Grieco knew he was not represented by an attorney since she began her pursuit of him on or about March 21, 2024.

518.    The July 23, 2024 e-mail attachment from Ms. Grieco made "findings" against Mr. Bowman, as if he had been afforded a trial with a judge and jury, which Ms. Grieco knew she had taken makes to make sure he was not through her choice of extra-judicial activity.[93]

519.    The July 23, 2024 "Assurance" document from Ms. Grieco to Mr. Bowman contained numerous errors of fact and misstatements of law.

---

[91]  E-mail attachment from Ms. Grieco titled "Assurance" (July 23, 2024, unsigned), ¶21 (p. 9).

[92]  E-mail attachment from Ms. Grieco titled "Assurance" (July 23, 2024, unsigned), ¶17 (p. 8), ¶25 (p. 9).

[93]  E-mail attachment from Ms. Grieco titled "Assurance" (July 23, 2024, unsigned), ¶1-¶4, p. 1-2.

520.   For example, the July 23, 2024 email attachment ("Assurance") asserts Mr. Bowman did not prepare a written document for his business that the statute he read did not include the word "written."[94]

521.   The July 23, 2024 email attachment includes claims Mr. Bowman did not train "all people authorized to sell firearms, rifles and shotguns" at his shop, even though the statutory language of NY GBL §875 is "employees" and Bowman's Gun Shop does not have "employees," as Mr. Bowman understood that term to mean from his accountant.[95]

522.   The July 23, 2024 e-mail attachment includes two claims that Mr. Bowman had not "implemented sufficient internal compliance procedures to ensure [multiple items]," but his reading of NY GBL §875 left him unable to locate words like "internal compliance procedures," "prevent unlawful sale," "prevent thefts," "prevent...sales to straw purchasers, traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others."

523.   The July 23, 2024 "Assurance" document from Ms. Grieco to Mr. Bowman threatened penalties that do not exist at law under NY GBL §875 (¶8-10, including all subparts, p. 3 through p. 6).

524.   The July 23, 2024 e-mail attachment includes a "stipulated penalty of $1,000 for each and every such default in the performance of any obligation," which does not exist in NY GBL §875 as a penalty.

---

[94] E-mail attachment from Ms. Grieco titled "Assurance" (July 23, 2024, unsigned), ¶1 reference to "security plan," (p. 1).

[95] E-mail attachment from Ms. Grieco titled "Assurance" (July 23, 2023, unsigned), ¶2 (p. 2).

525.    The July 23, 2024 "Assurance" document from Ms. Grieco to Mr. Bowman does not notify him that criminal charges could ensue, instead Ms. Grieco used cryptic language that the "OAG is willing to accept this Assurance pursuant to Executive Law §63(15), *in lieu of commencing a statutory proceeding for violations of…*"[96]

526.    On October 21, 2024, Ms. Grieco sent an email to Counsel for Mr. Bowman stating he "…testified under oath that he violated Section 875's requirements."   Ms. Grieco's email characterization falsely accuses Mr. Bowman of having committed criminal conduct.

527.    Ms. Grieco played prosecutor, judge, and jury without informing Mr. Bowman they were doing other than having a conversation about how FFLs operate in order to help her try to figure out how the new laws were going to be implemented, given the many variations on how state-licensed dealers in firearms conducted the operational aspects of their businesses.

528.    Mr. Bowman understood Ms. Grieco to have numerous, substantive questions about the new laws – just as he did.

529.    Mr. Bowman, throughout this extra-judicial activity, had no attorney representing him.  No judge overseeing the process.  No jury of his peers.  No evidence in admissible form presented against him.  No notification he could face criminal charges.  No notification he could invoke a right to remain silent, including in a civil proceeding.  No notification of witnesses against him, nor any opportunity to confront them.

530.    Ms. Grieco, Ms. Jensen-Thomson, and Ms. Wentworth asserted authority they did not have so as to demand performance from, interrogate, and convict Mr. Bowman under NY GBL §875.

---

[96]  E-mail attachment from Ms. Grieco titled "Assurance" (July 23, 2023, unsigned), ¶7 (emphasis added) (p. 2).

531.   The three Assistant NY Attorneys General sought to adjudicate and/or punish Mr. Bowman, regardless the consequences to him, his reputation, his licenses, and his business.

532.   The three Assistant NY Attorneys General sought to gain control over Mr. Bowman, his licenses, and his business for a period of years through a course of conduct that included demands for secrecy, false financial penalties, false business control penalties, and failure to disclose potential criminal penalties while dangling the threat of further litigation over him.

533.   Defendants' use of the extra-judicial subpoena activities and the "Assurance" stipulation were tactics being used to avoid judicial oversight.

534.   Ms. Grieco, Ms. Thomas-Jensen, and Ms. Wentworth knew or should have known that they had no legal authority to issue the extra-judicial subpoenas against Mr. Bowman, including, but not limited to, because NY GBL §875 conferred no authority to the NY Attorney General over state-licensed dealers in firearms.

535.   Ms. Grieco, Ms. Thomas-Jensen, and Ms. Wentworth knew or should have known that the extra-judicial subpoenas were designed to elicit records that could be used in a criminal proceeding(s) against Plaintiffs, but, at every one of the multiple points of contact directly with Mr. Bowman they failed to notify him of this or of his many other legal rights.

536.   Ms. Grieco, Ms. Thomas-Jensen, and Ms. Wentworth knew or should have known that the Superintendent of the NYS Police had not issued any regulations under NY GBL §875.

537.   Ms. Grieco claimed she was using her contact with state-licensed dealers in firearms to draft regulations to accompany NY GBL §875.

538. Defendants NY Attorneys General did not include the "Assurance" stipulation draft document in the "Order to Show Cause" Exhibits served upon the Plaintiffs on or about July 22, 2025.

539. Defendants NY Attorneys General did not include the "Assurance" stipulation draft document in their filings to state and federal courts on or after July 18, 2025.

540. Amidst the extra-judicial activities of Ms. Grieco, Ms. Thomas-Jensen, and Ms. Wentworth, the U.S. Supreme Court issued a unanimous decision in *Vullo v. NRA*, 602 U.S. 175 (May 30, 2024). In a blistering decision against the head of the Financial Services Division in Albany, the Hon. Sonya Sotomayor pointed out "Yet where, as here, a government official makes coercive threats in a private meeting behind closed doors, the "ballot box" is an especially poor check on that official's authority." *Vullo*, *id*., at 198.

541. Only two other state-licensed dealers are known to have been served with extra-judicial subpoenas by Ms. Grieco. When those state-licensed dealers received the first extra-judicial subpoena from Ms. Grieco, the NYSP Officer who had stopped into their shops (an Officer Nicholas Arcadi) called the one business owner and said "I don't get it; we're supposed to be the one to do that" (¶44); "We were told: go out to educate the dealers" (¶45); and, "They didn't tell us anything about Attorney General subpoenas." *Blue Line Sports II v. James*, Franklin Co., Index No. E2024-789 (herein, "*Blue Line II*"), NYSCEF doc. 6, ¶¶22-48.[97]

542. In the *Blue Line II* case, Ms. Grieco submitted an attorney affirmation that "[In] or about June of 2024, I requested and then received from the New York State Police information about

---

[97] The extra-judicial subpoenas in *Blue Line II* were issued by Ms. Grieco in June 2024, using slightly expanded versions of the first subpoena received by Mr. Bowman. The Franklin County FFLs filed a special proceeding to quash the extra-judicial subpoenas. The decision is pending.

the results of their ongoing inspections of dealers in firearms." *Id*., NYSCEF doc. 51, ¶6. There were no attachments of the alleged "request," the "response," indication from whom she requested the information, nor information from whom she received it. Ms. Grieco referred only to "a trooper" and "the same trooper." *Id.*, ¶7.

543.    In the *Blue Line II* case, Ms. Grieco chose not to submit an affidavit from anyone at the NYS Police, including no affidavit from Officer Arcadi who had direct contact with the petitioners months prior to Ms. Grieco issuing extra-judicial subpoenas to them.

544.    In the *Blue Line II* case, Ms. Grieco chose not to submit any "checklist" that may have been completed by Officer Arcadi. Instead, Ms. Grieco submitted a fragment of an unpublished NYS Police form, "GENL-123." *Id*., NYSCEF doc. 52. Ms. Grieco chose not to respond to demonstrated evidence that there is more than one "checklist" used by the NYS Police. *Id.*, NYSCEF doc. 16. Ms. Grieco chose not to respond to evidence that there is neither a "checklist," nor a "compliance certification" form on the NYS Police website official page for dealers in firearms. *Id.*, NYSCEF doc. 18.

545.    In the *Blue Line II* case, Ms. Grieco claimed that in or about June of 2024 "I then began to investigate the non-compliant dealers." *Id.*, NYSCEF doc. 51, ¶10.

546.    In the *Blue Line II* case, Ms. Grieco made no claim and produced no documentation from the NYS Police Superintendent to satisfy NY EXE §63(3).

547.    At no time has the NY Attorney General or any of the named Assistant NY Attorneys General pointed to a provision within NY GBL §875 that grants any authority to their office concerning state-licensed dealers in firearms.

548. Ms. Grieco initiated contact with and obtained documents from the NYS Police for an unspecified purpose that, at best, constituted trolling.

549. Shortly after the filing of the Memorandum of Law in *Blue Line II* contesting Ms. Grieco's affirmation filed to the court, multiple state-licensed dealers in firearms were contacted by multiple Officers of the NYS Police to make statements that NYSP Officers had been instructed "from the very top of the NYSP – and I do mean *the very top*" to no longer put anything in writing concerning state-licensed dealers in firearms, to terminate all Troop-based on-site dealer visits statewide, and that a special unit within the NYS NICS Unit would be created and specially trained to conduct any further dealer inspections.

550. No state-licensed dealer in firearms is known to have been "inspected" since that time.

## I. PLAINTIFF IS A LAW-ABIDING CITIZEN, WHO IS NOT A "DISQUALIFIED PERSON," WHO HAS INDIVIDUAL AND BUSINESS LICENSES AUTHORIZING PERFORMANCE OF LAWFUL CORE FUNCTIONS OF THE SECOND AMENDMENT

551. Plaintiff highly values his civil rights as afforded to him by the U.S. Constitution and the Bill of Rights, including the Fourteenth Amendment.

552. Plaintiff highly values his individual Second Amendment rights, in particular, as guaranteed to him relative to the federal and state governments, as extended to him through the Fourteenth Amendment to the U.S. Constitution.

553. Plaintiff wants and intends to continue to exercise his individual federal rights under the Second Amendment and as extended through the Fourteenth Amendment to the U.S. Constitution.

554.   Plaintiffs wants and intends to continue to exercise his individual federal rights under the Second and Fourteenth Amendments to the U.S. Constitution, including, but not limited to, as those rights are being contoured through decisions of the U.S. Supreme Court such as *Heller*, *McDonald*, *Bruen*, and *Rahimi*[98].

555.   Mr. Bowman owns, possesses, and uses firearms on a daily basis as an individual, as a business owner in his community, and/or a federally-licensed dealer in firearms, and/or a state-licensed dealer in firearms and gunsmith.

556.   Mr. Bowman owns, possesses, and handles one or more handgun(s), specifically, on a daily basis, as an individual with a valid New York concealed carry permit, and, also, as a federal and state licensed dealer in firearms, including of handguns.

557.   Mr. Bowman regularly handles and discharges firearms to maintain and enhance his skills as an experienced owner of firearms.

558.   Mr. Bowman regularly buys, sells, and uses firearms and ammunition as an individual. He intends to continue to do so in a consistent and on-going manner. He intends to continue to use firearms and ammunition on a frequent basis.

559.   Mr. Bowman has knowledge of a wide range of manufacturers, types, calibers, features, accessories, and tools of his trade and his licenses, and he intends to continue to sustain and expand that knowledge on a frequent basis.

560.   Mr. Bowman is not a "disqualified person" as that legal term is understood to mean under federal law at 18 U.S.C. §922(g).

561.   Mr. Bowman does not have a criminal record.

---

[98]   *United States v. Rahimi*, 602 U.S. 680 (2024).

562.  Mr. Bowman has not previously been charged with a crime.

563.  There are no pending criminal charges against Mr. Bowman.

564.  Mr. Bowman has no intention of becoming a disqualified person. He actively seeks not to become such a person.

565.  Mr. Bowman has not, nor does he have intention to, aided or abetted others who are disqualified persons to obtain firearms through illegal process(es).

566.  Mr. Bowman's focus is on safety and defense of his person and family, his community, and his country.

567.  Mr. Bowman regularly undergoes background checks in connection with one or more licenses issued by the state and federal governments.

568.  Mr. Bowman regularly undergoes background checks in connection with firearms and/or ammunition purchases, involving both the state and federal governments.

569.  Mr. Bowman has not been denied a background check in connection with his federal or state licenses or his firearms or ammunition purchases, whether under the ATF-direct background check system or the post-September 13, 2023 NY point-of-contact background check system.

570.  Mr. Bowman intends and will continue to sustain and renew his licenses, including any background checks to which he is asked to submit.

## B. PLAINTIFF HAS MET THE KNOWN EXPECTATIONS
## OF FEDERAL AND STATE LICENSING AUTHORITIES

571.     Continuously from the point of his initial application to the ATF for his federal license, Mr. Bowman has enjoyed the partnership, training, guidance, and constructive engagement of his relationship with the ATF.

572.     Continuously from the point of his initial application to the ATF for his federal license, the ATF has engaged Mr. Bowman with Agents in the field going on-site to Bowman's Gun Shop for everything from routine training through post-burglary inventory reconciliation.

573.     The ATF has "800" telephone numbers that are fully-staffed and who respond with substantive answers to Mr. Bowman's questions. Additionally, the ATF Field Agents are assigned to Mr. Bowman and his FFL region on a long-term basis so that relationships are developed.

574.     During his years as an FFL, Mr. Bowman has benefited from and followed the recommendations of the ATF, and the Field Agents assigned to his shop, as focusing on public safety, coming from experience, sounding in good public policy, and being generally consistent with all that for which Mr. Bowman was previously trained by the federal and state governments through his employment and various community positions and responsibilities.

575.     Among the many performance compliance mandates[99] instituted by the U.S. federal government and through BATFE, Mr. Bowman is the front line of prevention of a sale of a

---

[99] As used herein, "**compliance mandates**" is the umbrella term. Two types of compliance mandates apply to dealers in firearms, the "performance mandates" and the "operational mandates." The "performance mandates" are those tasks executed by the dealer in firearms on behalf of the government entity, as effecting the daily operations of the business at the customer interface level, herein, for example, New York, *see* (1.) NY Exe §228 ("NY NICS" for firearms background checks); (2.) NY Pen §§400.00(8) and 400.00(9) with NY Pen §§265.65 and 265.66 (SAR license); (3.) NY Pen §400.02(2) (ammunition background check); and, (4.) NY Pen §400.03(2)

firearm to a disqualified person. Performance of this responsibility in accordance with federal law and BATFE training, combined with Mr. Bowman's other work and volunteer services, includes (a.) the refusal to complete the sale of a person who fails a background check under a formal "DENY;" (b.) the pause on the potential sale when a person's background check comes back under a formal "DELAY;" (c.) the decision not to complete a sale even if it comes back as a "PROCEED;" (d.) the decision not to pursue a sale on delay that either clears statutory hold periods or comes back as proceed; (e.) the decision to discourage a person to return to his shop; (f.) the decision not to not progress the person to the point of submission of the ATF Form 4473; and, (g.) the decision to contact law enforcement to report, discuss, review footage, analyze, or seek further information on a suspicious person.

576.    Mr. Bowman has performed his federal responsibilities under his license and in accordance with federal law, regulations, and partnership with the ATF, has followed their active, inter-personal guidance, and has remained consistently ahead of federal requirements governing his performance compliance requirements and his operational compliance requirements.

577.    Mr. Bowman received no notification from the NYS Police in advance of the effective date of the new laws. He received no notification after the drop-by visit that there were any "results," nor notification of any requested or required remediation with a period to cure, nor educational materials about the new laws. The "checklist" left behind by the NYS Police Officers was a cut-and-paste of NY GBL §875, lacking regulations, or explanatory or

---

(manual ammunition sales records). The "<u>operational mandates</u>" are those most simplistically characterized as effecting daily operations, primarily through increased time, complexity, and costs of doing business, *see*, e.g., NY GEN §875.

instructional content. The "NY Penal Law" pages left behind by the NYS Police Officers was a photocopy of the law, itself, lacking explanatory or instructional content.

578. In the more than ten years that Mr. Bowman has held a "state license" as a Dealer in Firearms and as a Gunsmith, the NYS Police have not offered him any form of training, nor substantive response to the questions he has presented, nor recommendations or guidance on how best to meet any performance or operational mandates.

579. On several occasions, the NYS Police have contacted *him* to request his assistance with their analysis of a firearm under the 2013 "SAFE Act" provision concerning "assault weapons." More than ten years later, questions persist within the NYSP over a key statutory provision with associated criminal penalty.

580. In the more than three years since NY GBL §875 took effect, the NYS Police have not offered Mr. Bowman any training, nor substantive response to the questions he has presented. Concerning the Office of the NY Attorney General, Ms. Grieco informed him of a PowerPoint presentation available on a website page and told him to go look it up, himself.

581. When Mr. Bowman asks a question to a NYS Police Officer, including those identified herein, and others who he has attempted to contact via telephone, the universal, repetitive, and resounding response has been: "I don't know."

582. Mr. Bowman wants and intends to continue to meet the legal expectations of those governing his license oversight.

583. Mr. Bowman is confident that because of his established and on-going partnership with the ATF, he can continue to meet or exceed federal expectations for his license to remain in good standing.

584. Mr. Bowman has a successful history with federal, state, and local licensing bodies, oversight, and successful completion of expectations set forth, including, but not limited to, the NYS Department of Environmental Conservation, the U.S. Army (including during overseas deployment in Iraq in 2005), the NYS Department of Corrections, and local fire fighting and EMS organizations.

585. To reporters, on the same day of July 18, 2025 that Defendants issued the "Press Release" targeting Plaintiffs, the NYS Police claimed: "[S]tate police work with those dealers to help bring them into compliance with the regulations."[100]

586. The statement of the NYS Police on July 18, 2025 to reporters was false.

587. No state-licensed dealer in firearms has received assistance from the Defendant Superintendent of NYS Police or the NYSP Officers concerning the new laws, least of all Plaintiffs Tim Bowman and Bowman's Gun Shop.

### C. PLAINTIFF EXERCISES HIS SECOND AMENDMENT RIGHTS, INCLUDING DERIVATIVELY ON BEHALF OF HIS CUSTOMERS AND COMMUNITY

588. Mr. Bowman highly values his role in his community as a business owner licensed to engage in the business of dealing in firearms and gunsmithing on behalf of his customers, who, themselves, are law-abiding individuals seeking to exercise their fundamental Second and Fourteenth Amendment rights.

589. Among Plaintiffs' routine customers are members of law enforcement, including the New York State Police, Sheriff's Departments, and municipal law enforcement departments.

---

[100] Hyman, *supra*.

590.     Among Plaintiffs' routine customers are first responders, including emergency medical services providers, medical providers, and firefighters.

591.     And, among Plaintiffs' routine customers are NYS Corrections Officers.

592.     Among Plaintiffs' routine customers are persons engaged in law enforcement, emergency first responders, and corrections officers, who regularly use their personal firearms as their service firearm.

593.     Among Plaintiffs' routine customers are persons engaged in law enforcement, emergency first response, and corrections officers, who also refer and concurrently engage the services of Bowman's Gun Shop, including for, but not limited to, the transfer of firearms off their badges and to family members and others, including use of the background check for inter-personal transfers.

594.     Mr. Bowman's credentials combine to give him the presence to say *no* when a background check is denied, and to explain the reason for *delayed*.  He exercises his legal right as a federally-licensed dealer to decline a sale, even if it says *proceed* because something isn't right about what's going on in front of him.  Mr. Bowman is committed to preventing gun sales to disqualified persons as a part of contributing to the enduring lawful sales of firearms to those who honestly exercise their Second Amendment rights.

### D.  PLAINTIFF IS A LAW-ABIDING INDIVIDUAL WHO EXERCISES HIS FIRST AMENDMENT RIGHTS, INCLUDING ON BEHALF OF HIS CUSTOMERS AND HIS COMMUNITY THROUGH HIS GUN SHOP

595.     On a daily or near daily basis, Mr. Bowman exercises his First Amendment rights of free speech in, at, around, and specifically concerning the Second Amendment; the federal/state/local laws impacting the ownership, use, and possession of firearms and

ammunition; relevant court decisions; government background check systems; elected officials; candidates for public office; government offices and agencies that administer licenses; law enforcement, prosecutors, the corrections system, and more.

596. Every day that Bowman's Gun Shop is open for business, people come in asking questions to and speaking with Mr. Bowman about their civil rights, particularly as infringed by politicians in Albany; how best to lawfully exercise their rights and meet their responsibilities; and restrictions that cause a person to become disqualified; circumstances where an appeal of a denial or inquiry to the NYSP in the event of a delay is available; and more.

597. Every day that Bowman's Gun Shop is open for business, people come in engaging Mr. Bowman in conversations that relate directly to the proper performance of compliance mandates, such as the necessity of participating in the background check system, so that he can perform core functions, vital to the Second Amendment.

598. Even when Bowman's Gun Shop is not open for business, people throughout the community approach and engage with Mr. Bowman concerning the Second Amendment and "gun rights" of New Yorkers.

599. One important segment of customers to Bowman's Gun Shop are persons wanting help recertifying their concealed carry license, which is something to which Mr. Bowman is committed to providing assistance, including showing customers the NYS Police website page and information, helping them navigate through screens, explaining any additional interaction they may need directly to do in person with their respective County Clerk's Office for address changes and the like.

600. Another important segment of customers to Bowman's Gun Shop are persons interested in making their first firearms purchase, including those who will require a concealed carry permit

or the new SAR license.  Mr. Bowman is committed to assisting customers locate instructors, ranges, rod and gun clubs, and other establishments that have necessary resources to obtain training, as well as to connecting individuals with their respective County Clerk's Office for the paperwork, fingerprinting, and/or fees.

601. Mr. Bowman, as a routine course of conduct, seeks out new information from reliable sources, most notably the federal, county, and state governments, not only to be in compliance in his own person and business, but, also, so that he can speak intelligently and reliably with his customers, as part of the on-going conversation taking place daily in New York, and, in particular, at locations like Bowman's Gun Shop.

602. And, Mr. Bowman asks question about and to government officials, at all levels – and not "just" about issues relating to core Second Amendment functions - but, as part of conscientiously working to remain a law-abiding citizen.

## CAUSE OF ACTION I:

## LIBEL *PER SE*

603. Plaintiff repeats and realleges all previously pleaded allegations, above, as if set forth, herein.

604. New York recognizes statements as libel *per se* when they affect a person "in his profession, trade, or business by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want to any necessary qualification in the exercise thereof." *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985), quoting from *Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 768 (1st Dept. 1977).

605.   "A writing also is libelous *per se* if it "tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community, even though it may impute no moral turpitude to him [or her].""" *E. Jean Carroll v. Trump*, 650 F.Supp.3d 213, 225 (S.D.N.Y., 2023).

606.   Read as a whole, the "Press Release" of July 18, 2025 is capable of only one meaning, that meaning being defamatory. *James v. Gannett Co.*, 40 N.Y.2d 415, 419 (1976).

607.   The July 18, 2025 "Press Release" and "Order to Show Cause" of the New York Attorney General was defamatory, in general, and libelous *per se*, specifically, against Mr. Bowman as an individual, as a business owner of "Bowman's Gun Shop," as a NY state-licensed "Dealer in Firearms," as a NY state-licensed "Gunsmith," as a federally-licensed "Dealer in Firearms," and as a NY state-licensed concealed carry permit holder.

608.   Trustworthiness and honesty are reputational characteristics critical to the profession of a federally-licensed dealer in firearms and, also, to the companion state license. These qualities are also critical to an individual with a concealed carry permit.

609.   To be a law-abiding citizen is a matter of particular pride to those who, like Mr. Bowman, support the Second Amendment to the U.S. Constitution.

610.   Mr. Bowman, as an individual, as a business owner, and as a licensee (personal, state, and federal), depends upon his community and his customers' belief in him; his ethics; his business practices; his commitment to their safety and to that of the community; his knowledge and expertise in his field; and his performance of compliance mandates in the operation of his business and business transactions.

611.  The customers of Bowman's Gun Shop rely heavily on Mr. Bowman to help them navigate the well-known gauntlet of firearms ownership and use in New York as a means to defending their Second and Fourteenth Amendment rights and their exercise of them.

612.  The customers of Bowman's Gun Shop and the members of his community rely heavily upon Mr. Bowman to be their voice in the community, in particular, as concerns matters of public safety and personal safety.

613.  The "Press Release" of July 18, 2025 was and still remains on the official New York State government website page of the NY Attorney General Letitia James, and has been and continues to be published through numerous media outlets.  It also has an enduring status on the World Wide Web.

614.  The "Press Release" of July 18, 2025 reached and will continue to reach its intended audience, including those who use Internet search engines such as Google to find basic contact information and the address of Bowman's Gun Shop.

615.  The "Press Release" of July 18, 2025 from New York Attorney General Letitia James, bearing also the names of Assistant NY Attorneys General and invoking the New York State Police, taken as a whole, accused Mr. Bowman of being a criminal, of violating laws, of lacking moral and ethical character, and of being a danger and creating dangerous conditions in this state, other state(s), and internationally, the exact language of which is set out, already, herein.

616.  The "Press Release" of July 18, 2025 from New York Attorney General Letitia James, bearing also the names of Assistant NY Attorneys General and invoking the New York State Police, defames Mr. Bowman in his trade, business, or profession, and among his customers, colleagues, peers, and suppliers of goods and services necessary to the operation of his business, the exact language of which is set out, already, herein.

617. The "Press Release" of July 18, 2025 from New York Attorney General Letitia James, bearing also the names of Assistant NY Attorneys General and invoking the New York State Police, read in whole, declared Mr. Bowman guilty of numerous crimes and associates him with those who are criminals, in this specific instance, those convicted or not and those known or not, the exact language of which is set out, already, herein.

618. The "Press Release" of July 18, 2025 from New York Attorney General Letitia James, bearing also the names of Assistant NY Attorneys General and invoking the New York State Police, has caused and will continue to cause an average reader to incorrectly associate Mr. Bowman and Bowman's Gun Shop with criminals, with the burglars of his own shop, with those with those engaged in the illegal trafficking of firearms, and with those criminals illegally supplying firearms to other criminals, the exact language of which is set out, already, herein.

619. As a proximate result of the actions of Defendants on July 18, 2025 and on-going, Bowman's Gun Shop has lost customers and revenue, and will continue to lose customers and revenue, because average people have and will continue to understand the "Press Release" and media coverage to mean that the business was closed down by the NY Attorney General and/or the NYS Police as a result of the violations committed following investigations.

620. "What gives the sting to the writing is its permanence of form. The spoken word dissolves, but the written one abides and perpetuates the scandal." *E. Jean Carroll*, 650 F.Supp.3d, at 227. "[A] written publication of a defamatory statement is more lasting and has the likelihood of a wider audience than an oral communication." *Id.* n.63, citing *Ostrowe v. Lee*, 256 N.Y. 36, 39 (1931), but quoting from *Davis*, 754 F.2d, at 85.

621.   As a proximate result of the actions of Defendants on July 18, 2025 and on-going, there is now a general assumption by the public, the community, and amongst customers, that Bowman's Gun Shop is closed.

622.   As a proximate result of the actions of Defendants on July 18, 2025 and on-going, the symbolism of closure of Bowman's Gun Shop – in the minds of the average reader – reflects closure as the least of what law-abiding individuals seeking to exercise their Second Amendment rights expect to be the outcome of a gun shop owner, the likes of which was depicted of Mr. Bowman and his business.

623.   As a proximate result of the actions of Defendants on July 18, 2025, Bowman's Gun Shop suffers and will continue to suffer financial losses from a downturn in business attributable to the decrease in business from law-abiding customers seeking to exercise their Second Amendment rights exposed to the "Press Release," the media coverage, search engine results, and other, resultant fall-out.

624.   As a proximate result of the actions of Defendants on July 18, 2025, Mr. Bowman has and continues to suffer personal, professional, and businesses losses.

625.   As a proximate result of the actions of Defendants on July 18, 2025 and continuing thereafter, Mr. Bowman has and continues to suffer personal, professional, and emotional harm.

626.   As a proximate result of the actions of Defendants on and after July 18, 2025, Mr. Bowman has and continues to suffer fear, anxiety, and associated feelings of anxiousness that the language used in the "Press Release," the "Order to Show Cause," and the associated press coverage will spark thieves, robbers, and other persons with criminal motivations, intentions, and experience, including those who engage in the illegal trafficking of firearms, to select,

target, and otherwise attempt further crimes against his firearms, whether in the inventory of his business or from his personal firearm(s), and whether at his business premises or at his nearby residence.

627.     As a proximate result of the actions of Defendants on and after July 18, 2025, Mr. Bowman has and continues to suffer fear, anxiety, and associated feelings of anxiousness that the language used in the "Press Release" and the media coverage with on-going government website, Internet-based, and social media-based coverage, puts himself, his wife, and his son at unnecessarily heightened – and avoidable – risk of becoming the focus of criminals, including violent crime against their persons and property.

628.     The Second Circuit has held that "liability for libel may attach…when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader."" *Davis v. Ross*, 754 F.2d 80, 86 (2d Cir., 1985), citing to *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977). "The *Hotchner* court further stated that "[o]pinions based on false facts are actionable…against a defendant who had knowledge of the falsity or probable falsity of the underlying facts." *Davis*, *id*.

629.     Prior to July 18, 2025, Defendants were in possession of records and otherwise had access to public records that demonstrated that their statements were false in the "Press Release."

630.     Prior to July 18, 2025, Defendants had the opportunity to read and analyze documents in their own possession and know that the "Press Release" contained false assertions of fact.

631.     Prior to July 18, 2025, Defendants had the opportunity to read and analyze documents supplied by Plaintiffs, including in the form of a court case record, correspondence, e-mails,

text messages, photographs, and other form of records, which also conflict with the "Press Release."

632. On July 18, 2025, Defendants issued a "Press Release" containing statements Defendants NY Attorneys General knew to be false or should have known to be false.

633. Because of the nature of the claim of libel *per se*, the damage to the reputation is established by the nature of the defamatory remarks.

634. Plaintiffs seek monetary damages in an amount unspecified in this Complaint, and provide the following notice of what has already occurred, now more than sixty days, and, it appears, in an on-going, indefinite basis:

    i. As a proximate result of Defendants' actions on July 18, 2025, in particular, Mr. Bowman has been permanently damaged in his law-abiding reputation in his community and his business, and with licensing offices and agencies and oversight bodies.

    ii. As a proximate result of Defendants' actions on July 18, 2025, ordinary, law-abiding citizens, customers, and (in particular) law enforcement customers will be permanently deterred from associating with him or conducting business with him or at his shop.

    iii. As a proximate result of Defendants' actions on July 18, 2025, Plaintiff, his family, those associated with his business, and his property have been placed at increased risk of violent and criminal behavior.

635. Due to the nature of what has been asserted through the "Press Release" of July 18, 2025, Mr. Bowman and Bowman's Gun Shop will be forever tainted, particularly in the minds of

Second Amendment supporters, gun owners, and firearms users in New York who, themselves, face atypical barriers to the exercise of their fundamental civil rights.

636. Plaintiffs seek also punitive damages in an amount unspecified in this Complaint.

637. Punitive damages may be awarded to Plaintiffs through demonstration of actual malice. As explained by the Second Circuit in *Carroll v. Trump*, 151 F.4th 50, 71 (2d Cir. 2025):

> ""Actual malice requires proof that the publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard [to] its truth or falsity." *Celle v. Filipino Rep. Enters, Inc.*, 209 F.3d 163, 182 (2d Cir. 2000). "Although actual malice is subjective, a court typically will infer actual malice from objective facts" such as "the defendant's own actions or statements, the dubious nature of his sources, and the inherent improbability of [his] story among other circumstantial evidence." ("[W]hether defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts."(citation omitted)."

638. On July 18, 2025, Defendants published the "Press Release" with intentional and/or reckless disregard for the truth concerning the Plaintiffs and the safety of the Plaintiffs.

639. On July 18, 2025, Defendants published the "Press Release" with reckless disregard for the reasonably foreseeable consequences of their actions upon Plaintiffs, specifically, and FFLs with state licenses in NY, generally, including as relates to the safety of the Plaintiffs, specifically, and FFLs with state licenses and business premises in NY, generally.

640. On July 18, 2025, Defendants published the "Press Release" to harass and maliciously injure the Plaintiffs.

641. Defendants' "Press Release" of July 18, 2025 is contradicted by the records they served in an action commenced the same day against Mr. Bowman and Bowman's Gun Shop.

642. Plaintiffs repeatedly noticed Defendants of the errors of their accusations in pre-commencement, extra-judicial activities and then in *Bowman I* in state court. Plaintiffs provided not only notice of the falsehoods, but also specific, objective, informative rebuttal with copies of records, references to public sources, and references to court records. And, Plaintiffs asked Defendants to demonstrate any record(s) the Defendant believed might support their claims, including the types of false claims of illegal conduct that appeared, amplified and broadcasted through the "Press Release" of July 18, 2025.

643. Left unchecked by a court order, Defendants' defamatory conduct – as evidenced by more than a year of escalating behavior – is highly likely to continue.

644. Mr. Bowman and Bowman's Gun Shop are suffering as a direct result of the defamatory actions of Defendant Letitia James and the Assistant NY Attorneys General named herein, and will, unless awarded judicial relief, continue to suffer due to the on-going actions of Defendants as taken under color of state law. Plaintiffs are entitled to the relief requested herein.

## CAUSE OF ACTION II:

### 42 U.S.C. §1983 – SECOND AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

645. Plaintiff repeats and realleges all previously pleaded allegations, above, as if set forth, herein.

646. The Second Amendment protects the "right of the people to keep and bear Arms." U.S. Const., amend. II. The term "the people" "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S., at 580. The Second Amendment "thus recognizes a right "guaranteed to 'all Americans.'" *United States v. Rahimi*,

602 U.S., at 752, Thomas, J., dissenting, quoting *Bruen*, 597 U.S., at 70 (quoting *Heller*, 554 U.S., at 581). It is "an individual right the people expressly preserved for themselves in the Constitution's text." *Rahimi*, 602 U.S., at 711, Gorsuch, J., concurring.

647. The Second Amendment's text "'guarantee[s] the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 597 U.S., at 22, quoting *Heller*, 554 U.S., at 592. And, that "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Gazzola*, 88 F.4th, at 197.

648. The Second Amendment, through the Fourteenth Amendment Equal Protection Clause, is incorporated against infringement by the States. U.S. Const., amend. XIV, §1; *McDonald*, 561 U.S., at 786. It is the Equal Protection Clause that insists a State may not abridge "the privileges or immunities of citizens of the United States." *Id*., at 754.

649. Although Justice Black's theory of the "total incorporation" of the Bill of Rights as applicable to the States was not adopted by the U.S. Supreme Court (see, e.g., *McDonald*, *id*., at 763), this nation has, through decades of "selective incorporation," nearly arrived to that same result because the Equal Protection Clause and the Due Process Clause are concurrently available through the Fourteenth Amendment. U.S. Const., amend. XIV, §1. In a fully-integrated Bill of Rights, the rights of the federal-state dual citizen are as one. The individual citizen is made whole.

650. The Second Amendment is not a right without limit. "Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S., at 626.

651. At federal law under 18 U.S.C. §922(g), various limitations are placed upon persons who may exercise the right to purchase, own, and possess firearms. These limitations render a person a "disqualified person."

652. When a person is disqualified under 18 U.S.C. §922(g), the disqualification applies universally across the fifty states, District of Columbia, Puerto Rico, and U.S. territories. 18 U.S.C. §921(a)(2) (jurisdictional definitions of disqualification).

653. Mr. Bowman is not the subject defendant of *United States v. Rahimi*. He is not a man with multiple prior convictions for illegal acts, including involving the illegal use and possession firearms, and whose disqualification under 18 U.S.C. §922(g)(8) was upheld by the nation's high court. 602 U.S., at 686, *passim*.

654. Mr. Bowman is a man who lacks "an earlier finding of guilt or liability in an adjudication regarding [a] 'violation.'" *Mexicano*, 605 U.S., at 300, Thomas, J., concurring.

655. Mr. Bowman is an "ordinary, law-abiding, adult [citizen] – [who is] part of "the people" whom the Second Amendment protects." *Heller*, 554 U.S., at 580, 635; *Bruen*, 597 U.S., at 31, 70.

656. Mr. Bowman has for the decades of his youth and his adult life respected and abided by the Bill of Rights, including the Second and Fourteenth Amendments. He has so demonstrated through his person, his family, his community, his service in the U.S Army Reserves, his employment as a NYS Corrections Officer, his first responder volunteerism, and his business and operations as a licensed dealer in firearms and a gunsmith, as well as through his individual concealed carry permit and his NYS DEC licenses. He wants and intends to continue to do so, not only for himself and his family, but those with whom he is a fellow American. It is simply who he is and who he intends to continue to be.

657. The good faith intention of Mr. Bowman to preserve and protect his individual civil rights, as well as to continue all licenses and business operations, is best evidenced by the fact that he

*does* ask questions of government officers and does continuously strive to meet (if not exceed) requirements in the operation and use of his business and licenses.

658.    *Bruen* provides the framework for analyzing whether *a law* violates the Second Amendment.

> "In keeping with *Heller*, … when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify *its regulation*, the government may not simply posit that *the regulation* promotes an important interest.  Rather, the government must demonstrate that *the regulation* is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm *regulation* is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" 597 U.S., at 17 (citation omitted) (emphasis added).

659.    To overcome this presumption, "the government must demonstrate that *the regulation* is consistent with the Nation's historical tradition of firearm regulation." *Ibid* (emphasis added).

> "The presumption against *restrictions* on keeping and bearing firearms is a central feature of the Second Amendment.  That Amendment does not merely narrow the Government's *regulatory power*.  It is a barrier, placing the right to keep and bear arms off limits to the Government." (emphasis added)

660.    The U.S. Supreme Court has "repeatedly compared" the protections afforded the Second Amendment to that of the freedom of speech in the First Amendment. *See*, e.g., *Heller*, 554 U.S., at 582, 595, 606, 618, 634-635.

661.    Defendants declared Mr. Bowman's Second Amendment rights extinguished <u>via "Press Release"</u> on July 18, 2025, by declaring him in violation of criminal laws following NYS Police investigations, as and through an official, public act that invoked and continues to

invoke the power and position of the Office of the New York Attorney General and the New York State Police to the deprivation of the civil rights of Mr. Bowman.

662.    Mr. Bowman is living under an anvil of criminal charges and a conviction, which, if the Defendants pursue, will result in a legal cascade of losses, including making him a disqualified person at federal law.   Such a legal status would permanently extinguish his fundamental Second Amendment rights, terminate his federal license, terminate his state licenses for his person and his business, and render him unable to own, possess, or use a firearm.   This would be a catastrophic and particularly unjust legal outcome for a man who has lived the life Mr. Bowman has lived.

663.    Mr. Bowman has every reason to believe that the Defendants will enforce the laws against him, particularly if he continues to speak out about the constitutional infringements he has suffered, continues to ask questions about the new laws, and pursues this case in a good faith effort to stop and reform Defendants' conduct.

664.    This nation's history and tradition do not allow a state government official to strip an ordinary law-abiding American of his fundamental Second and Fourteenth Amendment civil rights through a "Press Release."   The American system of governance has and does require due process of law to convert an ordinary, law-abiding citizen into a federally-disqualified person under 18 U.S.C. §922(g).   The conviction of Mr. Bowman by NY Attorney General Letitia James via "press release" and resultant media coverage is not "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S., at 24.   A "press release" is neither law, regulation, nor any other legislatively-enacted or agency-adopted restriction.   In this case, however, the "press release" was precisely the process and the punishment chosen by NY Attorney General Letitia James and her Assistant NY Attorneys General on July 18,

2025 for Mr. Bowman and Bowman's Gun Shop, as a culmination of Defendants' actions taken against Plaintiffs, as described herein.

665. The method of "guilt by press conference" is deployed so regularly by the NY Attorney General Letitia James that it is part of her public reputation. Fed. R. Civ. P. 404.

666. The government bans in *Heller* and *McDonald* did not require the nation's high court to define what process would be required for a deprivation of individual Second Amendment rights. So, too, is the "conscience-shocking" behavior of Defendants "in a constitutional sense" against Mr. Bowman and Bowman's Gun Shop to terminate his Second Amendment rights as an individual, a licensee, a business owner, and, through him, the derivative rights of the his customers. Quotations from *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d. Cir. 1995).

667. Defendants also declared Mr. Bowman's Second Amendment rights extinguished <u>via an e-mail attachment during extra-judicial activities</u> conducted through direct contact with Mr. Bowman in 2024, by "finding" him in "violation" of criminal laws part of NY GBL §875, following an "investigation," and asking him to stipulate to extinguish his own rights, under color of state law through a series of official acts, invoking the power of the New York Attorney General Letitia James and her Assistant NY Attorneys General.

668. The method of extra-judicial subpoenas and the "Assurance" document was and is being deployed by NY Attorney General Letitia James and her NY Assistant Attorney General Martha Grieco against Plaintiffs and other licensed dealers.

669. The NYS Police drop-ins, the "checklists," the extra-judicial subpoenas, the "Assurance" document, and now the "Press Release" and its resultant publicity have had a strong, negative impact on the New York State industry of state and federally-licensed dealers in firearms.

670. The new laws, coupled with the tactics of Defendants detailed herein, are driving law-abiding, licensed dealers in firearms to close. To date, more than Three Hundred Fifty (350) federally-licensed dealers in firearms with business premises in New York have surrendered or otherwise not renewed their federal license. That is a decline of 19% of those who were licensed as of May 2022, the last 30-day period prior to the new laws being signed into effect. See ATF large datasets at https://www.atf.gov/firearms/listing-federal-firearms-licensees.

671. FFL closures are derivatively depriving their customers of their ability to exercise their core Second Amendment rights in New York. *Gazzola*, 88 F.4th, at 194.

672. Over the course of the three years since the new laws were passed and federally-licensed dealers with business premises in New York started closing, Plaintiffs' routine customer base has expanded from a one-hour radius, steadily, into a three-hour-plus radius.

673. This nation's history and tradition do not allow a state government official to strip an ordinary law-abiding American of his fundamental Second and Fourteenth Amendment civil rights through the extra-judicial stroke of an executive pen. The conviction of Mr. Bowman via e-mail attachment document titled "Assurance" by Defendant New York Attorney General Letitia James and her Assistant NY Attorney General Martha Grieco is not "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S., at 24.

674. Through the "Press Release," the NY Attorney General and Assistant NY Attorneys General declared Mr. Bowman's Second Amendment rights extinguished, using several incorrect and non-existing legal theories, including (1.) application of NY GBL §875 *ex post facto*, for events years prior to the effective date of the statute.

675. This nation's history and tradition do not allow a state government official to strip an ordinary law-abiding American of his fundamental Second and Fourteenth Amendment civil

rights through such incorrect and unavailable legal methods. "The *ex post facto* prohibition forbids the Congress and the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (citations omitted, dating to 1798). The conviction of Mr. Bowman via "Press Release" for, *arguendo*, events that occurred years prior to the new laws at NY GBL §875 (2022) and NY GBL §898 (as amended, 2021) is not "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S., at 24.

676. Defendants declared Mr. Bowman's Second Amendment rights extinguished by declaring him in violation of criminal laws (2.) <u>not within the jurisdiction of their offices</u>, whether under a federal law or regulation, or, under a state law that conferred no authority or jurisdiction, be it NY PEN §400.00, NY PEN §265.00, NY GBL §875, or NY EXE §63(3), and whether that be through actual lack of authority or jurisdiction or lack of request by the Superintendent to the NY Attorney General under NY EXE §63(3).

677. "Dual sovereignty" defines that every citizen of the United States is also a citizen of a State or territory. "He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both… That either or both may (if they see fit) punish such an offender, cannot be doubted." *U.S. v. Wheeler*, 435 U.S. 313, 317 (1978), citing *Moore v. Illinois*, 14 How. 13, 19-20 (1857).

678. The United States Attorney General is the head of the U.S. Department of Justice. 28 U.S.C. §503. "Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor,

is reserved to officers of the [U.S.] Department of Justice, under the direction of the [U.S.] Attorney General." 28 U.S.C. §516.

679. None of the Defendants named herein have jurisdiction or authority to pursue the BATFE-conferred and administered federal license of Plaintiffs, whether through "investigation," "prosecution," "press release," or extra-judicial activities.

680. This nation's history and tradition do not allow a state government official to strip an ordinary law-abiding American of his fundamental Second and Fourteenth Amendment civil rights (3.) <u>outside and otherwise without the Constitutional and/or statutory authority and jurisdiction over the individual</u>. The conviction of Mr. Bowman via "Press Release" for, *arguendo*, events related to federal law or regulations is not "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S., at 24.

681. This nation's history and tradition do not allow a state government official to strip an ordinary law-abiding American of his fundamental Second and Fourteenth Amendment civil rights outside the jurisdiction of the state prosecutor's office, including where lacking referral from the Superintendent of NYS Police to the NY Attorney General under NY EXE §63(3), as not being "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S., at 24.

682. Defendants declared Mr. Bowman's Second Amendment rights extinguished by declaring him in violation of criminal laws without due process of law, which, by definition for a criminal charge, occurs in a court of competent jurisdiction, not in the shadow cast by an Assistant NY Attorney General, such as Ms. Grieco, usurping the judicial due process and its "full panoply of protections that we otherwise afford to criminal defendants." *Mexicano*, 602 U.S., at 300, Thomas, J., concurring. "The Constitution deals with substance, not shadows." *Gazzola*,

88 F.4th, at 196 (citations omitted). "This Court has confronted State attempts to evade federal constitutional commands before, including schemes that forced parties to expose themselves to catastrophic liability as state-court defendants in order to assert their rights." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 65 (2021), Sotomayor, J., concurring in part, dissenting in part.

683.    This nation's history and tradition do not allow a state government official to strip an ordinary law-abiding American of his fundamental Second and Fourteenth Amendment civil rights through schemes outside of the jurisdiction of the state office. This is not "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S., at 24.

684.    Defendants declared Mr. Bowman's Second Amendment rights extinguished, including (4.) via "checklist" of the New York State Police, which involves no discernable process, nor jurisdiction or authority, at all.

685.    This nation's history and tradition do not allow a state government official to strip an ordinary law-abiding American of his fundamental Second and Fourteenth Amendment civil rights using a "Yes/No" checklist in the form of a survey, under the guise of "educational materials," while the licensee wasn't present, and the NYS Police Officers said, "I don't know" in response to any questions asked. That, most assuredly, is not "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S., at 24.

686.    Defendants have demonstrated their intentions to terminate the Second Amendment rights of Mr. Bowman by turning him into a disqualified person, as that term is defined at federal law. 18 U.S.C. §922(g). This will trigger a legal cascade that will terminate multiple federal and state licenses, and would eliminate his fundamental right to self-defense with a concealed carry firearm and drill down even to his ability to hunt as part of providing food for his family.

687. Mr. Bowman and Bowman's Gun Shop are suffering as a direct result of the deprivation of their rights by Defendants under the Second Amendment to the U.S. Constitution, as guaranteed through the Fourteenth Amendment, in violation of 42 U.S.C. §1983. Plaintiffs will, unless awarded judicial relief, continue to suffer due to the on-going actions of Defendants, as taken under color of state law. Plaintiffs are entitled to the preliminary and permanent injunctive relief against such laws, customs, policies, and practices of the Defendants as detailed, herein.

## CAUSE OF ACTION III:

## 42 U.S.C. §1983 – FIRST AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

688. Plaintiff repeats and realleges all previously pleaded allegations, above.

689. The First Amendment to the U.S. Constitution protects that "Congress shall make no law … abridging the freedom of speech…" U.S. Const., amend. I. ("Free Speech Clause," herein.)

690. The First Amendment, through the Fourteenth Amendment Equal Protection Clause, is incorporated against infringement by the States. U.S. Const., amend. XIV, §1; *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802 (2019); *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

691. ""If there is any fixed star in our constitutional constellation, it is the principle that the government may not interfere with "an uninhibited marketplace of ideas."" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (citations omitted).

692. "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002).

693. In *National Institute for Family and Life Advocates v. James*, the NY Attorney General, Letitia James, in her official capacity, as well as her officers, agents, employees, attorneys, and all persons in active concert or participation with her who receive actual notice were permanently enjoined from enforcing NY GBL, art. 22-A, §§349/350 and NY EXE §63(12) against plaintiffs for making public statements about abortion pill reversal to "further the societal interest in the fullest possible dissemination of information." 746 F.Supp.3d 100, 123 (W.D.N.Y., 2024), citing *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. 557, 561-62 (1980).

694. "Political speech, because it is essential to a free and democratic society, enjoys the greatest constitutional protection." *Burson v. Freeman*, 504 U.S. 191, 198 (1992).

695. "From 1791 to the present, "the First Amendment has permitted restrictions upon the content of speech in a few limited areas" – including obscenity, defamation, fraud, and incitement." *Rahimi*, 602 U.S., at 716, Kavanaugh, J., concurring, citing *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quotation marks omitted).

696. Speech concerning the Second Amendment is not among those limited areas of potentially permitted restrictions upon speech.

697. "A government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Natl Rifle Assn. of America v. Vullo*, 602 U.S. 175, 177 (2024).

698. "Generally, too, the government may not compel a person to speak its own preferred messages." *303 Creative*, 600 U.S., at 586, citing *Tinker v. Des Moines Indp. Comm School Dist.*, 393 U.S. 503, 505-506 (1969) (addl citations omitted).

699.    Citizens, such as Plaintiffs, and as described herein, have a First Amendment right to ask questions, in good faith, about laws, appropriately directed to a government official, with a reasonable expectation of an answer – not that the question will result in obstruction and censorship.

700.    At the same time, citizens, such as Plaintiffs, have a First Amendment right to speak about laws, bills, politicians, public officials, and the creation, advancement, enactment, amendment, and repeal of laws, whether in support of or in opposition or simple discussion or public education and the government of that law may not obstruct, chill, deter, or retaliate against that political speech.

701.    When the government restricts speech under the First Amendment, as when the government restricts the Second Amendment, "the Government bears the burden of proving the constitutionality of its actions." *Bruen*, 597 U.S., at 24, quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000).

702.    For both the First and the Second Amendments, the government's burden is "to show that a type of speech belongs to a "historic and traditional categor[y]" of constitutionally unprotected speech "long familiar to the bar" (internal quotation marks omitted)." *Bruen*, 597 U.S., at 25.

703.    The nation's high court makes no exception from the guarantees of freedom of expression for speech concerning and related to the Second Amendment of the U.S. Constitution.  Speech concerning the Second Amendment should be treated as "speech unconditionally guaranteed." *Bantam Books v. Sullivan*, 372 U.S. at 66.

704.    It is not a thin line that distinguishes speech relating to the Second Amendment and speech that is arguably prohibited as "endangering the foundations of organized government and

threatening its overthrow by unlawful means." *Gitlow v. People of the State of New York*, 268 U.S. 652, 667 (1925).

705.    A government office or agency cannot obstruct citizen inquiry, as Defendants have done and are doing to Plaintiffs herein, through practices, policies, and actions universally stating, "I don't know" to censor undesirable speech and expose citizens to potentially unlawful activity through ignorance.

706.    The First Amendment, which applies to restrict Defendants by operation of the Fourteenth Amendment, secures Plaintiffs' right to free speech, including the right to express viewpoints and political beliefs regarding the Second Amendment.

707.    Defendants violated Mr. Bowman's First Amendment Free Speech Clause rights, as guaranteed to him against state actors through the Fourteenth Amendment Equal Protection Clause, for punishing and suppressing his pro-Second Amendment viewpoint and core political speech, and did so under color of state law.

708.    Mr. Bowman has a lifelong history of First Amendment speech and expression advancing the Second Amendment rights of himself and all Americans, and including New Yorkers.

709.    Mr. Bowman has a First Amendment right to freely engage in speech concerning the Second Amendment and everything about it, including its core functions; its history; protection of it and all civil rights against enemies foreign and domestic through lawful means, including through service in the U.S. Armed Forces; the Second Amendment rights of Americans in the global context of restrictions against the right to bear arms in nations abroad, including Iraq; the laws and regulations of governments relating to and the exercise of it by the individual, including the federal and state governments, in comparison, and in contrast; the derivative

rights and responsibilities of dealers in firearms on behalf of customers; and the discussions between dealers and customers, the community, and the greater public-at-large.

710. Mr. Bowman has a First Amendment right to freely engage in speech, including speech towards the government that may be interpreted as speech against it, such as asking government officials questions about laws and regulations, bills, proposed legislation and legislative amendments, legislative processes, executive policies and procedures, and failures by government officials to perform their own responsibilities in accordance with the law.

711. Mr. Bowman has a First Amendment right to freely engage in speech, including with and on behalf of his customers, at Bowman's Gun Shop, which necessarily includes speech concerning his regulation by and interaction with federal, state, county, and local government offices and agencies that grant, renew, and administer his licenses; and, necessarily includes speech concerning his customers' regulations and interactions with those same government actors to achieve the lawful exercise of Second Amendment rights, as guaranteed through the Fourteenth Amendment; as well as the preservation and protection of those fundamental rights in New York.

712. Mr. Bowman's questions about the new laws, specifically, and about the actions being taken by the Defendants against him under color of state law do not fail the original "clear and present danger" test of *Schenck v. United States*, 249 U.S. 47, 52 (1919). His words were not designed to "bring about the substantive evils that Congress has a right to prevent." *Id*.

713. "[F]reedoms of expression must be ringed about with adequate bulwarks," *Bantam Books v. Sullivan*, 372 U.S. 58, 66 (1963).

714. The Superintendent of the NYS Police was granted authority by the NYS Legislature to oversee certain operational mandates being imposed upon state-licensed dealers in firearms

with business premises in New York. The Superintendent was also given the opportunity to be part of the process, if he issued regulations by the effective date of the statute. The Superintendent chose not to, as a result of which the opportunity window closed. NY S.4970-A, §5.

715.   The Superintendent of the NYS Police waived the opportunity to engage in "inspections" of state-licensed dealers in firearms under NY GBL §875-g when he did not issue and promulgate public regulations for such function in a timely manner. NY S.4970-A, §5.

716.   NYSP Officers went to Bowman's Gun Shop in the knowing absence of the owner-operator and licensee for the stated purpose of dropping off "educational materials" about laws going into effect in "2027." They repeatedly reassured Mr. Bowman's adult son, Tyler, that they were not there to "shut you guys down," that they did not know how the "checklist" would be evaluated; and failed to respond substantively to relevant questions posed, as detailed herein.

717.   The NYSP Officers did not conduct an "investigation" in any sense of that word, or, within any sense of what was intended by the language of NY GBL §875, and, specifically, §875-g(2)(b).

718.   The actions of Defendants, in relation to Plaintiffs and other state-licensed dealers, is part of a statewide scheme, under the direction of the Superintendent, including Officers from the "Joint Terrorism Task Force" and the "Counter Terrorism Unit," whether in uniform or plain clothes, whether one or more at a time, with varying formats of "checklists," who go on-site to a state-licensed dealer in firearms, stand at the counter for a few minutes, recite a script of ignorance, feign a need for help carrying out the responsibilities of their assignment, ask questions of state-licensed dealers such as Plaintiffs, refuse to answer questions about the new laws, check boxes on a form, and meet quotas of uploads of checked boxes into a one-way

electronic portal, with no subsequent communication to the subject dealer. The charade is a display of force, statewide, to intimidate, bully, frighten, coerce, and harass state-licensed dealers in firearms, such as Plaintiffs, into submission to the point of closure of business operations and the surrender of the state license as a dealer in firearms and/or gunsmith.

719. The actions of Defendants, in relationship to Plaintiffs and other state-licensed dealers in firearms, extends through the dealers to the customers, to stop them from saying or doing anything in the way of speech concerning the new laws and the impact of those laws on their ability to exercise their Second Amendment rights for core purposes such as the purchase of firearms and ammunition and the maintenance of those arms in good working order. The Defendant NYSP Officers, as part of their practices as "investigations" with "checklists" including those three who went on-site to Bowman's Gun Shop, appear during regular business hours of the business, in the presence, eye gaze, and ear shot of customers (whether known or strangers), asking questions, including about the security operations of the gun shop, in a manner designed to stage their presence as enforcers of the law.

720. The success of the exhibition of power of Defendants against Plaintiffs, state-licensed dealers, and individual customers, is evidenced through the significant, consistent, and continuing closure of state and federally-licensed dealers in firearms across the State of New York since June 2022, and the pressure now upon Plaintiffs to do the same.

721. Other Officers and employees of the NYS Police who were attempted to be contacted by telephone at the published number of the NYS Police website by Mr. Bowman also did not answer his questions about NY GBL §875.

722. The NYS Police universally adopted "I don't know" as their response to questions of Plaintiffs and state-licensed dealers in firearms, including refusing to give their name when so

requested on their "800" number, giving instead "operator #326" and "operator #301" and similar numbers.

723. The New York Attorney General was given no express statutory authority under the new laws, specifically, NY GBL §875.

724. The Assistant NY Attorneys General named herein, and particularly Ms. Grieco in her repeated, direct interaction with Mr. Bowman via telephone, in person, via e-mail, and via text messaging, did not respond to the substantive questions asked by Mr. Bowman, whether about new laws, extra-judicial subpoenas and "Assurance" documents, processes, rights, and options.

725. The Defendant NY Attorneys General designed their approach to Plaintiffs and other state-licensed dealers to threaten, coerce, and intimidate the speech of Plaintiffs, specifically, state-licensed dealers, generally, and individual customers, as well.

726. Instead of adhering to the new law, as proscribed by the NYS Legislature, the NY Attorney General and her Assistant NY Attorneys General, in conjunction with the NYS Police, devised a scheme as detailed herein to dispatch officers of the NYS Police to engage in direct contact with state-licensed dealers on site at business premises (with or without the licensee present); to have the Officers make false, misleading, or otherwise grossly negligent representations of law and do so under the disguise of "education;" to then transmit "checklist" responses to the NY Attorney General; for the NY Attorney General to then commence a clandestine and unauthorized "investigation" into the state-licensed dealer; to issue extra-judicial subpoenas in lieu of a potentially lawful executive action against the dealer; which scheme then sought to silence the dealer from speaking of the Office of the Attorney General or the law and its application under threat of reprisal; and, when that didn't silence the dealer, to amplify the threats and coercion by issuing an official government press release containing false facts about

the dealer and commencing a special proceeding against him on a legally-improper basis to coerce his silence, the loss of his individual and business licenses, the loss of his business and livelihood, and the threat of the loss of his status as a federally non-disqualified person.

727.    Defendant NY Attorneys General sought to silence Mr. Bowman, through an intentional pattern of conduct, including, as detailed herein, deployment of multiple attorneys in person and asking questions of him during a multi-hour interrogation, repeatedly requesting his silence, dissuading him from consulting with or obtaining legal representation, and pursuing him to waive his rights in writing threatening him with further penalties were he to speak of it after signing.

728.    Defendant NY Attorneys General and Ms. Grieco, specifically, in the absence of a government-initiated judicial review, treated Mr. Bowman as if they had authority under the Patriot Act and could subject him to nondisclosure orders modeled after the infamous National Security Letters at 18 U.S.C. §§2709, 3511. The language used by Ms. Grieco in her "Assurance" document she repeatedly requested Mr. Bowman to sign runs perilously close to NSL letters prohibiting a company from "disclosing to any person that the FBI has sought or obtained access to information or records." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 865 (2d Cir. 2008). There was no basis in state law to do so.

729.    New York Attorney General Letitia James and her group of Assistant NY Attorneys General then gathered their forces and wielded their power in a penultimate demonstration of what happens to those like Mr. Bowman who do not succumb to their demands: they unleashed the power of the second most powerful position in the State of New York via "Press Release" against a private individual with a private business, without warning, in a 5-page, single-spaced document filled with false facts and misrepresentations of law disseminated to the media,

published locally to internationally. Defendants' aim was to defame Mr. Bowman in his profession, licensed profession, and/or trade, to drive away business, to put him out-of-business, and to turn him into a disqualified person in order to strip him of his fundamental Second Amendment rights.

730. "The power that a government official wields, while certainly not dispositive, is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive. (citation omitted) Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel to disregard a directive from the official." *Vullo*, 602 U.S., at 191-192.

731. There is no higher ranking state-level prosecutor in New York at all times herein than Letitia James. The "Press Release" bears the official seal of her office, her name, her title, a quotation from her, and the names of individual Assistant Attorneys General who correspond to counsel of record in litigation involving Plaintiffs. Since the new laws went into effect, it is the NY Attorney General who Mr. Bowman and other state-licensed dealers have feared because of her well-known reputation for public discrimination and bullying of those whose political viewpoint she intends to eliminate, using the power of her office.

732. The scheme, deployed by Defendants against Mr. Bowman and Bowman's Gun Shop violated the First Amendment rights of Plaintiffs, which requires any potential limitation by the State of freedom of expression "conform to procedures that will ensure against the curtailment of constitutionally protected expression." *Bantam Books*, 372 U.S. at 66.

733. Defendants "deliberately set out to achieve the suppression" of speech deemed offensive to political and personal aims and ambitions through their scheme. Quoted reference to *Bantam Books*, 372 U.S. at 67.

734. A passage from *Bantam Books*, 372 U.S. at 69-70 well describes the scheme deployed by

Defendants:

> "Herein lies the vice of the system. The Commission's operation is a form of effective state regulation superimposed upon the State's criminal regulation of obscenity and making such regulation largely unnecessary. In thus obviating the need to employ criminal sanctions, the State has at the same time eliminated the safeguards of the criminal process. Criminal sanctions may be applied only after a determination of obscenity has been made in a criminal trial hedged about with the procedural safeguards of the criminal process. The Commission's practice is in striking contrast, in that it provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter. It is a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law."

735. It is precisely Mr. Bowman's questions about the new laws that is the evidence of his lack

of *scienter* under the new laws that would be required for a conviction under NY GBL §875-i,

a statute that requires a dealer "knowingly" violate the law. Mr. Bowman's manner of

expression must be protected, lest Defendants continue to use, *inter alia*, a "Press Release" and

extra-judicial actions in lieu of substantively answering questions.

736. Mr. Bowman's speech concerning the new laws, in particular, as asked by himself directly

to the NYS Police, and asked by his son to the NYS Police, and by himself directly to Assistant

NY Attorney General Grieco, and through his state court case to quash Ms. Grieco's extra-

judicial subpoenas, must be most ardently protected speech, for those words are evidence of

his intention and desire to comply with the laws as written and/or to otherwise through lawful

means seek redress of his grievances against the new laws through, for example, a civil court

proceeding, and those expressions are evidence in admissible form that would defeat a criminal

charge against him under NY GBL §875 or a general nuisance suit against him as combined

with NY GBL §898 and met with the PLCAA affirmative defense.

737. Had Mr. Bowman signed the "Assurance" document put to him by Ms. Grieco and had he adhered to its terms, including paragraph #21, Mr. Bowman's voice would have been silenced forever under threat of additional, adverse legal repercussions by those who should, instead, have answered his questions and assisted his intended compliance.

738. Mr. Bowman and Bowman's Gun Shop are suffering as a direct result of the deprivation of their rights by Defendants under the First Amendment to the U.S. Constitution, as guaranteed through the Fourteenth Amendment, in violation of 42 U.S.C. §1983. Plaintiffs will, unless awarded judicial relief, continue to suffer due to the on-going actions of Defendants, as taken under color of state law. Plaintiffs are entitled to the preliminary and permanent injunctive relief against such laws, customs, policies, and practices of the Defendants, as detailed herein.

**CAUSE OF ACTION IV:**

**42 U.S.C. §1983 – FOURTEENTH AMENDMENT DUE PROCESS CLAUSE – PROCEDURE DUE FOR THE SECOND AND FIRST AMENDMENT DEPRIVATION OF CIVIL RIGHTS**

739. Plaintiff repeats and realleges all previously pleaded allegations, above, as if set forth, herein.

740. The United States Constitution provides that "No State shall…deprive any person of life, liberty, or property, without due process of law…" U.S. Const. amend. XIV, §1.

741. New York State Constitution similarly provides that "No person shall be deprived of life, liberty or property without due process of law." N.Y. Const. art. 1, §6.

742. "[M]ost of the provisions of the Bill of Rights are procedural, for it is procedure that marks much of the difference between rule of law and rule by fiat." *Wisconsin v. Constantineau*, 400 U.S. 433, 436 (1971).

743.　The touchstone of due process is "the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" *Matthews v. Eldridge*, 424 U.S. 319, 348-49 (1976), quoting *Joint Anti-Fascist Comm. V. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring).

744.　"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *BMW of N. Amer. v. Gore*, 517 U.S. 559, n.19 (1996), citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

745.　"The 'timing and nature of the required hearing will depend on appropriate accommodation of the competing interests involved.'" *Krimstock v. Kelly*, 306 F.3d 40, 51-52 (2d Cir. 2002), quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1981).

746.　"In determining how much process is due, a court must weigh (1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the value of other safeguards, and (3) the government's interests." *Matthews*, 424 U.S., at 335.

747.　On an individual level, an individual's "'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'" *Constantineau*, 400 U.S., at 437, quoting *Joint Anti-Fascist Refugee Comm. V. McGrath*, 341 U.S., at 168 (Frankfurter, J., concurring).

748.　On an individual level, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Constantineau*, *id*.

749.　As a matter of a protected property interest, "once the government has granted a business license to an individual, the government cannot "depriv[e] [the individual of] such an

interest…without appropriate procedural safeguards." *Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009), quoting *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974) (Powell, J., concurring in part).

750. Once the government has granted a business license to an individual, "their continued possession may become essential in the pursuit of a livelihood." *Spinelli*, *ibid.*, quoting *Bell v. Burson*, 402 U.S. 535, 539 (1971).

751. As detailed herein, Mr. Bowman wants and intends to continue to exercise his First and Second Amendment civil rights on a daily basis, as an individual, as a state and federally-licensed dealer in firearms, and, derivatively on behalf of his customers.

752. As described herein, Mr. Bowman wants and intends to continue to own, possess, and use firearms and ammunition, as an individual, as a business owner-operator and gunsmith, and with customers and members of his community.

753. Defendants had multiple, legal, statutory pathways available as described herein, including, through civil legal processes under NY PEN §400.00 in relation to Plaintiffs' state-issued licenses.

754. Defendants had multiple, legal, statutory pathways available as described herein, including, through criminal legal processes under NY GBL §875-i and NY PEN §265.00 with respect to operational compliance mandates and performance compliance mandates.

755. The Defendant Superintendent of NYS Police could have chosen to accept the NYS Legislature's offering to issue tailored regulations, *inter alia*, the regulations for NY GBL §875-g by December 5, 2022; could have authorized an Officer to conduct an "inspection" under NY GBL §875-g under such regulations (if timely issued); could have set up policies

and training for Officers to conduct an "inspection" and assess the probable cause for a chargeable misdemeanor(s) under NY GBL §875-i; and, could have set up policies and training for Officers on referral to a county district attorney through NY CNT §700 or through the Superintendent to the state attorney general through NY EXE §63(3). The Defendant Superintendent of the NYS Police did not choose this path. It was not available to the NY Attorney General or her Office, as a result.

756. Similarly, if probable cause was thought to exist that a crime(s) was being committed under NY PEN §265.00, the NYS Police could have applied for a judicial search warrant; executed upon it if granted; evaluated the subject, witnesses, and evidence; worked with a county district attorney under NY CNT §700 or transmitted a written invitation by the NYS Police Superintendent to the NY Attorney General under NY EXE §63(3). The Defendant Superintendent of the NYS Police did not choose this path. It was not available to the NY Attorney General or her Office, as a result.

757. The NY Attorney General and the Assistant NY Attorneys General have taken every opportunity directly at Mr. Bowman, through his counsel, within judicial proceedings, and through the "Press Release" and the media to avoid and evade the adversarial process and judicial oversight.

758. Instead, Defendants, collectively, chose to infringe upon the Plaintiffs' civil rights without due process of law, and to do so under color of state law.

759. The enforcement mechanism selected by Defendant Attorney General Letitia James and her Assistant NY Attorneys General involved no due process at all. The "Press Release" of July 18, 2025 with its 'gotcha!' headline, sensationalism, bombast, and linguistic assuredness of widespread broadcast achieved by baiting media outlets throughout New York, the United

States, and internationally to reproduce the press release in whole or in part, further spinning the words into their own click-bait.

760. Defendants deprived Mr. Bowman of his constitutional rights of due process as relates to Defendants' conduct as set forth herein, including: (1.) an "inspection" in the name of NY GBL §875-g with a secret "checklist" of findings of guilt; (2.) the NY AGO conduct of extra-judicial subpoenas and an "Assurance" document with findings of guilt and penalties under the guise of NY GBL §875; (3.) the NY AGO conduct of the proceedings during *Bowman I* purportedly under NY EXE §63(12), NY GBL §898, and NY GBL §875 with accusations of criminal conduct, demands for penalties, and multiple demands for expedited proceedings; (4.) the NY AGO conduct of the proceedings during *Bowman II* purportedly under NY EXE §63(12), NY GBL §898, and NY GBL §875 with accusations of criminal conduct, demands for penalties, and multiple demands for expedited proceedings; and, (5.) the "Press Release" of July 18, 2025 bearing false facts and legal fictions.

761. At every opportunity, Defendants deprived Mr. Bowman of his constitutional rights of due process as set forth herein, including: (1.) obstruction of Mr. Bowman's right to be heard; (2.) by insisting to get on set to Bowman's Gun Shop in the absence of deadline or emergency; (3.) by creating an atmosphere – both in and out of the courtroom – of chaos and exigency in the absence of emergency, whilst bouncing legal activities amongst multiple, concurrent Assistant NY Attorneys General as named herein; (4.) by refusing or otherwise ignoring questions of Mr. Bowman; (5.) by making repeated reassurances that legal representation was unnecessary; (6.) by hiding from Mr. Bowman was he and his business were the subject of an active and on-going investigation that could have criminal consequences that would permanently infringe his Second Amendment and other valuable civil rights; (7.) by repeatedly

asking Mr. Bowman to sign a legal document without benefit of counsel but containing false statements that Mr. Bowman had been represented; (8.) by repeatedly asking Mr. Bowman to sign a legal document that would have stripped him of valuable civil rights without legal recourse, including, but not limited to, his right to a hearing, to learn the charges against him, to be presented with and confront witnesses and evidence against him, to compel the NY AGO to establish his guilt beyond a reasonable doubt, to have a judge or jury of his peers adjudicate the evidence and make a ruling based upon the facts and the law, and to have rights of appeal; (9.) by subjecting him to a Cross-Petition (Bowman I) and a Petition (Bowman II) in the form of special proceedings without even basic rights within a civil proceeding such as discovery and a hearing; and, (10.) by subjecting him to multiple "orders to show cause" and comparable requests for "expedited proceedings" where neither factual nor legal emergency circumstances when presented.

762.    Public shaming of an individual without the proper procedural safeguards of a hearing renders the criminal process a "sham." *Bursac v. Suozzi*, 868 N.Y.S.2d 470, 470 (Sup. Ct. Nassau County 2008).

763.    Furthermore, the New York Attorney General and the Assistant NY Attorneys General have intentionally sought to shift the burden of proof from that of the State to prove guilt of criminal conduct beyond a reasonable doubt to forcing Mr. Bowman to prove his innocence in the courtroom of the press and public opinion.

764.    The Assistant NY Attorney General Ms. Grieco used an extra-judicial activity to attempt to issue findings and fact and conclusions of law in the manner of a judge against Plaintiffs, then intentionally withheld the "Assurance" document issued by her to Plaintiffs from state and federal courts.

765.    The Assistant NY Attorney General Ms. Grieco used an extra-judicial activity to attempt to issue punishments not available at law against Plaintiffs, then intentionally withheld the "Assurance" document issued by her to Plaintiffs from her from the state and federal courts.

766.    Defendants are seeking to transfer or otherwise deflect blame off of themselves and onto Mr. Bowman for the Defendants' own failures to perform the legal responsibilities of their offices in a timely and competent manner, particularly as concerns the 2020 burglary committed at Bowman's Gun Shop.

767.    Defendants are seeking to transfer or otherwise deflect blame off of themselves and onto Mr. Bowman for the Defendants' own failures to perform the legal responsibilities of their offices in a timely and competent manner, particularly as concerns the firearms stolen in 2020 and not recovered and not restored to the inventory of Bowman's gun shop, including multiple separate communications made from third-party law enforcement offices only to the Defendant NYS Police and neither communicated to Mr. Bowman, the BATFE, the FBI, and/or the U.S. Army investigators and prosecutors.

768.    Defendants are seeking to exercise power beyond the limits of their state power concerning federal laws and regulations, including all allegations made against Mr. Bowman and Bowman's Gun Shop as relates to the federal requirements of a federally-licensed dealer in firearms for routine inspections by the ATF, for routine inventory reconciliation with and by the ATF, for individual A&D Book entries following a theft or loss reporting to the ATF, for inventory reconciliation with and by the ATF following a theft or loss reporting, and for individual A&D Book entries made under the advisement of and in conjunction with the ATF.

769. Defendants are seeking to exercise power beyond the limits of their state power concerning anything having to do with a state-licensed dealer in firearms prior to December 5, 2022, prior to which date no compliance mandates existed at state law or regulation.

770. It is the exclusive domain of the legislature elected by the people to determine what form of punishment to levy for specific crimes, and therefore even a sentencing court is without authority to impose other forms of punishment "not authorized by statute." *People v. Letterlough*, 665 N.E. 2d 146, 150 (N.Y. 1995).

771. "The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."" *Bruen*, 597 U.S., at 70, citing *McDonald*, 561 U.S., at 780.

772. Second Amendment standards must "[accord] with how we protect other constitutional rights." *Bruen*, 597 U.S., at 24.

773. Mr. Bowman and Bowman's Gun Shop are suffering as a direct result of the deprivation of their rights under the Fourteenth Amendment Due Process Clause to the U.S. Constitution, as guaranteed through the Fourteenth Amendment Equal Protection Clause to protect from unjust deprivation of their First and Second Amendment rights, in violation of 42 U.S.C. §1983. Plaintiffs will, unless they are awarded judicial relief, continue to suffer due to the on-going actions of Defendants, as taken under color of state law. Plaintiffs are entitled to the preliminary and permanent injunctive relief against such laws, customs, policies, and practices of the Defendants, as detailed herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that judgment be entered in their favor and against Defendants, as follows:

I. Declare that Defendants New York Attorney General Letitia James and the Office of the NY Attorney General has committed Libel *Per Se* against Timothy Bowman and Bowman's Gun Shop, LLC;

II. Declare that Defendants violated the civil rights of Plaintiff, under the First, Second, and Fourteenth Amendments to the U.S. Constitution;

III. Award monetary damages to Plaintiffs as against Defendants;

IV. Award punitive damages to Plaintiffs as against Defendant New York Attorney General Letitia James and the Office of the New York Attorney General in an amount sufficient to impact and create meaningful change in the systemic and pervasive practices used by Defendants NY Attorneys General against Plaintiff and similar New York citizens in the lawful exercise and attempted exercise of their First Amendment and Second Amendment rights, as guaranteed to them through the Fourteenth Amendment of the U.S. Constitution, including through Defendants' use of a "Press Release" on July 18, 2025 against Plaintiffs;

V. Order of a permanent injunction against the NY Attorney General Letitia James and the Office of the NY Attorney General, in their official capacities, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them to be enjoined from further use and continued proliferation of the "Press Release" and "Petition" of July 18, 2025 at (1.) https://ag.ny.gov/press-release/2025/attorney-

169

general-james-sues-st-lawrence-county-gun-shop-violating-gun-safety and, (2.) https://ag.ny.gov/sites/default/files/court-filings/state-of-new-york-v-bowman-s-gun-shop-llc-timothy-bowman-complaint-2025.pdf;

VI. Order a written retraction of the "Press Release" of July 18, 2025 by New York Attorney General Letitia James and the Office of the NY Attorney General, as having been made in factual and legal error, said retraction to issue in the form of an official press release required to be pre-approved by the court and counsel and to be electronically posted to the preceding two webpages of the Office of the NY Attorney General *in lieu of* the "Press Release" of July 18, 2025, as well upon a fresh page, such uploads to remain posted, *en situ*, in perpetuity, and said written apology to be transmitted through the identical means and methods as were used on or about July 18, 2025 to deploy the defamatory "Press Release;"

VII. Order of a permanent injunction against NY Attorney General Letitia James and the Office of the NY Attorney General, in their official capacities, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, to be enjoined from prohibiting any additional, further, or different "trial publicity" concerning Timothy Bowman and Bowman's Gun Shop, LLC, as that term is defined by the NY Code of Professional Conduct, Rule 3.6;

VIII. Appointment of an independent monitor to the NY Attorney General Letitia James and the Office of the NY Attorney General in matters involving state-licensed dealers in firearms, including requirement of independent monitor certify in a writing to be affixed to all documents that commence a new action or proceeding that a *prima facie* cause of

action is established based upon evidence in admissible form and that no extra-judicial activities be so certified;

IX. A permanent injunction against the Superintendent of NYS Police and any other Defendant, in their official capacities, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, be enjoined from issuing regulations and, also, be enjoining enforcement of regulations (if any) that published after December 5, 2022 under or in relation to NY GBL §875-b(2), §875-e(3), §875-f, §875-g(1)(b), §875-g(2), and §875-h;

X. An order declaring that the challenged sections of the NY GBL, art. 39-BB, are unenforceable, unconstitutional, and violate the First, Second, and Fourteenth Amendments to the U.S. Constitution;

XI. A permanent injunction against the Superintendent of NYS Police and the New York Attorney General, in their official capacities, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcement under NY GBL §875-i based upon any "inspection" or other on-site visit conducted by any Officer of the NYS Police on or after December 5, 2022; and that all records of Defendants concerning any state or federally-licensed dealer in firearms or gunsmith be immediately transmitted to every such licensee to thereafter be purged or otherwise permanently sealed; and that all such records shall be otherwise deemed "inadmissible" in a court of law; and,

XII. An award of the costs of this lawsuit, including attorney's fees and costs, pursuant to 42 U.S.C. §1988; and,

XIII. Such other, further, and different relief as to the Court is just.

Dated:  October 6, 2025

Respectfully Submitted,

*Paloma A. Capanna*

Paloma A. Capanna, Attorney
N.Y. Bar Roll No. 2483469
106-B Professional Park Drive
Beaufort, North Carolina 28516
(252) 515-3676
pcapanna@yahoo.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 6, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

Dated:  October 6, 2025

*Paloma A. Capanna*
Paloma A. Capanna, Attorney